## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARISOL GOMEZ and IGNACIO OSORIO, | CASE NO. 1:15-cv-01489-AWI-BAM |
| Plaintiffs, | **ORDER GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| v. | |
| J. JACOBO FARM LABOR CONTRACTOR, INC. | (Doc. Nos. 108, 108-1) |
| Defendant. | |

# I. Introduction

In this lawsuit a farm labor contractor is being sued by two of its employees for violating California's wage-and-hour laws and the federal Migrant and Seasonal Agricultural Workers Protection Act of 1983 ("MAWPA"). The two employees are Plaintiffs Marisol Gomez and Ignacio Osorio (collectively "Plaintiffs"). The farm labor contractor is Defendant J. Jacobo Farm Labor Contractor, Inc., which is not to be confused with Javier Jacobo, who is the president of J. Jacobo Farm Labor Contractor Inc. For clarity, the Court will refer to J. Jacobo Farm Labor Contractor, Inc. as "Defendant," whereas the Court will refer to Javier Jacobo by his full name.

Before the Court is Plaintiffs' motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. See Doc. No. 108. For the reasons discussed herein, Plaintiffs' certification motion will be granted, in part, and denied, in part.

# II. Facts

According to the Court's review of the parties' briefs, exhibits, and prior filings on the docket, the facts for purposes of adjudicating the certification motion are as follows. See In re Hydrogen Peroxide Antitrust Litigation, 552 F.3d 305, 313 (3d Cir. 2008) ("Although the district court's findings for the purpose of class certification are conclusive on that topic, they do not bind the fact-finder on the merits.") (emphasis added).

Defendant is a farm labor contractor. This means that Defendant employs farm workers to work on farms that are owned by third-parties. The president of Defendant is Javier Jacobo.

At least 3,267 employees were employed by Defendant between December 20, 2011, and January 6, 2018. During that time, Defendant sent employees to work on seventy-seven different farms, although it is not clear to the Court which employees worked at each of the seventy-seven farms. On average, each of the 3,267 employees worked at 2.35 farms during the employee's course of employment with Defendant. The number of employees that worked at each of the farms varied from farm to farm. For example, two employees worked at the Bobby Salazars farm, eighty-four employees worked at the Hagopian Farms, one hundred seventy-seven employees worked at the Raghibir Bath farm, and four hundred ten employees worked at the Raymoles Dinuba Duke farm. Some of the employees worked as field workers. Some field workers did pruning, thinning, and picking; some picked grapes and olives; and some worked with blueberries.

Defendant placed each employee into one of its multiple work "crews." The work crews were led by a foreperson. Some forepersons took instructions from Defendant. Some employees worked with foreperson Baltazar Gonzalez, and some employees worked with Pedro Cisneros, and some employees do not remember which foreperson they worked with.[1] Beyond that, it is unclear to the Court the number of crews used by Defendant, the number and identities of Defendant's other forepersons, and the number and (with a few exceptions) identities of employees assigned to each crew and foreperson. It is also unclear to the Court whether and to what extent the employees transferred from crew to crew during the course of their employment.

Some forepersons did not strictly regulate when or how often or for how long the employees could take breaks. These forepersons allowed the employees in their crew to decide when to take breaks and the length of the breaks. For example, Plaintiff Marisol Gomez testified in her deposition that her foreperson told her to take breaks whenever she felt heat exhaustion or sick, and her foreperson never told her to not take breaks. See Doc. Nos. 91-2, 109-1. Gomez affirmed in her deposition that she was permitted to take breaks at work "at any time." Doc. No.

---

[1] Two other possible forepersons were "Juventino" and "Eladio," according to the deposition testimony of Plaintiff Marisol Gomez. See Doc. No. 91-2 at 21.

91-2 at 24.  Similarly, Plaintiff Ignacio Osorio testified in his deposition that he knew that lunch breaks were available to him and he was permitted to take rest breaks.  <u>See</u> Doc. No. 110-2.  The testimony from Osorio and Gomez harmonizes with the testimony of Javier Jacobo, the president of Defendant, who declared that Defendant "instructs it employees that they may take rest breaks whenever they would like and that they may take meal breaks whenever they would like."  Doc. No. 91-6.

It is not clear to the Court the number and identities of the forepersons who instructed their employees to take meal breaks and/or rest breaks whenever they wanted.  Similarly, it is not clear to the Court the number and identities of the forepersons, if any, who precluded their employees from taking meal breaks and/or rest breaks whenever they wanted or, alternatively, precluded their employees from taking meal breaks and/or rest breaks altogether.

With respect to meal breaks, some employees — and likely most employees — were provided with thirty-minute lunch breaks.  It is true that some employees declared — in boilerplate or "cookie-cutter" declarations[2] — that they "do not recall" having a thirty-minute meal break "scheduled" into their shift, including during the first five hours of their shift.  <u>See, e.g.</u>, Doc. Nos. 108-7, 108-8, 108-9.  Ignacio Osorio was one such employee who made such a declaration.  <u>See</u> Doc. No. 108-6.  But some employees, including Osorio himself and Marisol Gomez, knew that thirty-minute lunch breaks were available to them, and these employees regularly took the provided lunch breaks.  For example, despite Osorio's declaration suggesting otherwise, Osorio testified in his deposition that he knew that thirty-minute lunch breaks were

---

[2]  In support of the certification motion, Plaintiffs filed multiple declarations from individuals who were employed by Defendant.  Several of the declarations are largely identical in form and substance, strongly suggesting that they are boilerplate or cookie-cutter declarations apparently drafted by counsel.  <u>See, e.g.</u>, Doc. Nos 108-7, 108-8, 108-9, 108-10, 108-11, 108-12, 108-13.  As other courts have said, such cookie-cutter declarations "inspire less confidence than declarations more closely resembling the facts to which potential class members would actually testify at trial."  <u>Polanco v. Schneider Nat. Carriers, Inc.</u>, Case. No. 10-cv-4565, 2012 WL 10717265, at *14 (C.D. Cal. Apr. 25, 2012) (quoting <u>Espinoza v. Domino's Pizza, LLC</u>, Case No. 07-cv-1601, 2009 WL 882845, at *13 (C.D. Cal. Feb. 18, 2009); <u>see also</u> <u>In re Wells Fargo Home Mortg. Overtime Pay Litig.</u>, 527 F.Supp.2d 1053, 4060 (N.D. Cal.2007) (noting the "glaring reliability concerns" of similar declarations); <u>Silverman v. SmithKline Beecham Corp.</u>, Case No. 06-cv-7272, Case No. 07–cv-2601, 2007 WL 6344674, at *2 n.5 (C.D. Cal. Oct. 15, 2007) ("The Court strongly disapproves of the use of boilerplate attorney-drafted declarations.").  The reliability concerns are made more serious when portions of the declaration appear to be contradicted by the declarant's deposition testimony, which is the case here with Plaintiff Ignacio Osorio's declaration and deposition testimony.  <u>Cf.</u> Doc. No. 108-6 (Plaintiff Ignacio Osorio's declaration); Doc. No. 110-2 (Osorio's deposition testimony).

available to him and his fellow employees.  See Doc. No. 110-2.  Osorio testified that the lunch

breaks were available at "noon" or "noontime," and Osorio referred to these lunch breaks as

"noontime breaks."  Id.  Osorio testified that "it was an obligation to take a lunch break" and "it is

an order you have to take the 30 minutes."  Id.  More specifically, Osorio testified that the

foreperson would tell the employees, "Everybody go out" to take the lunch break.  Id.  Similarly,

Gomez testified in her deposition that thirty-minute lunch breaks were provided to her and her

fellow employees.  Gomez testified that her foreperson "always" told her to take lunch breaks.

Doc. No. 109-1.  Gomez testified that she would "always" take her lunch break at 10:00 a.m.  Doc.

No. 91-2 at 67.  Gomez testified that all employees in her crew took lunch breaks every day.  Id. at

70.  Gomez testified that she could take lunch breaks if she wanted to.  This testimony from

Gomez and Osorio harmonizes with the declaration of Javier Jacobo, who declared that Defendant

"instructs it employees that they may take rest breaks whenever they would like and that they may

take meal breaks whenever they would like."  Doc. No. 91-6.

Some employees believed that they could elect to take or not take their lunch break.  Some

— and likely most — employees always elected to take their lunch breaks, see Doc. No. 91-2 at

70 (Marisol Gomez testifying that "all" employees in her crew took lunch breaks "every day"),

whereas other employees elected to not take their lunch breaks.  Some employees could leave the

farm during their lunch break to get food if they had enough time to do so.  Some employees

would use the entire thirty-minute allotment of time on their lunch break, whereas other

employees would elect to spend only twenty or twenty-five minutes on their lunch break.  For

example, some employees would eat quickly so that they could get back to work and make more

money, and some employees believed that it was their decision whether to cut their lunch break

short to go back to work.

To the extent that an employee was not provided with or not permitted to take a thirty-

minute lunch break, the failure to provide or permit the lunch break was due to the employee's

particular foreperson or other unique variables, see, e.g., Doc. No. 110-2 (deposition of Ignacio

Osorio) ("Q. During the time that you worked for Jacobo you were still given a half-hour break for

lunch, weren't you?  A. So if it's by contract or piecework — we have the right to take the breaks.

It depended a lot on if we were getting out earlier, if we were staying late, it depended on the season, a lot depended on the climate."), but the failure was not due to Defendant's company-wide policies. Similarly, the timing of the employee's lunch break — i.e., when the lunch break occurred during the shift — appears to have been determined to some extent by unique variables, including the particular foreperson. For example, Osorio testified in his deposition that the timing of the lunch break "depends" because "each crew leader has a different schedule." Id.

With respect to rest breaks, some employees were provided with and permitted to take rest breaks throughout their shift. It is true that one employee, Antonio Mejia, declared that "[i]t was the practice of [Defendant] to not permit workers to take 10 minute rest breaks," Doc. No. 108-14, but Mejia's declaration is contradicted by significant evidence showing that many employees were permitted to take rest breaks during their shifts and did, in fact, take rest breaks. For example, in Mejia's own declaration, Mejia admits that he and his fellow employees took rest breaks. Id. ("We were not separately paid for the rest breaks that we took during the course of the work day."). Similarly, Ignacio Osorio testified in his deposition that he was allowed to take breaks and, in fact, took ten-minute rest breaks, including a rest break at around 8:30 a.m. or 9:00 a.m. in the morning and a rest break after lunch at around 2:00 p.m. or 2:30 p.m. See Doc. No. 110-2. Additionally, as previously noted, Marisol Gomez testified in her deposition that her foreperson told her to take breaks whenever she felt heat exhaustion, sick, or "anytime" she wanted to take a break. Doc. Nos. 91-2, 109-1. Gomez testified that her foreperson never told her to not take breaks, and Gomez testified that employees were told "right from the beginning when they give us the classes" to take breaks. Id. Gomez testified that many employees chose to take breaks, whereas other employees chose to not take breaks so that they could keep working and making more money. Some crews were told by their foreperson that the crew would finish its work faster if the employees did not take breaks. See Doc. No. 108-14.

To the extent that an employee was not provided with or permitted to take a rest break or did not take an available rest break, such was due to the employee's particular foreperson or the employee's particular preferences, but it was not due to Defendant's company-wide policies.

With respect to the length of the employees' shifts, the lengths of the shifts varied. Sometimes some employees worked shifts lasting longer than six hours, and sometimes some employees worked shifts lasting longer than ten hours, and sometimes some employees worked closer to eight-hour or nine-hour shifts. Some employees finished their shifts at different times depending on the day. For example, some days some employees would start their shift at 6:00 a.m. and other days at 7 a.m., and then some days the shift would finish at 4:00 p.m. and other days at 5:00 p.m. Some days some employees were sent home at 1:30 p.m. or 2:00 p.m. because it was too hot outside to continue working. Some employees do not recall a shift going past 4:00 p.m. in 2015. Some employees would go home after their shift ended but then sneak back onto the farm later in the day or evening to work more to make more money, although this was prohibited by the crew leaders. The foregoing variety of shift-times and shift-lengths was due, to a significant extent, by unique variables, including the preferences of the particular foreperson, the crop season, and the weather.

With respect to pay, Defendant paid some of its employees on a piece-rate basis. Of Defendant's 3,267 employees, 2,868 employees (or 87.8%) were paid on a piece-rate basis at some point during their employment. The pay was made by check. Defendant issued at least 18,376 paychecks to the 3,267 employees between December 20, 2011, and January 6, 2018. Of those paychecks, 12,398 paychecks (or 67.5%) indicated that they were for piece-rate work. Of the 12,398 paychecks that indicated that they were for piece-rate work, 9,488 paychecks (or 76.5%) did not include payment for rest breaks. The 9,488 piece-rate checks that did not include payment for rest breaks were paid to 2,320 (or 80.1%) of the 2,868 piece-rate employees. Those 2,320 employees worked at 59 (or 76%) of the 77 farms.

Some but not all employees were retroactively paid by Defendant by check for previously unpaid break and non-productive time. Approximately 409 employees received minimum wage "true-ups." It appears that Defendant has payment records identifying the employees who were given retroactive "safe harbor" payments and minimum wage true-ups.

With respect to wage statements, Defendant provided its employees with wage statements. Some employees' wage statements failed to include information about rest periods, rest payments,

payments for other non-productive time, Defendant's address (other than Defendant's P.O. box), and the address of the farms where the employees performed their work.  There is no indication that Defendant's system or practices for wage statements differed from employee to employee or from crew to crew.  This is to say, Defendant universally applied the same system and practices for wage statements to all employees.

With respect to Defendant's payroll records and system, Defendant kept payroll records for its employees.  Defendant used a software called Datatech to process and maintain payroll records.  Defendant recorded in Datatech the payments and paychecks that Defendant made to its employees.  Defendant recorded in Datatech whether payments to employees were for piece-rate work.  Defendant recorded in Datatech the farms where each employee worked within a pay period.  Defendant recorded in Datatech some rest break information of its employees.  For example, Datatech information reveals that of the 18,376 paychecks issued to the 3,267 employees between December 20, 2011, and January 6, 2018, 2,910 paychecks (or 23%) contained rest break pay whereas the other 9,488 paychecks (or 76.5%) did not include any rest break pay.  Defendant did not record in Datatech any meal period information of its employees.  Information within Datatech indicates that Defendant made safe harbor payments to some, but not all, employees.

With respect to a timekeeping system, Defendant did not maintain a timekeeping system whereby employees could clock in and out for work periods, meal periods, and rest periods.  Jacobo did not keep any documents related to employee time cards, employee work schedules, and employee rest break schedules.

The original complaint against Defendant was filed in September 2015 by Marisol Gomez, but not Ignacio Osorio.  The complaint was amended in August 2018 to add Osorio as a named plaintiff.  The first amended complaint, which is the operative complaint, pleads the following nine causes of action against Defendant:

    1)  <u>MAWPA violations</u>: Defendant violated its employees' rights under MAWPA, 29 U.S.C. § 1801 <u>et seq.</u>, by:

        a.  providing false and misleading information regarding terms and conditions of employment;

     b. violating the terms of Plaintiffs' working arrangements;

     c. failing to pay wages when due; and

     d. failing to provide accurate itemized written statements.

2) <u>Minimum wages</u>: Defendant failed to pay minimum wages to its employees in violation of Cal. Lab. Code §§ 510, 1194, 1194.2, 1197, and California Industrial Welfare Commission ("IWC") Wage Order Nos. 8, 13, 14, Cal. Code Regs. tit. 8, §§ 11080, 11130, 11140.

3) <u>Overtime wages</u>: Defendant failed to pay overtime wages to its employees in violation of Cal. Lab. Code §§ 510, 1194, 1194.2, and IWC Wage Orders Nos. 8, 13, 14.

4) <u>Meal periods</u>: Defendant failed to provide timely meal periods to its employees or pay additional time to its employees in lieu of providing meal periods in violation of Cal. Lab. Code §§ 226.7, 512, and IWC Wage Orders 8, 13, 14.

5) <u>Rest periods</u>: Defendant failed to provide timely and complete rest periods to its employees or pay additional wages to its employees in lieu of providing rest periods in violation of Cal. Lab. Code §§ 226.7, 512, and IWC Wage Orders 8, 13, 14

6) <u>Wages upon termination or resignation</u>: Defendant failed to pay wages to its terminated or resigned employees in violation of Cal. Lab. Code §§ 201, 202, and 203.

7) <u>Itemized wage statements</u>: Defendant failed to issue properly itemized wage statements to its employees in violation of Cal. Lab. Code §§ 226(B), 1174, 1175.

8) <u>Unfair business competition</u>: Defendant engaged in unfair business competition in violation of Cal. Bus. & Prof. Code §§ 17200 <u>et seq.</u> by engaging in the foregoing wage-and-hour violations.

9) <u>PAGA relief for California Labor Code violations</u>: Due to Defendant's foregoing violations of the California Labor Code, the employees are entitled to relief pursuant to California's Private Attorneys General Act of 2004 ("PAGA"), Cal. Lab. Code §§ 2698 <u>et seq.</u>

    In November 2018, a paralegal working for Defendant's counsel visited the "PAGA search database" on the website of the State of California Department of Industrial Relations.  Doc. No.

109-2. The paralegal, Patricia Morrison, searched for PAGA claims filed against Defendant, but Morrison saw no search results or records on the website indicating that a PAGA claim had been filed against Defendant. Similarly, Morrison searched for PAGA claims filed by Plaintiffs, but Morrison saw no search results or records on the website indicating that a PAGA claim had been filed by the Plaintiffs.

## III. Plaintiffs' Motion for Class Certification

Plaintiffs move for certification of one "overarching" class and six subclasses, as follows:

> Overarching Class: All individuals who have been employed or are currently employed, by Defendant J. Jacobo Farm Labor Contractor Inc. as a non-exempt "field worker" or agricultural laborer who worked at any time from September 30, 2011 to the present.

> Piece Rate Rest Period Subclass: All individuals who have been employed, or are currently employed, by Defendant as a non-exempt "field worker" or agricultural worker, who worked on a piece rate basis at any time from March 17, 2011[3] up to the present and were not separately compensated for rest periods during their piece rate shifts.

> Meal Period Subclass: All individuals who have been employed, or are currently employed, by Defendant as a non-exempt agricultural worker, any time from September 30, 2011 to the present, for whom a meal period was not recorded.

> Inaccurate/Incomplete Wage Statement Subclass: All individuals who have been employed, or are currently employed, by Defendant as a non-exempt "field worker" or agricultural worker, any time from September 30, 2011 to the present, who received a wage statement that: 1) did not have the address of the employer J. Jacobo, 2) did not provide the full name and/or address of the

---

[3] It appears that the beginning date identified by Plaintiffs for the piece-rate subclass, March 17, 2011, was made inadvertently in error by Plaintiffs' counsel. The beginning date identified by Plaintiffs for all other subclasses and the overarching class is September 30, 2011, which is four years prior to the date that the original complaint was filed. See Doc. No. 1 (original complaint) (filed on September 30, 2015). In light of this inadvertent error, the Court suspects that portions of the certification motion in this lawsuit were copied-and-pasted from a certification motion previously filed by Plaintiffs' counsel in another lawsuit, see Aldapa v. Fowler Packing Company, Inc., Case No. 15-cv-420-DAD-SAB, Doc. No. 145 (certification motion filed by attorneys Mario Martinez and Edgar Aguilasocho), but here Plaintiffs' counsel failed to make obvious and requisite modifications to the copied-and-pasted material, such as modifying the beginning date of the piece-rate subclass. Cf. id. ("Piece Rate Rest Period Subclass: All individuals who have been employed, or are currently employed, by Defendants as a non-exempt 'field worker' or agricultural worker, who worked on a piece rate basis at any time from March 17, 2011 up to the present, and were not separately compensated for rest periods during their piece rate shifts.") (emphasis added); with the certification motion in this lawsuit, Doc. No. 108-1, which was filed, in part, by attorneys Mario Martinez and Edgar Aguilasocho ("Piece Rate Rest Period Subclass: All individuals who have been employed, or are currently employed, by Defendant as a non-exempt 'field worker' or agricultural worker, who worked on a piece rate basis at any time from March 17, 2011 up to the present and were not separately compensated for rest periods during their piece rate shifts.") (emphasis added).

growers for which work was done, and/or 3) due to the violations claimed herein, received an inaccurate itemized wage statement by listing either: a) false gross and net wage earned amounts or 2) failed to provide the amount of hours worked without compensation.

AWPA Subclass: All individuals who have been employed, or are currently employed, by Defendant as a non-exempt "field worker" or agricultural worker, any time from September 30, 2011 up to the present, who, due to the violations claimed herein, were not paid wages due or provided employment consistent with the terms of the employee's "working arrangements."

Section 17200 Subclass: All individuals who have been employed, or are currently employed, by Defendant as a non-exempt "field worker" or agricultural worker, any time from September 30, 2011 up to the violations claimed herein, were employed under "unlawful or unfair business acts or practices."

Final Paycheck Subclass: All individuals who have been employed, or are currently employed, by Defendant as a non-exempt "field worker" or agricultural worker, any time from September 30, 2011 up to the present, who were not paid all wages due when they were laid off, discharged or quit each season as required by the California Labor Code.

Plaintiffs propose that Ignacio Osorio be appointed as the class representative and Stan Mallison, Hector Martinez, Mario Martinez, and Edgar Aguilasocho be appointed as class counsel.

# IV. Discussion

**1.**    **Legal standard for Rule 23 class certification**

A class action is a procedural mechanism that allows for representative litigation. This means that one or more class members may "litigate on behalf of many absent class members, and those class members are bound by the outcome of the representative's litigation." Newberg on Class Actions § 1:1 (5th ed.) (citing Supreme Tribe of Ben Hur v. Cauble, 255 U.S. 356, 363 (1921)). Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure, which imposes a two-step process in deciding whether a class may be certified.

The first step under Rule 23(a) asks whether the moving party demonstrated that the proposed class action satisfies each of the following four requirements:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are

typical of the claims or defenses of the class; and (4) the
representative parties will fairly and adequately protect the
interests of the class.

Fed. R. Civ. P. 23(a)(1)-(4).  If the proposed class action satisfies the forgoing four requirements
of Rule 23(a), then the second step asks whether the proposed class action satisfies the
requirements of Rule 23(b)(1),[4] Rule 23(b)(2), or Rule 23(b)(3).  Rule 23(b)(2) requires that "the
party opposing the class has acted or refused to act on grounds that apply generally to the class, so
that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as
a whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) requires that "the questions of law or fact
common to class members predominate over any questions affecting only individual members,
and that a class action is superior to other available methods for fairly and efficiently adjudicating
the controversy."  Fed. R. Civ. P. 23(b)(3).

The movant bears the burden of affirmatively demonstrating to the district court through
evidentiary proof that the proposed class action meets the requirements of Rule 23(a) and Rule
23(b).  Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013).  Federal courts throughout the country
require the movant to demonstrate by a preponderance of the evidence that class certification is
appropriate.  Newberg on Class Actions § 7:21 (5th ed.) (citing cases, including Martin v. Sysco
Corporation, 325 F.R.D. 343, 354 (E.D. Cal. 2018) ("While Rule 23 does not specifically address
the burden of proof to be applied, courts routinely employ the preponderance of the evidence
standard.")).

In order to be "satisfied" that the class meets the prerequisites of Rule 23(a) and fits within
one of the categories of Rule 23(b), the district court must conduct a "rigorous analysis."  General
Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).  The rigorous analysis may
include "prob[ing] behind the pleadings," Comcast Corp., 569 U.S. at 33, and may also "entail
overlap with the merits of the plaintiff's underlying claim," and this is because the analysis of
Rules 23(a) and 23(b) "generally involves considerations that are enmeshed in the factual and
legal issues comprising the plaintiff's cause of action."  Id. at 34.

---

[4] Through silence, Plaintiffs have indicated that Rule 23(b)(1) is inapplicable to this lawsuit and their certification
motion.

"[I]n evaluating a motion for class certification, a district court need only consider material sufficient to form a reasonable judgment on each Rule 23(a) requirement." <u>Sali v. Corona Reg'l Med. Ctr.</u>, 909 F.3d 996, 1005 (9th Cir. 2018) (emphasis added). This means that "a district court is not limited to considering only admissible evidence in evaluating whether Rule 23's requirements are met." <u>Id.</u> Nonetheless, "the district court need not dispense with the standards of admissibility entirely." <u>Id.</u> at 1006. Rather, the district court should analyze the "persuasiveness" of the evidentiary proof presented at the class certification stage and "may consider whether the plaintiff's proof is, or will likely lead to, admissible evidence." <u>Id.</u>

In evaluating expert testimony that supports class certification, the "district court should evaluate admissibility under the standard set forth in <u>Daubert</u>. But admissibility must not be dispositive. Instead, an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." <u>Id.</u> (citations omitted). In other words, the court's evaluation of the evidence must focus on the persuasiveness of the evidence, for which admissibility is a factor but is not dispositive. <u>See id.</u>; <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 982 (9th Cir. 2011).

If a court decides to certify a class, the court must issue a certification order. Fed. R. Civ. P. 23(c)(1)(A)-(B). The certification order "must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g)." <u>Id.</u>

**2.**     **Rule 23(a) requirements**

    **A.**     **Ascertainable class**

Rule 23 implicitly requires the proposed class to be ascertainable by reference to objective criteria, at least for class certification under Rule 23(b)(3). <u>See</u> <u>Marcus v. BMW of North America, LLC</u>, 687 F.3d 583, 592-93 (3d Cir. 2012); <u>Jones v. ConAgra Foods, Inc.</u>, Case No. 12-cv-1633, 2014 WL 2702726, *8 (N.D. Cal. 2014); <u>Lilly v. Jamba Juice Co.</u>, 308 F.R.D. 231, 236 (N.D. Cal. 2014); <u>Newberg on Class Actions</u> § 3:1 (5th ed.). While courts have "ascribe[d] widely varied meanings" to the term "ascertainability," <u>Briseno v. ConAgra Foods, Inc.</u>, 844 F.3d 1121, 1124 (9th Cir. 2017), there are three linguistic formulations commonly used to express the test for definiteness:

> [F]irst, that the class must be "precise, objective, and presently ascertainable"; second, that the class must be "adequately defined and clearly ascertainable"; and third, that the class can be ascertained "by reference to" or "based on" "objective criteria."

Newberg on Class Actions § 3:3 (5th ed.) (citations omitted).  The ascertainability requirement "protects absent plaintiffs in two ways — by enabling notice to be provided where necessary and by defining who is entitled to relief; and a definable class protects defendants by enabling a final judgment that clearly identifies who is bound by it."  Id. at § 3:1.  The movant for class certification bears the burden of sufficiently pleading a sufficiently ascertainable class.  See Whitaker v. Bennett Law, PLLC, Case No. 13-cv-3145, 2016 WL 4595520, at *1 (S.D. Cal. 2016); Brazil v. Dell Inc., 585 F. Supp. 2d 1158, 1167 (N.D. Cal. 2008); Newberg on Class Actions § 3:3 (5th ed.).  While the ascertainability requirement provides for an "objectively ascertainable" class, the Ninth Circuit does not require that the proposed class also be "administratively ascertainable."  Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1123-26 (9th Cir. 2017).  "Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry."  Newberg on Class Actions § 3:3 (5th ed.).

Here Defendant does not argue that the overarching class is not ascertainable, and the Court concludes that the overarching class is sufficiently ascertainable, with one exception.  Plaintiffs' proposed overarching class is defined as follows:

> Overarching Class: All individuals who have been employed or are currently employed, by Defendant J. Jacobo Farm Labor Contractor Inc. as a non-exempt "field worker" or agricultural laborer who worked at any time from September 30, 2011 to the present.

Doc. No. 108-1.  The contours of the overarching class are largely ascertainable based on objective criteria, namely, whether someone was employed by Defendant as a field worker or agricultural worker.  However, Plaintiffs' proposed end date for the class period — "to the present" — is not ascertainable.  "An end date of 'the present' creates a moving target and presents potential case management problems."  Taylor v. Autozone, Inc., Case No. 10-cv-8125, 2011 WL 2357652, at *1 (D. Ariz. June 14, 2011).  By contrast, a "specified end date" promotes

13

the "interests of clarity and finality" and "helps ensure that plaintiff-specific discovery will be completed in a timely manner." Id.; see also Decastro v. City of New York, No. 16-cv-3850, 2019 WL 4509027, at *7 (S.D.N.Y. Sept. 19, 2019) (redefining unascertainable class period end date as the date the complaint was filed); Hendricks v. Total Quality Logistics, LLC, Case No. 10-cv-649, 2015 WL 13814202, at *4 (S.D. Ohio Mar. 30, 2015) (redefining unascertainable class period end date as the close of discovery date); Hart v. Rick's NY Cabaret Int'l, Inc., Case No. 09-cv-3043, 2013 WL 11272536, at *5 (S.D.N.Y. Nov. 18, 2013) ("At the outset, the Court concludes that it is necessary to set a clear end-date to the class period. The class as certified on December 20, 2010, by the judge then assigned to this case ran from 'six years prior to the filing of the Complaint to the entry of judgment in this case.' But an open-ended end-date is untenable. It fails to take account of the possibility that material facts might change. And it denies the parties, after the close of fact discovery, a practical vehicle for exploring whether there have been material factual changes. Lack of clarity as to the end date of the class period also has the potential to confuse putative class members as to whether their interests will, or will not, be represented in the pending lawsuit.") (citing cases in favor of ascertainable class period end date); Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 910 (S.D.N.Y. 2013); Jacks v. DirectSat USA, LLC, Case No. 10-cv-1707, 2012 WL 2374444, at *8 (N.D. Ill. June 19, 2012) (redefining unascertainable class period end date as the date complaint was filed); Taylor v. Autozone, Inc., Case No. 10-cv-8125, 2011 WL 2357652, at *1 (D. Ariz. June 14, 2011) (redefining unascertainable class period end date as the date of conditional class certification order); Cruz v. Dollar Tree Stores, Inc., Case No. 07-cv-2050, 2009 WL 1974404, at *2 (N.D. Cal. July 2, 2009) (redefining unascertainable class period end date as the date of certification order).

To cure the lack of ascertainability with Plaintiffs' proposed class period end date, the end date will be redefined as the date of this certification order. See, e.g., Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81, 85 n.2 (S.D.N.Y.2001) ("In my discretion, and in the interests of fairness and efficiency of case management, I fix the end date of the class period as the date of this decision."); see also Taylor v. Autozone, Inc., Case No. 10-cv-8125, 2011 WL 2357652, at *1 (D.

Ariz. June 14, 2011) (redefining unascertainable class period end date as date of conditional class certification order).

As for Plaintiffs' proposed subclasses, the Court views the proposed subclasses as "case management" subclasses under Rule 23(d) that are treated informally and need not independently satisfy the certification requirements of Rules 23(a) and 23(b), including the implied ascertainability requirement.  See American Timber & Trading Co. v. First Nat. Bank of Oregon, 690 F.2d 781, 787 n.5 (9th Cir. 1982); see also Newberg on Class Actions §§ 4:80, 7:27, 7:29, 7:32 (5th ed.).

### B.      Numerosity and impracticability of joinder

Pursuant to Rule 23(a)(1), a class action is maintainable only if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Here Defendant does not argue that the proposed overarching class fails to satisfy the numerosity requirement, and the Court concludes that the numerosity requirement is satisfied.  The evidence before the Court does not conclusively establish the exact number of members in the proposed overarching class, but knowing the exact number of putative class members is not required.  See Arnold Chapman and Paldo Sign & Display Co. v. Wagener Equities Inc., 747 F.3d 489, 492 (7th Cir. 2014) ("[A] class can be certified without determination of its size, so long as it's reasonable to believe it large enough to make joinder impracticable and thus justify a class action suit."); In re Lithium Ion Batteries Antitrust Litigation, Case No. 13-cv-2420, 2017 WL 1391491, *3 (N.D. Cal. 2017) (quoting Newberg on Class Actions § 3:3 (4th ed.)) ("Where the precise size of the class is unknown, but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied."); Newberg on Class Actions § 3:13 (5th ed.) ("[I]t is well settled that a plaintiff need not allege the exact number or specific identity of proposed class members.").

The evidence before the Court shows that Defendant employed at least 3,267 employees between December 20, 2011, and January 6, 2018.  Approximately 2,868 of the employees worked at some point on a piece-rate basis, and there is no dispute by Defendant that most of those 2,868 employees worked as farm and agricultural workers.  Therefore, the number of employees in the overarching class is likely in the hundreds or thousands, which satisfies the numerosity

1  requirement.  See Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995)

2  (stating that "numerosity is presumed at a level of 40 members") (citing Newberg on Class

3  Actions § 3.05 (2d ed.)); Californians for Disability Rights, Inc. v. California Dep't of Transp.,

4  249 F.R.D. 334, 347 (N.D. Cal. 2008) (stating that "precedent suggests that 20-40 class members

5  is the 'grey area' for numerosity").  This is because it would be extremely difficult and

6  inconvenient to join the hundreds or thousands of members in the overarching class, which means

7  that joinder is impracticable.

8      **C.**      **Commonality**

9         Pursuant to Rule 23(a)(2), a class action is maintainable only if "there are questions of law

10  or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Under this requirement, the movant must

11  show that there is "at least one common question of law or fact shared by the class, and . . . the

12  common question not be peripheral but important to most of the individual class member's

13  claims."  Newberg on Class Actions § 3:18 (5th ed.).  To say that the common question is shared

14  by the class means that "the class members have suffered the same injury," not that the class

15  members merely "suffered a violation of the same provision of law."  Wal-Mart Stores, Inc. v.

16  Dukes, 564 U.S. 338, 349-50 (2011).  To say that the common question is not peripheral but is

17  important means that the determination of the common question "will resolve an issue that is

18  central to the validity of each one of the claims in one stroke."  Id. at 350; see also Wang v.

19  Chinese Daily News, Inc., 737 F.3d 538, 542 (9th Cir. 2013) (requiring the district court on

20  remand to "determine whether the claims of the proposed class depend upon a common contention

21  . . . of such a nature that it is capable of classwide resolution") (citations omitted).

22         The commonality requirement has similarities with and serves as the foundation to the

23  commonality-predominance requirement of Rule 23(b)(3).  See Newberg on Class Actions § 3:27

24  (5th ed.) (explaining that Rule 23(b)(3)'s commonality-predominance requirement "obviously

25  builds on" Rule 23(a)(2)'s commonality requirement).  Because of the overlap between these two

26  requirements, the Court will analyze Rule 23(a)(2)'s commonality requirement infra when the

27  Court analyzes Rule 23(b)(3)'s commonality-predominance requirement.

28

## D. **Typicality**

Pursuant to Rule 23(a)(3), a class action is maintainable only if the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[T]ypicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class so that the court may properly attribute a collective nature to the challenged conduct." Newberg on Class Actions § 3:29 (5th ed.). Accordingly, the typicality requirement "emphasizes that the representatives ought to be squarely aligned in interests with the represented group." Benjamin Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L. Rev. 356, 387 n.120 (1967). The Ninth Circuit's test for typicality is (1) "whether other members have the same or similar injury," (2) "whether the action is based on conduct which is not unique to the named plaintiffs," and (3) "whether other class members have been injured by the same conduct." Wolin v. Jaguar Land Rover North America, LLC, 617 F.3d 1168, 1175 (9th Cir. 2010) (citations omitted).

Based on the Ninth Circuit's foregoing test for typicality, the Court concludes that the claims of the proposed class representative, Ignacio Osorio, are typical of the claims of the overarching class. First, other members of the overarching class have the same alleged injury as Osorio. For example, like Osorio, other members of the class have the same alleged injuries for noncompliant wage statements. Second, Osorio's claims are not based on conduct that is unique to Osorio but is, instead, based on Defendant's conduct rendered towards the entire class. Third, the members of the class and Osorio have allegedly been injured by the same conduct. For example, like Osorio, other members of the class were allegedly injured by Defendant's failure to provide compliant wage statements.

Defendant argues unpersuasively that the typicality requirement is not satisfied because Plaintiffs and the "witness workers" failed to demonstrate "with competent evidence" that they were injured by Defendant. Doc. No. 110 at 14. This argument is unsound. First, the only proposed class representative is Ignacio Osorio, not Marisol Gomez or the "witness workers," meaning it is irrelevant whether Gomez or the "witness workers" are typical of the class. Second,

the typicality requirement does not require that the plaintiff demonstrate or prove the merits of the claims. See Stockwell v. City & County of San Francisco, 749 F.3d 1107, 1113-14 (9th Cir. 2014) ("[T]he district court erred in denying class certification because of its legal error of evaluating merits questions, rather than focusing on whether the questions presented, whether meritorious or not, were common to the members of the putative class."); see also Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013) (stating that merits questions "may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied").

### E.    Adequacy of representation

Pursuant to Rule 23(a)(4), a class action is maintainable only if the "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The term "parties" refers to both the class representative and the class counsel.  See Beck v. Maximus, Inc., 457 F.3d 291, 296 (3d Cir. 2006); In re Conseco Life Ins. Co. LifeTrend Ins. Sales and Marketing Litigation, 270 F.R.D. 521, 531 (N.D. Cal. 2010).  Therefore, "the standard for adequacy splits into two prongs: adequacy of the proposed class representative and adequacy of the attorneys seeking appointment as class counsel."  Newberg on Class Actions § 3:54 (5th ed.).

### *(i)    Adequacy of class representative*

The adequacy of the class representative focuses on both "whether there are conflicts of interest between the proposed representative and the class, and whether the proposed representative is qualified to serve as a class representative . . . ."  Id.  Here Osorio is an adequate class representative.  There is no indication that he has conflicts of interest with the class or is unqualified.

Defendant argues unpersuasively that the adequacy requirement is not satisfied because Plaintiffs "failed to demonstrate that [Osorio] has any more knowledge of and involvement in this case than anyone else."  Doc. No. 110 at 14.  This argument is unsound.  First, the adequacy requirement does not require the class representative to have more knowledge of the case than the other class members.  Second, Defendant has not shown that Osorio is not sufficiently involved in this case.  The evidence shows that Osorio has been sufficiently involved in this case: for example,

Osorio spoke with Plaintiffs' counsel and agreed to be the class representative, and Osorio appeared and testified at his deposition, which was noticed and conducted by his adversary, Defendant.

### *(ii)* *Adequacy of class counsel*

The adequacy of the class counsel focuses on "whether the attorneys who seek to represent the class are competent to do the job." Newberg on Class Actions § 3:54 (5th ed.). To determine the adequacy of the class counsel, Rule 23(g) requires the court to consider the following four factors: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv).

Here the proposed class counsel includes Stan Mallison, Hector Martinzez, Liliana Garcia, and Staci Schoff. According to Mallison's declaration, each of these attorneys has experience litigating class actions and employment-related claims. For example, Mallison has worked as a litigator since 1996, working on employment litigation, wage-and-hour litigation, PAGA litigation, and class action litigation. Martinez has worked as a litigator since 1999, working on PAGA litigation on behalf of agricultural employees.

Defendant does not challenge the adequacy of the proposed class counsel, and the Court concludes that the proposed class counsel are adequate. Having considered Rule 23(g)'s factors, the Court finds that class counsel (1) sufficiently identified and investigated the potential claims in this lawsuit; (2) have sufficient experience litigating class actions and wage-and-hour-related claims; (3) appear to have sufficient knowledge of the applicable wage-and-hour laws; and (4) appear to be willing and able to commit sufficient resources to representing the proposed class. As will be discussed infra, the Court is displeased with the quality of certain aspects of the proposed class counsel's briefing in this lawsuit, but those shortcomings do not yet warrant a determination that the proposed class counsel are inadequate.

**3. Rule 23(b)(2) requirements**

A class action may be maintained under Rule 23(b)(2) if the proposed class satisfies the requirements of Rule 23(a) and "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). The Supreme Court in 2011, in its significant class-action opinion, Wal-Mart Stores, Inc. v. Dukes, emphasized the crucialness of Rule 23(b)(2)'s "apply-generally-to-the-class" requirement:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.

Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 360-61 (2011).

The Supreme Court also held in Dukes that Rule 23(b)(2) does not authorize class actions "when each class member would be entitled to an individualized award of monetary damages." Id. The Supreme Court also held in Dukes that only money damages that are "incidental" to, as opposed to central to, the plaintiff's requested relief may be pursued in a class action maintained under Rule 23(b)(2). Id. at 360; see also Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985). Incidental damages are those that "would flow to the class as a whole by virtue of its securing the sought after injunctive relief." Newberg on Class Actions § 4:36 (5th ed.) (citing Dukes, 564 U.S. at 365). Therefore, the only type of monetary damages that may be sought in Rule 23(b)(2) class actions are those that "are group-based, flow ineluctably from the injunctive or declaratory relief to the class as a whole, and that do not require individualized assessments." Newberg on Class Actions § 4:37 (5th ed.)

Here class certification under Rule 23(b)(2) is not warranted because the money damages that Plaintiffs seek are not "incidental" to the requested relief. Rather, the money damages are Plaintiffs' primary requested relief. Moreover, the requested money damages are not of the type that flow to the class as a whole by virtue of its securing injunctive relief. Rather, the requested

money damages are Plaintiffs' primary requested relief, and for most of the claims an award of the requested money damages would require "individualized determinations of each employee's eligibility" for the money damages, as discussed infra.

Plaintiffs argue that class certification under Rule 23(b)(2) is appropriate despite the foregoing holdings from the Supreme Court in Dukes. To advance this argument, Plaintiffs posit:

> If Plaintiff is meritorious, Plaintiff will request that Defendant be required to pay its employees in compliance with the California Labor Code and Wage Orders. Therefore, injunctive relief would be necessary were Plaintiffs to succeed on the merits. Accordingly, class certification under Rule 23(b)(2) is appropriate.

Doc. No. 108-1. The first problem with Plaintiffs' position is that its reasoning is flawed. Simply because Plaintiffs will request money damages if they succeed on the merits does not mean that injunctive relief "would be necessary," and Plaintiffs did not provide any authority to the contrary. Also, simply because injunctive relief is available does not mean that certification under Rule 23(b)(2) is appropriate, and Plaintiffs did not provide any authority to the contrary.

The second problem with Plaintiffs' position is that that it defies the law. Plaintiffs try to cloak their flawed position with legal support by citing to, first, a non-binding district court order issued in 2011 from the Northern District of California, Gardner v. Shell Oil Co., 2011 WL 1522377 (N.D. Cal. Apr 21, 2011), and, second, an opinion issued in 2010 from the Ninth Circuit, Wang v. Chinese Daily News, Inc., 623 F.3d 743, 753 (9th Cir. 2010). In Gardner, which was an employee wage-and-hour lawsuit, the district court ruled that the employees' claims for individualized monetary relief were appropriate for class certification under Rule 23(b)(2) because the monetary relief was closely related to and "on equal footing" with the claims for injunctive relief. The district court also stated that the employees' claims for back wages were a form of relief appropriate for certification under Rule 23(b)(2). The district court arrived at these rulings by relying on the Ninth Circuit's holdings in Wang and Dukes v. Wal–Mart Stores, Inc., 603 F.3d 571, 594 (9th Cir. 2010). See Gardner, 2011 WL 1522377 at *6 (citing Wang and Dukes (9th Cir. 2010)).

In Wang and Dukes (9th Cir. 2010), the Ninth Circuit stated that claims for monetary damages may be certified under Rule 23(b)(2) even if the monetary damages are more than

21

"incidental" to the plaintiff's requested relief.  Also in Wang, the Ninth Circuit stated that claims for monetary damages may be certified under Rule 23(b)(2) when the claims for monetary damages are on "equal footing" with the claims for injunctive relief.  Also in Wang, the Ninth Circuit stated that an employee's claims for back wages — when the claims are brought in a lawsuit where the employee is also seeking to enjoin a "longstanding set of employment policies" that caused the underpayment of wages — do not predominate over the claims for injunctive relief and, therefore, are appropriate for certification under Rule 23(b)(2).

    The rulings and holdings from the Ninth Circuit in Wang and Dukes and the district court in Gardner would, if they were still good law, obviously support Plaintiffs' position as to why Plaintiffs' claims should be certificated under Rule 23(b)(2).  But the rulings and holdings are not good law, and this should be obvious to Plaintiffs' counsel, who declared that they are experienced class action practitioners.  In 2011 the Supreme Court reversed the Ninth Circuit's holdings in Wang and Dukes, as demonstrated supra by the foregoing discussion of the Supreme Court's holdings in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011).  See also Chinese Daily News, Inc. v. Wang, 565 U.S. 801 (2011) (vacating the Ninth Circuit's judgment in Wang and remanding to the Ninth Circuit "for further consideration in light of" the Supreme Court's holdings in Dukes).[5]  This means that Plaintiffs have advanced a legal theory that was expressly rejected by the Supreme Court in 2011.

    Certification under Rule 23(b)(2) is also inappropriate because the evidence indicates that many members of the class, including the proposed class representative, Ignacio Osorio, lack standing to pursue prospective injunctive relief.  Whether there is standing by a class for prospective injunctive relief requires an assessment of the standing of the "class as a whole."

---

[5]  It is suspect that Plaintiffs' certification motion cited to the Ninth Circuit's 2010 opinions in Wang and Dukes but never cited to the Supreme Court's 2011 opinions in Wang and Dukes.  The Supreme Court's Dukes opinion is a significant opinion for class action law and jurisprudence.  See, e.g., Elizabeth G. Porter, Pragmatism Rules, 101 Cornell L. Rev. 123, 127 (2015) (calling the Supreme Court's Dukes opinion a "watershed decision"); Tobias Barrington Wolff, Managerial Judging and Substantive Law, 90 Wash. U.L. Rev. 1027, 1034 (2013) (stating that the Supreme Court's Dukes opinion "has been received as a watershed, with academic commentators treating the Court's holdings on commonality and on Rule 23(b)(2) as paradigm-shifting statements of class-action policy"); David Freeman Engstrom, Agencies As Litigation Gatekeepers, 123 Yale L.J. 616, 689 (2013) (calling the Supreme Court's Dukes opinion a "blockbuster decision" that "was a watershed moment").

Dukes, 564 U.S. at 365 ("[T]he validity of a (b)(2) class depends on whether 'final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'") (emphasis in original) (quoting Fed. R. Civ. P. 23(b)(2)). To establish standing for prospective injunctive relief, the plaintiff or class as a whole must demonstrate that they have suffered or are threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that they will be wronged in a similar way. Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007). This means that a former employee does not have standing to bring prospective injunctive relief against its former employer for employment violations. Dukes, 564 U.S. at 364 ("The Ninth Circuit recognized the necessity for this when it concluded that those plaintiffs no longer employed by Wal–Mart lack standing to seek injunctive or declaratory relief against its employment practices."); see also Walsh v. Nev. Dep't of Human Res., 471 F.3d 1033, 1037 (9th Cir. 2006) (recognizing that former employees lack standing to seek injunctive relief because they "would not stand to benefit from an injunction requiring the anti-discriminatory policies [to cease] at [their] former place of work"); Am. Civil Liberties Union of Nev. v. Lomax, 471 F.3d 1010, 1015 (9th Cir.2006) (stating that when evaluating whether standing is present, a court must look at the facts as they exist at the time the complaint was filed).

Here it appears that neither Marisol Gomez nor the proposed class representative, Ignacio Osorio, still work for Defendant. Similarly, the evidence suggests that many of the class members no longer work for Defendant. Therefore, Plaintiffs have failed to demonstrate that there is standing to bring prospective injunctive relief under Rule 23(b)(2).

**4.      Rule 23(b)(3) requirements**

A class action may be maintained under Rule 23(b)(3) if the proposed class satisfies the requirements of Rule 23(a) and the following two requirements of Rule 23(b)(3): first, common questions predominate over any questions affecting only individual members; and, second, class resolution is superior to other available methods for the fair and efficient adjudication of the controversy. Fed. R. Civ. P. 23(b)(3); Amchem Products, Inc. v. Windsor, 521 U.S. 591, 615 (1997).

## A. Commonality and predominance

The commonality and predominance requirement of Rule 23(b)(3) asks whether the class members' interests are "sufficiently cohesive to warrant adjudication by representation." Id. at 623. The inquiry "logically entails two steps": first, whether the issues in the case are individual or common; and, second, whether the common issues predominate over the individual issues. Newberg on Class Actions § 4:50 (5th ed.).

As for the first step, an individual issue is one where "the members of a proposed class will need to present evidence that varies from member to member." Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. __, 136 S. Ct. 1036, 1045 (2016) (citing Newberg on Class Actions § 4:50 (5th ed.)). By contrast, a common issue is one either where "the same evidence will suffice for each member to make a prima facie showing," Tyson Foods, Inc., 136 S. Ct. at 1045 (citing Newberg on Class Actions § 4:50 (5th ed.)), or, similarly, where the issue is "susceptible to generalized, class-wide proof." In re Nassau County Strip Search Cases, 461 F.3d 219, 227 (2d Cir. 2006).

As for the second step, common issues likely will not predominate if "a great deal of individualized proof" would need to be introduced to address most or all of the elements of a claim, Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004), or "a number of individualized legal points" would need to be established after common questions were resolved, id., or "the resolution of . . . [an] overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." Cooper v. Southern Co., 390 F.3d 695, 722 (11th Cir. 2004). By contrast, common questions likely will predominate if "individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria — thus rendering unnecessary an evidentiary hearing on each claim," Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 40 (1st Cir. 2003) (citing Roper v. Consurve, Inc., 578 F.2d 1106, 1112 (5th Cir. 1978)), or "when adding more plaintiffs to the class would minimally or not at all affect the amount of evidence to be introduced." Newberg on Class Actions § 4:50 (5th ed.) (citing Klay v. Humana, Inc., 382 F.3d 1241, 1255 (11th Cir. 2004)).

A finding of predominance will generally not be "defeat[ed]" merely because there is a need to make individualized damage determinations. See Just Film, Inc. v. Buono, 847 F.3d 1108,

1121 (9th Cir. 2017); <u>Leyva v. Medline Indus. Inc.</u>, 716 F.3d 510, 514 (9th Cir. 2013); <u>see also</u>

<u>Comcast Corp. v. Behrend</u>, 569 U.S. 27, 35 (2013) (Ginsburg and Breyer, JJ., joined by

Sotomayor and Kagan, JJ., dissenting) (stating in case resolved on other grounds that

"[r]ecognition that individual damages calculations do not preclude class certification under Rule

23(b)(3) is well nigh universal" and that ordinarily "individual damages calculations should not

scuttle class certification under Rule 23(b)(3)").

　　　　Certain affirmative defenses, such as assumption of risk, contributory negligence, and

statute of limitations, "may depend on facts peculiar to each plaintiff's case." <u>Thorn v. Jefferson-</u>

<u>Pilot Life Ins. Co.</u>, 445 F.3d 311, 329 n.22 (4th Cir. 2006).  If the affirmative defenses of a case

are individualized, then the district court should consider the defense when determining whether

common issues predominate.  <u>See</u> <u>Waste Management Holdings, Inc. v. Mowbray</u>, 208 F.3d 288,

295 (1st Cir. 2000) ("[W]e regard the law as settled that affirmative defenses should be considered

in making class certification decisions."); <u>Newberg on Class Actions</u> § 4:55 (5th ed.).

　　　　Here the Court will undertake the commonality and predominance inquiry by analyzing

each of Plaintiffs' claims seriatim, and this is because "[c]onsidering whether questions of law or

fact common to class members predominate begins, of course, with the elements of the underlying

cause of action." <u>Erica P. John Fund, Inc. v. Halliburton Co.</u>, 563 U.S. 804, 809 (2011).

***i.***      ***<u>Rest breaks</u>***

　　　　Section 226.7 of the California Labor Code together with IWC Wage Order No. 14-2001

("Wage Order No. 14"), which is codified at 8 Cal. Code Regs. § 11140, govern rest breaks for

non-exempt agricultural employees.  Section 226.7 requires employers to provide rest breaks

consistent with the applicable wage order.  Wage Order No. 14 requires employers of agricultural

workers to provide rest breaks in the following way: one ten-minute rest break is required for

shifts between three and one-half hours and six hours in length; two ten-minute rest breaks are

required for shifts between six hours and ten hours in length; and three ten-minute rest breaks are

required for shifts between ten hours and fourteen hours in length.  8 Cal. Code Regs. §

11140(12); <u>see also</u> <u>Alberts v. Aurora Behavioral Health Care</u>, 241 Cal. App. 4th 388, 400 (2015)

(stating that the employer is liable for violating the wage order if the employer fails to "authorize

and permit the amount of rest break time called for under the wage order for its industry") (citing Brinker Rest. Corp. v. San Diego Cty. Superior Court, 53 Cal. 4th 1004, 1033 (2012).

Section 226.7 requires employers to count rest breaks towards hours worked and prohibits employers from deducting wages for rest breaks. Section 226.2 mandates that piece-rate employees be separately compensated for their rest-breaks at an amount not less than the applicable minimum wage. Cal. Lab. Code § 226.2(a)(3)(A) (setting the compensation rate at the "higher of" the applicable minimum wage or "[a]n average hourly rate"); Gonzalez v. Downtown LA Motors, LP, 215 Cal. App. 4th 36, 44-45 (2013); Bluford v. Safeway Stores, Inc., 216 Cal. App. 4th 864, 872 (2013). "[C]ompliance [with this requirement] cannot be determined by averaging hourly compensation," id., and this means that "employees [must] be compensated at the minimum wage for each hour worked." Gonzalez, 215 Cal. App. 4th at 45 (citing Armenta v. Osmose, Inc., 135 Cal. App. 4th 314, 323 (2005)).

If the employer forces the employee to miss a required rest break or does not provide the employee with a required rest break, then the employee is entitled to be paid immediately for the missed rest break. Murphy v. Kenneth Cole Prods., Inc., 40 Cal. 4th 1094, 1108 (2007); see also Brinker Rest. Corp. v. San Diego Cty. Superior Court, 53 Cal. 4th 1004, 1033 (2012) (stating that an employee is incapable of waiving a rest break if the employer never authorized the rest break). Specifically, the employer "shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the . . . rest recovery period is not provided." Cal. Lab. Code § 226.7(c).

Although employers are required to "authorize and permit" rest breaks, employees are not required to take provided rest breaks and employers are not required to force employees to take provided rest breaks. 8 Cal. Code Regs. § 11140(12); Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1033 (2012). Additionally, employers are not required to track or record rest breaks. 8 Cal. Code Regs. § 11140(7)(A)(3); see also Munoz v. Giumarra Vineyard Corp., Case No. 09-cv-0703, 2015 WL 5350563, at *6 (E.D. Cal. Sept. 11, 2015) (Ishii, J.). However, not recording a rest break may create a rebuttable presumption that the employee was not relieved of

duty and that no rest break was provided.  See Brinker, 53 Cal. 4th at 1053 (Werdegar, J., concurring).

Here, as outlined supra, the evidence shows that some employees — and likely most employees — were provided with and permitted to take numerous rest breaks during their shifts. In other words, contrary to Plaintiffs' suggestion, the evidence does not show that Defendant had a universal policy or practice of not authorizing or not providing rest breaks for the entire class. Rather, to the extent that an employee was not provided with or permitted to take a rest break, such appears to be the result of the employee's particular foreperson at the time.  To compound this individualized factual issue, it also appears that Defendant's employees worked under multiple forepersons for varying lengths of time throughout the course of their employment, and the length of an employee's particular shift under a particular foreperson varied depending on numerous variables, such as the crop season and the weather.

Consequently, insofar as the rest break claim is premised on the theory that Defendant did not provide its employees with sufficient rest breaks,[6] there are important individualized questions: namely, which employees were not provided with rest breaks, and to what extent were these employees not provided with rest breaks.  Because these are individualized questions, the same generalized, class-wide proof — for example, Defendant's uniform policies for providing rest breaks — will fail to make a prima facie showing that Defendant did not provide rest breaks to each member of the overarching class.  See Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. __, 136 S.

---

[6] To be clear, the theory that Defendant did not provide its employees with sufficient rest breaks, regardless of the terms of any rest break policy that Defendant had on record, is different from the theory at issue in Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004 (2012).  In Brinker the relevant theory for the rest break claim was that the employer had a written, "common, uniform rest break policy" that was established at the employer's corporate headquarters, and that on its face the written policy, "measured against wage order requirements, allegedly violates the law."  Id. at 1033.  Because that was the theory of the rest break claim in Brinker, the California Supreme Court stated there that it was beside the point whether some employees "waived" their rest breaks.  Id. at 1033 ("An employer is required to authorize and permit the amount of rest break time called for under the wage order for its industry.  If it does not — if, for example, it adopts a uniform policy authorizing and permitting only one rest break for employees working a seven-hour shift when two are required — it has violated the wage order and is liable.  No issue of waiver ever arises for a rest break that was required by law but never authorized; if a break is not authorized, an employee has no opportunity to decline to take it.").  The rest break theory in Brinker is not the theory that Plaintiffs advance in their certification motion.  In the certification motion, Plaintiffs primarily advance the theory that Defendant did not pay for rest breaks.  Additionally, Plaintiffs also advance, but to a lesser extent, the theory that Defendant in practice (i.e., regardless of any policies on record) did not provide rest breaks — which is a theory, as discussed supra, that will require extensive individualized inquires to determine which, if any, employees were not provided with rest breaks.

Ct. 1036, 1045 (2016) (quoting <u>Newberg on Class Actions</u> § 4:50 (5th ed. 2012)) ("[A] common question is one where 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'"). Instead, resolving these individualized questions will require determining, for example, which particular forepersons did not provide rest breaks, which particular employees worked under those particular forepersons, how many shifts those particular employees worked under those particular forepersons, and how long each particular shift was under those particular forepersons. <u>See id.</u> (quoting <u>Newberg on Class Actions</u> § 4:50 (5th ed. 2012)) ("An individual question is one where 'members of a proposed class will need to present evidence that varies from member to member.'"); <u>see, e.g.,</u> <u>York v. Starbucks Corporation</u>, Case No. 08-cv-7919, 2012 WL 12931739, at *2-*3 (C.D. Cal. Sept. 12, 2012) (finding insufficient commonality where the "evidence did not and could not show, for the limited number of violations that did occur, why a break was missed or not taken at the appropriate time. That is, the statistical evidence could not show whether the manager insisted that the break be skipped or delayed, or whether the employee simply preferred to skip the break or take it at a time that was more convenient;" and "the evidence showed that members of the purported class had widely differing experiences, that the corporate policy mandating compliance with the California Labor Code was widely enforced, but that some managers, in some locations, on some occasions, apparently deviated from that policy for reasons that no doubt vary from location to location, and that the reasons why employees may have missed breaks has less to do with corporate policy and much more to do with individual circumstances."); <u>id.</u> at *3 (finding a lack of commonality-predominance where "[d]etermining whether a given employee suffered a meal or rest break violation will largely depend on numerous highly fact-specific inquires as to the reason why the employee did not take a break, such as, who was running the shift at a particular café, the employee's personal preferences, customer volume, and the number of staff at each Starbucks store"); <u>see also</u> <u>Taylor v. West Marine Products, Inc.</u>, Case No. 13-cv-4916, 2014 WL 4683926, at *11 (N.D. Cal. Sept. 19, 2014) (finding insufficient commonality and commonality-predominance where the employees' experiences were not the same in being provided with, or not provided with, rest breaks); <u>In re Bank of Am. Wage & Hour Employment Litig.</u>, 286 F.R.D. 572,

593 (D. Kan. 2012) (stating that where the evidence showed that the employer did not require the entire class of employees to skip rest breaks "all the time or even on a consistent basis," and where the evidence showed that "the occasions when employees missed rest periods were sporadic," "[i]t is impossible to determine, then — at least on a class-wide representative basis — when or whether employees missed their rest periods") (dealing with California wage-and-hour laws); Cortez v. Best Buy Stores, LP, Case No. 11-cv-5053, 2012 WL 255345, at *4 (C.D. Cal. Jan. 25, 2012) (stating that where the failure to provide rest breaks was not universal to the entire class, and where there are not time records of employees taking rest breaks, "[t]he only apparent way to determine if an employee was denied a rest period (and to determine how many rest periods that employee was denied) would be to make an individualized inquiry of each hourly employee."). Here these individualized questions will be particularly laborious because it appears that Defendant did not keep records documenting either the length of the employees' shifts or the identity of the forepersons under whom the employees worked each particular shift.

Insofar as the rest break claim is premised on the theory that Defendant failed to pay its employees for the rest breaks — a theory that is distinct from, although related to, the foregoing theory that Defendant failed to provide rest breaks — there are additional individualized questions. As outlined supra, a significant contingent of the class elected to forego their rest breaks by working through the provided rest breaks, and they did so to make more money on a piece-rate basis. See, e.g., Doc. Nos. 91-2, 109-1 (deposition of Plaintiff Marisol Gomez) (testifying that "half" of the employees that she worked with elected to forego rest breaks). The identities of the employees who comprise this significant contingent are largely unknown and, moreover, cannot be known absent extensive individualized inquiries. That is problematic because such employees were paid a piece-rate for the work they conducted during the foregone rest breaks; therefore, liability is not triggered and these employees are not entitled to additional compensation for the foregone rest breaks. Perez v. Sun Pac. Farming Co-op., Inc., Case No. 1:15-cv-259, 2015 WL 3604165, at *7 (E.D. Cal. June 8, 2015) ("When an employer pays its employees by the piece, however, those employees cannot add to their wage during rest breaks; a break is not for rest if piece-rate work continues."); see also Vaquero v. Stoneledge Furniture LLC, 9 Cal. App. 5th 98,

111 (2017) ("Indeed, the purpose of a rest period is to rest, not to work."); <u>Chaaban v. Wet Seal, Inc.</u>, 2012 WL 1114568, at *5 (Cal. Ct. App. Apr. 4, 2012) (affirming trial court's denial of class certification due to insufficient commonality and predominance) ("To recover for meal- and rest-break penalties, the class members would have to show not only that they worked through lunch but also why they worked through lunch — each time. If they chose to work through their meal or rest periods — perhaps to get an extra hour of pay — then they cannot claim another penalty. How is this to be determined for the class as a whole?").

        To be clear, the foregoing paragraph is not saying that there is insufficient commonality simply because individualized inquiries will be required as to each employee's respective <u>damages</u> for unpaid rest breaks — although it is true that such inquires will likely be required. Rather, the focus of the foregoing paragraph is on liability, not damages. <u>See</u> California Department of Industrial Relations, Opinion Letter to Robyn A. Babock Re: Rest Period Provisions, January 28, 2002, <u>available at</u> https://www.dir.ca.gov/dlse/opinions/2002-01-28.pdf (last visited October 29, 2019) ("[A]n employer <u>is not subject to any sort of penalty or premium pay obligation</u> if an employee who was truly authorized and permitted to take a rest break, as required under the applicable wage order, freely chooses without any coercion or encouragement to forego or waive a rest period.") (emphasis added). In order to determine whether and to what extent Defendant is liable for failing to pay for provided rest breaks, an individualized inquiry will be required to determine, first, which employees in the class took unpaid rest breaks and, second, how many unpaid rest breaks these employees took (which, by the flip-side of the same token, largely addresses how many rest breaks these employees worked through). Although it appears that Defendant's payroll records can reveal whether and to which employees Defendant made rest break payments (as well as safe-harbor payments), the payroll records do not appear to reveal which particular employees elected to forego provided rest breaks and which and how many rest breaks were foregone by each particular employee. Consequently, even in light of Defendant's payroll records and policies for paying (or not paying) for provided rest breaks, extensive individualized inquiries will still be required. <u>See</u> <u>Abdullah v. U.S. Sec. Assocs., Inc.</u>, 731 F.3d 952, 964 (9th Cir. 2013) (stating that "it is an abuse of discretion for the district court to rely on

uniform policies to the near exclusion of other relevant factors touching on predominance")

(citations omitted); In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 959 (9th

Cir. 2009) (holding in an overtime lawsuit that the fact that the employer applied an exemption

policy to all class employees "does not eliminate the need to make a factual determination as to

whether the class members are actually performing similar duties"); see also Ordonez v. Radio

Shack, Inc., Case No. 10-cv-7060, 2014 WL 4180958, at *5-*6 (C.D. Cal. Aug. 15, 2014)

("Plaintiff has not proffered a viable method of determining when (or if) a particular employee

took a rest break on a particular day, short of obtaining testimony regarding each Radioshack store

and each Radioshack employee.  The parties agree that rest breaks were not recorded on

employees' timecards, and, as stated above, the parties have provided conflicting declarations as to

whether defendant's rest break policy was implemented as written.  Plaintiff's analysis of

Radioshack's electronic scheduling records . . . does not alter this conclusion because the parties

agree that these records do not show when an employee actually did (or did not) take a rest break.

At most, they reflect when Radioshack scheduled rest breaks for its employees.  The Court is

therefore left without a method of establishing by common proof when rest breaks were or were

not taken by members of the class.").

The foregoing individualized questions are at the heart of Plaintiffs' rest break claim, and

this is because liability hinges on whether Defendant provided and paid its employees for rest

breaks.  Consequently, the individualized questions predominate over any common questions at

play.  Accordingly, class certification under Rule 23(b)(3) is not warranted and will be denied as

to Plaintiffs' rest break claim.

### *ii.* *Meal breaks*

Wage Order No. 14 requires employers to "authorize and permit all employees after a

work period of not more than five (5) hours to take a meal period of not less than thirty (30)

minutes."  8 Cal. Code Regs. § 11140(11).  If an employee is working no more than six hours

during a day, then the employee may validly waive a meal break by mutual consent from both the

employee and the employer.  Id.  During the meal break, the employer may not require the

employee to work unless the parties have executed a written agreement to an "on duty" meal

break, which is required by the nature of the work. Cal. Lab. Code § 226.7; 8 Cal. Code Regs. § 11140(11). Generally, the employer's duty to provide a meal break is discharged "if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not impede or discourage them from doing so." Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (2012). Further, employers are required to record meal breaks. See Cal. Code Regs. § 11140(7)(A)(3) ("Meal periods, split shift intervals and total daily hours worked shall also be recorded."). If the "employer's records show no meal period for a given shift over five hours, a rebuttable presumption arises that the employee was not relieved of duty and no meal period was provided." ABM Indus. Overtime Cases, 19 Cal. App. 5th 277, 311 (2017), as modified (Jan. 10, 2018). If the employer fails to provide the employee with the meal break, then the employer "shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal . . . period is not provided." Cal. Lab. Code § 226.7(c).

Here, for the same reasons that Plaintiffs' rest break claim lacks sufficient commonality and predominance, so too does the meal break claim. Although it appears that Defendant did not record meal break information, the evidence shows, as outlined supra, that Defendant provided its employees with thirty-minute lunch breaks, the employees were allowed to choose for themselves whether to take the provided lunch breaks, and many employees took the provided lunch breaks. To the extent that an employee was not provided with or permitted to take a thirty-minute lunch break, such was not due to Defendant's company-wide policies but, rather, was due to particular circumstances, including the employee's particular foreperson.

Consequently, there are important individualized questions with respect to the meal break claim: namely, which employees were not provided with meal breaks, and to what extent (e.g., how many shifts) were these employees not provided with meal breaks. Because these are individualized questions, the same generalized, class-wide proof — for example, Defendant's policies for providing meal breaks — will fail to make a prima facie showing that Defendant did not provide meal breaks to each member of the overarching class. Instead, as with the rest break claim, resolving these individualized questions will require determining, for example, which

particular forepersons did not provide meal breaks, which particular employees worked under those particular forepersons, and how many shifts those particular employees worked under those particular forepersons. These individualized questions will be particularly laborious because it appears that Defendant did not keep records documenting either the identity of the forepersons under whom the employees worked or whether a foreperson provided meal breaks to his or her employees.

The foregoing individualized questions are at the heart of Plaintiffs' meal break claim, and this is because liability hinges on whether Defendant provided its employees with meal breaks. Consequently, the individualized questions predominate over any common questions at play. Accordingly, class certification under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' meal break claim.

### *iii.* *Minimum wages*

Wage Order No. 14 states that "every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise." Cal. Code Regs. tit. 8, § 11140(4)(B). Piecemeal employees are not paid on an hourly basis, but when piecemeal employees are engaged in non-piecemeal "hours worked," such as during authorized rest breaks, the employees must be paid at least the minimum wage for each non-piecemeal hour worked, which cannot be arrived at by averaging. <u>Bluford v. Safeway Inc.</u>, 216 Cal. App. 4th 864, 872 (2013); <u>Armenta v. Osmose, Inc.</u>, 135 Cal. App. 4th 314, 324 (2005). "Hours worked" means the "time during which an employee is subject to the control of an employer." 8 Cal. Code Regs. § 11140(2)(G). "Hours worked" includes "all the time the employee is suffered or permitted to work, whether or not required to do so," 8 Cal. Code Regs. § 11140(2)(G), and also includes authorized rest break time. 8 Cal. Code Regs. § 11140(12). This means that piece-rate employees must be paid at least the applicable minimum wage for their authorized rest break time. Cal. Code Regs. tit. 8, § 11140(12).

Plaintiffs failed to meaningfully articulate the factual basis for their minimum wage claim. The complaint, for example, merely alleges:

33

> The Defendants failed to pay minimum wages for "all hours worked." In particular, Plaintiffs and the Class were required to work "off the clock" by, for example, arriving early for set up, driving to and from work sites during shifts, and work at hourly wage or piece rates below minimum wage, or uncompensated work while doing piece rate work.

Doc. No. 95 at 15. Yet the complaint provides no additional explanation or details about employees "arriving early," "setting up," or "driving to and from work sites." Id. As for Plaintiffs' certification motion, it too fails to identify the specific factual basis for the minimum wage claim. At most, the certification motion suggests that the minimum wage claim is premised on Defendant's failure to pay for rest breaks, which in turn would mean that Defendant failed to pay the applicable minimum wage for all hours worked. See Doc. No. 108-1 at 12 (certification motion) ("In the context of piece-rate pay, courts have held that, to comply with this requirement, employers must provide rest-break compensation separate from piece-rate compensation. Failure to do so is a violation of the minimum wage and rest-break laws."). In other words, the minimum wage claim is simply derivative of the rest break claim.

As discussed supra, Plaintiffs' rest break claim lacks sufficient commonality-predominance. Consequently, because Plaintiffs' minimum wage claim is derivative of the rest break claim, the minimum wage claim also lacks sufficient commonality-predominance. Accordingly, class certification under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' minimum wage claim.

### iv.    Overtime

Agricultural workers covered by Wage Order No. 14 "shall not be employed more than ten (10) hours in any one workday or more than six (6) days in any workweek unless the employee receives one and one-half (1 1/2) times such employee's regular rate of pay for all hours worked over ten (10) hours in any workday and for the first eight (8) hours on the seventh (7th) day of work and double the employee's regular rate of pay for all hours worked over eight (8) on the seventh (7th) day of work in the workweek." Cal. Code Regs. tit. 8, § 11140(3)(A)(1).[7]

"Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the

---

[7] For employment occurring on or after January 1, 2019, this regulation provides slightly different requirements than for employment occurring prior to that date. See Cal. Code Regs. tit. 8, § 11140(3)(A)(2).

legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit." Cal. Lab. Code § 1194(a).

A plausible overtime claim must allege that the agricultural employee worked more than ten hours in a day without being compensated for the overtime hours worked during that workweek. Landers v. Quality Commc'ns, Inc., 771 F.3d 638, 644-45 (9th Cir. 2014). "[C]onclusory allegations that merely recite the statutory language are [not] adequate": the complaint must assert facts about specific periods of time where overtime/regular pay was withheld. Id. "[A] plaintiff may establish a plausible claim by estimating the length of her average workweek during the applicable period and the average rate at which she was paid, the amount of overtime wages she believes she is owed, or any other facts that will permit the court to find plausibility." Id. at 645.

Here Plaintiffs have utterly failed to demonstrate or even attempt to demonstrate the commonality and predominance for the overtime claim. For example, the complaint merely alleges:

> Under the piece rate policy, Defendants fail to compensate for all "hours worked" (within the meaning of the Wage Orders) and fail to pay overtime premium wages for work performed in the fields.
>
> . . . .
>
> Defendants violated California Labor Code § 510 and IWC Wage Orders by failing to pay agricultural workers who were required to work more than 10 hours in one workday or 60 hours in one work week overtime wages. Defendants also violated the California Labor Code and IWC Wage Orders by compensating Plaintiffs and the Class at rates lower than the applicable overtime premium wage rate and/or without properly calculating the regular rate of pay for purposes of paying overtime to piece rate employees.

Doc. No. 95 at ¶¶ 25, 67. The foregoing allegations are "conclusory allegations that merely recite the statutory language." Landers, 771 F.3d at 644-45; see also Rodriguez v. Cleansource, Inc., Case No. 14-cv-0789, 2015 WL 5007815, at *5 (S.D. Cal. Aug. 20, 2015) ("Here, Plaintiff has plead that Defendant failed to pay overtime when employees worked over 8 hours a day and when

employees worked over 40 hours a week.  These type of allegations are precisely the type of allegations that the <u>Landers</u> court labeled as insufficient.  There are no details plead as to any specific named plaintiff or any specific workday or workweek where a plaintiff worked overtime but was not compensated therefore.") (citing <u>Landers</u>, 771 F.3d at 644-45).  As for Plaintiffs' certification motion, it is absolutely devoid of any discussion about the overtime claim.

Therefore, class certification under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' overtime claim.

### *v.*     ***Wages paid upon termination***

"If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting."  Cal. Lab. Code § 202(a). "[W]ages of workers employed by a farm labor contractor shall be paid on payroll periods at least once every week on a business day designated in advance by the farm labor contractor.  Payment on such payday shall include all wages earned up to and including the fourth day before such payday."  Cal. Lab. Code § 205.  "If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."  Cal. Lab. Code § 201(a).  "If an employer willfully fails to pay, without abatement or reduction, . . . any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."  Cal. Lab. Code § 203(a).

Plaintiffs' complaint alleges that Defendant did not timely pay all wages due upon termination, and those wages included compensation for unprovided rest breaks, unprovided meal breaks, and compensation for work done "off the clock" and / or at hourly rates below the minimum wage.  Doc. No. 95.  Plaintiffs' certification motion fails to further explain the theory or factual basis for the wages-paid-upon-termination claim, other than to assert that certification of the claim is warranted if the Court certifies any of the other "wage recovery classes," such as the rest break claim and meal break claim.  In light of this limited information from Plaintiffs'

complaint and certification motion, it appears that Plaintiffs' wages-paid-upon-termination claim is simply derivative of Plaintiffs' rest break and meal break claims.  In other words, Plaintiffs' theory is that the employees were not paid all wages due upon termination because Defendant did not pay for rest breaks and unprovided meal breaks.

As discussed <u>supra</u>, Plaintiffs' rest break claim and meal break claim lack sufficient commonality-predominance.  Consequently, because Plaintiffs' wages-paid-upon-termination claim is derivative of the rest break claim and meal break claim, the wages-paid-upon-termination claim also lacks sufficient commonality-predominance.  Accordingly, class certification under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' wages-paid-upon-termination claim.

### *vi.* *Itemized wage statements*

"An employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employee, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an accurate itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee . . ., (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee . . . .  The deductions made from payment of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement and the record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California."  Cal. Lab.

Code § 226(a). For employees who are compensated on a piece-rate basis, the itemized wage statement must also "separately state the following . . . : (A) The total hours of compensable rest and recovery periods, the rate of compensation, and the gross wages paid for those periods during the pay period" and "the total hours of other nonproductive time . . ., the rate of compensation, and the gross wages paid for that time during the pay period." Cal. Lab. Code § 226.2(a)(2).

Here the theory of Plaintiffs' wage statement claim is, according to the certification motion, that the employees' wage statements were defective in the following ways: the wage statements failed to include (1) "accurate wage entries" because Defendant did not pay for rest breaks and unprovided meal breaks; (2) the address of the employer; (3) the full name and address of the farm where work was done; and (4) the "hours work completed and paid at a 'zero' rate of compensation for rest periods." Doc. No. 108-1. Plaintiffs failed to further explicate this theory, other than to simply assert that Plaintiffs' database expert, Aaron Woolfson, supports the theory. Woolfson states in his expert report that he reviewed Defendant's wage statements and the wage statements "do not appear" to show the following information: (1) address information for Defendant; (2) address information for associated growers; (3) hours recorded for rest periods and the pay rate for the recorded rest periods; and (4) accurate wage amounts due to Defendant's failure to pay "premiums."[8] Doc. No. 108-18 at 17-18.

To the extent that the wage statement claim is premised on the theory that the wage statements failed to include "accurate wage entries" because Defendant did not pay for rest breaks and unprovided meal breaks, the wage statement claim lacks sufficient commonality-predominance for the same reasons that the rest break claim and meal break claim lack sufficient commonality-predominance. Accordingly, class certification under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' wage statement claim inasmuch as the claim is premised on this inaccurate wage entry theory.

---

[8] Woolfson also states that the wage statements fail to contain "name information for the associated grower where 'Javier Jacobo' as the listed grower with J. Jacobo's address." Doc. No. 108-18 at 17. Because the wording of that statement is so poor, the Court struggles to understand its meaning. If Woolfson is suggesting that, for some wage statements, the grower identified on the wage statement is "Javier Jacobo," then it is hard to understand how the wage statement also fails to contain the "name information" of the grower.

However, it is a different story to the extent that the wage statement claim is premised on the theory that the wage statements failed to include (1) the address information of Defendant, (2) the address information of the grower / farm that secured the services of the employer, and (3)(a) the total hours of compensable rest, recovery, and nonproductive periods, (b) the rate of compensation, and (c) the gross wages paid for those periods during the pay period. These alleged deficiencies in the wage statements apply universally to the entire class, and this is because Defendant's practices for creating wage statements were uniformly applied to all class members. Therefore, whether and the extent to which these alleged deficiencies did in fact occur are factual determinations that can be made using objective records, such as a review of the actual wage statements and / or Defendant's Datatech system for creating the wage statements. This is to say, the same generalized, class-wide proof will suffice for each member of the class to make a prima facie showing of the wage statement claim. See Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. __, 136 S. Ct. 1036, 1045 (2016) (citing Newberg on Class Actions § 4:50 (5th ed.)).

Accordingly, class certification under Rule 23(b)(3) is warranted and will be granted as to Plaintiffs' wage statement claim inasmuch as the claim is premised on the theory that the wage statements failed to include (1) the address information of Defendant, (2) the address information of the grower / farm that secured the services of the employer, and (3)(a) the total hours of compensable rest, recovery, and nonproductive periods, (b) the rate of compensation, and (c) the gross wages paid for those periods during the pay period.[9]

Having concluded that the wage statement claim will be certified, the next outstanding issue is the beginning date of the wage statement class period. Plaintiffs' certification motion proposes — without providing any meaningful analysis on the issue — that the wage statement class period should begin on September 30, 2011, which is four years prior to the filing of the

---

[9] In Defendant's opposition to Plaintiffs' certification motion, Defendant did not discuss Plaintiffs' wage statement claim. In other words, Defendant did not argue that certification should be denied as to Plaintiffs' wage statement claim, and Defendant did not address whether and why Plaintiffs' wage statement claim lacks sufficient commonality and predominance. The Court views this omission as a waiver or concession of the argument. See In re Online DVD Rental Antitrust Litig., Case No. 09-cv-2029, 2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011) (absent unusual circumstances, failure to respond to argument on merits "viewed as grounds for waiver or concession of the argument"); Sportscare of America, P.C. v. Multiplan, Inc., Case No. 10-cv-4414, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011) ("In most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.").

original complaint.  But Plaintiffs' proposed date contravenes the law.  Section 226 of the Labor Code states that a plaintiff of a wage statement claim may recover the greater of either the plaintiff's actual damages or statutorily prescribed penalties.  Cal. Lab. Code § 226(e)(1).  California law imposes a one-year statute of limitations if the plaintiff pursues wage statement penalties, Cal. Civ. Proc. Code § 340; <u>Naranjo v. Spectrum Sec. Servs., Inc.</u>, 40 Cal. App. 5th 444, ___, 253 Cal. Rptr. 3d 248, 265 (2019), and, alternatively, a three-year statute of limitations if the plaintiff pursues wage statement actual damages.  Cal. Civ. Proc. Code § 338; <u>Franke v. Anderson Merchandisers LLC</u>, Case No. 17-cv-173241, 2017 WL 3224656, at *8 (C.D. Cal. July 28, 2017).  Accordingly, to be overinclusive in the certification notice with respect to any putative class members who may elect to pursue actual damages rather than penalties, the noticed class period beginning date will be September 30, 2012, which is three years prior to the filing of the complaint.  But if a putative class member pursues penalties rather than actual damages, then the applicable class period beginning date will be September 30, 2014, which is one year prior to the filing of the complaint.

### *vii.*   ***MAWPA violations***

MAWPA provides that farm labor contractors shall not (1) provide false or misleading information to their employee about the terms of the employment, (2) violate the terms of the working arrangements that the contractor made with the employee, (3) fail to pay wages when due, and (4) fail to provide accurate itemized written statements to the employee each pay period.  29 U.S.C. §§ 1831(c), (e), 1832(a), (c).  MAWPA's requirements for itemized written statements are similar to but not identical to California's requirements for itemized wage statements.  MAWPA requires the employer to "provide to each . . . worker for each pay period, an itemized written statement" of the following information: "(A) the basis on which wages are paid; (B) the number of piecework units earned, if paid on a piecework basis; (C) the number of hours worked; (D) the total pay period earnings; (E) the specific sums withheld and the purpose of each sum withheld; and (F) the net pay."  29 U.S.C. § 1831(c)(1)(A)-(F).

Plaintiffs' certification motion fails to meaningfully address the MAWPA claim, including addressing whether the claim satisfies Rule 23(b)(3)'s commonality and predominance

requirements.  At most, the certification motion merely asserts that Plaintiffs' MAWPA claim "is a derivative claim based on the alleged violations in the aforementioned wage classes," and "[s]hould the court certify any one of the proposed wage recovery classes, this derivative claim is also ripe for adjudication."  Doc. No. 108-1 at 20.

Because Plaintiffs take the position that their MAWPA claim is purely derivative, and because Plaintiffs did not even attempt to demonstrate that the MAWPA claim independently warrants certification under Rule 23(b)(3), the Court will not independently consider this claim for certification under Rule 23(b)(3).  See Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011) (stating that party seeking class certification bears the burden of establishing conformity with Rule 23's requirements, and must do so by producing facts "affirmatively demonstrat[ing]" that certification is warranted.).  Moreover, even if the Court wanted to carry Plaintiffs' burden and investigate for itself whether certification under Rule 23(b)(3) is warranted, the Court would be in poor position to do so.  This is because Plaintiffs failed to explain the specific legal and factual basis for their MAWPA claim, such as explaining (1) which specific provisions of MAWPA were violated and (2) what specific conduct of Defendant caused the MAWPA violations.[10]  Plaintiffs' certification motion only vaguely asserts that Defendant violated MAWPA by not paying "wages owed" and not providing "employment consistent with the terms of the working arrangements made with [the employees]." Doc. No. 108-1 at 20.  With only these meager assertions on the table — assertions that simply paraphrase MAWPA's statutory provisions — the Court cannot adequately consider the commonality and predominance requirements of Plaintiffs' MAWPA claim.  See Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (stating that Rule 23 requires more than "a mere pleading standard"); Longest v. Green Tree Servicing LLC, 308 F.R.D. 310, 321 (C.D. Cal. 2015) ("More than a pleading standard, Rule 23 requires the party seeking class certification to affirmatively

---

[10]  It is true that Plaintiffs' complaint offers some allegations as to the MAWPA claim, see Doc. No. 95 at ¶ 46-48, but those allegations offer "little more than a paraphrase of the statute and [are] thus too meager, vague, or conclusory to nudge plaintiffs' claim from the realm of mere conjecture to the realm of plausibility."  Landers v. Quality Commc'ns, Inc., 771 F.3d 638, 642 (9th Cir. 2014), as amended (Jan. 26, 2015) (quoting Pruell v. Caritas Christi, 678 F.3d 10, 13 (1st Cir. 2012) (discussing overtime claim allegations)).

demonstrate compliance with the rule[.]") (citations omitted).  Accordingly, class certification

under Rule 23(b)(3) is not warranted and will be denied as to Plaintiffs' MAWPA claim.

### *viii.*    *Unfair business practices*

California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or

fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  The scope of the UCL's

"coverage is sweeping, embracing anything that can properly be called a business practice and that

at the same time is forbidden by law."  <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel.

Co.</u>, 20 Cal. 4th 163, 180 (1999) (citations omitted).  In prohibiting "any unlawful" business

practice, UCL "borrows violations of other laws and treats them as unlawful practices that the

unfair competition law makes independently actionable."  <u>Levitt v. Yelp! Inc.</u>, 765 F.3d 1123,

1129-30 (9th Cir. 2014) (citations omitted).

According to Plaintiffs, the UCL claim is "solely" a derivative claim based on the alleged

violations of the Labor Code and MAWPA.  <u>See</u> Doc. No. 95 at 24-25 (alleging that the UCL

claim is derivative of violations of Labor Code §§ 202, 203, 205.5, 206, 226, 226.7, 510, 1194,

1194.2, 1197, and 29 U.S.C. § 1801).  Plaintiffs state that the "primary purpose" of their UCL

claim is to extend the statute of limitations of the Labor Code and MAWPA claims to four years.

Doc. No. 108-1 at 21.

As discussed herein, the only "underlying" claim that Plaintiffs have demonstrated

warrants certification is the wage statement claim under Labor Code § 226.  Therefore, for

certification purposes, the itemized wage statement claim is the only underlying claim upon which

the UCL claim could be derivatively based.  But this is problematic because a UCL claim cannot,

as a matter of law, recover the remedies that are available for a wage statement claim.

The remedies available for a wage statement claim under Labor Code § 226 are actual

damages and penalties, but these remedies are not available under the UCL.  Labor Code § 226

states that an employee suffering injury as a result of the employer's knowing and intentional

failure to provide an accurate wage statement is entitled to the greater of either (1) actual damages

or (2) specified penalties not to exceed $4,000.00.  Cal. Lab. Code § 226(e)(1); <u>see also</u> <u>Novoa v.

Charter Commc'ns, LLC</u>, 100 F. Supp. 3d 1013, 1025 (E.D. Cal. 2015) (Ishii, J.) ("This Court is

convinced that Section 226 provides for both damages and penalties."). The available penalties are statutorily prescribed by Labor Code § 226, whereas the available damages are defined by California Civil Code § 3281 as follows: "Every person who suffers detriment from the unlawful act or omission of another, may recover from the person in fault a compensation therefor in money, which is called damages." Cal. Civ. Code § 3281 (cited with approval by Cortez v. Purolator Air Filtration Prod. Co., 23 Cal. 4th 163 (2000) when considering available remedies under the UCL and Labor Code). Accordingly, a general example of damages would be an award for "pain and suffering, physical injury, and property damage." Cortez, 23 Cal. 4th at 174.

In contrast to the damages and penalties that are available for a wage statement violation under Labor Code § 226, the remedies available for a UCL claim do not include actual damages or Labor Code penalties. See Pineda v. Bank of America, N.A., 50 Cal. 4th 1389, 1401 (2010) (stating that Labor Code penalties are not available under the UCL); Cortez, 23 Cal.4th at 172 (stating that "damages" are not available under the UCL); Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144 (2000). Rather, the "limited" available remedies for a UCL claim are "injunctive relief and restitution." Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co., 20 Cal. 4th 163, 179 (1999); see also Brewer v. Gen. Nutrition Corp., Case No. 11-cv-3587, 2015 WL 5072039, at *7 (N.D. Cal. Aug. 27, 2015) ("Here, the complaint seeks 'damages and penalties' for the violations of [Labor Code] section 226(a), which do not fall under the rubric of restitutionary relief provided by the UCL."). The "object" of restitution under the UCL is to restore money or property "that once had been in the possession of the person to whom it was to be restored." Cortez, 23 Cal. 4th at 177. Therefore, an example of restitution under the UCL is earned wages that the employer withheld but are "due and payable [to the employee] pursuant to section 200 et seq. of the Labor Code." Id. at 178. This is because the withheld earned wages "are as much the property of the employee who has given his or her labor to the employer in exchange for that property." Id.

In light of the foregoing law, available penalties and damages under Labor Code § 226 for wage statement violations are not restitutionary and, therefore, not recoverable under the UCL. Penalties for wage statement violations are intended to "punish" employers, not to restore or return

43

to the employee any funds which he or she has an ownership interest in.  See Pineda v. Bank of Am., N.A., 50 Cal. 4th 1389, 1401-02 (2010) (stating the same with respect to penalties under Labor Code § 203 for failure to timely pay wages).  The Court is not alone in concluding that penalties and damages under Labor Code § 226 are not recoverable under the UCL.  See Dawson v. Hitco Carbon Composites, Inc., Case No. 16-cv-7337, 2017 WL 7806561, at *9 (C.D. Cal. Aug. 3, 2017) ("Moreover, damages under § 226 for inaccurate wage statements are not subject to restitution under the UCL."); Brewer v. Gen. Nutrition Corp., Case No. 11-cv-3587, 2015 WL 5072039, at *7 (N.D. Cal. Aug. 27, 2015) ("[D]amages and penalties for the violations of section 226(a) . . . do not fall under the rubric of restitutionary relief provided by the UCL."); Ordonez v. Radio Shack, Case No. 10-cv-7060, 2011 WL 499279, at *6 (C.D. Cal. Feb. 7, 2011) ("Section 226(e) on its face provides for penalties rather than restitution and therefore cannot be the predicate violation on which to based plaintiff's UCL claim."); Campbell v. PricewaterhouseCoopers, Case No. 06-cv-2376, 2008 WL 3836972, at *6 (E.D. Cal. Aug. 14, 2008) (holding that penalty provisions of Cal. Lab. Code § 226 are not cognizable under UCL, and stating that "UCL remedies are cumulative only if the underlying statute provides for restitution — which the Labor Code sections identified above [including section 226] do not") (cited with approval by Guerrero v. Halliburton Energy Servs., Inc., 231 F. Supp. 3d 797, 808 (E.D. Cal. 2017) (O'Neill, C.J.)); see also Pineda v. Bank of Am., N.A., 50 Cal. 4th 1389, 1401-02 (2010) (holding that remedies for untimely paid wages under Labor Code § 203 are not restitutionary and, therefore, "cannot be recovered as restitution under the UCL").

Consequently, Plaintiffs' UCL claim cannot be derivative of Plaintiffs' wage statement claim.  Lacking another "underlying" claim to be derivatively based upon for certification purposes, Plaintiffs' UCL claim cannot and will not be certified under Rule 23(b)(3).  This means, in turn, that the statute of limitations for Plaintiffs' wage statement claim will not be extended to four years by the UCL.  See, e.g., Brewer v. Gen. Nutrition Corp., Case No. 11-cv-3587, 2015 WL 5072039, at *7-8 (N.D. Cal. Aug. 27, 2015) ("In seeking penalties for the alleged wage statement violations of section 226(a), the UCL does not operate to extend the claims period.").

1

### *ix.*     **PAGA**

2     "[PAGA] permits a civil action 'by an aggrieved employee on behalf of himself or herself

3 and other current or former employees' to recover civil penalties for violations of other provisions

4 of the Labor Code." Amalgamated Transit Union, Local 1756 v. Superior Court, 46 Cal. 4th 993,

5 1001 (2009) (quoting Cal. Lab. Code § 2699(a)). An aggrieved employee is "any person who was

6 employed by the alleged violator and against whom one or more of the alleged violations was

7 committed." Moorer v. Noble L.A. Events, Inc., 32 Cal. App. 5th 736, 742 (2019) (citing Cal.

8 Lab. Code § 2699(c)). PAGA effectively deputizes the aggrieved employee to act as a private

9 attorney general for the State of California. Id. at 741. "Unlike a class action seeking damages or

10 injunctive relief for injured employees, the purpose of PAGA is to incentivize private parties to

11 recover civil penalties for the government that otherwise may not have been assessed and collected

12 by overburdened state agencies." Ochoa–Hernandez v. Cjaders Foods, Inc., 2010 WL 1340777 at

13 *4 (N.D. Cal. Apr. 2, 2010). Under PAGA, "civil penalties recovered by aggrieved employees

14 shall be distributed as follows: 75 percent to the [California Labor and Workforce Development

15 Agency] and 25 percent to the aggrieved employees." Moorer, 32 Cal. App. 5th at 742 (citing Cal.

16 Lab. Code § 2699(i)).

17     "Whether a PAGA claim must be certified under Fed. R. Civ. P. 23 is an open question."

18 Varsam v. Lab. Corp. of Am., 120 F. Supp. 3d 1173, 1180-82 (S.D. Cal. 2015) (citing Baumann v.

19 Chase Investment Services Corp., 747 F.3d 1117, 1124 (9th Cir. 2014)). The California Supreme

20 Court recognized that PAGA actions are different from class actions in several respects, and on

21 that basis held in Arias v. Superior Court that PAGA does not require plaintiffs to meet state class-

22 certification requirements under California Code of Civil Procedure § 382. Arias v. Superior

23 Court, 46 Cal. 4th 969, 975 (2009). There the California Supreme Court held that "state class-

24 certification requirements did not apply to PAGA claims because unlike a class action, which

25 seeks recovery on behalf of individual employees, a plaintiff suing under PAGA steps into the

26 shoes of the state labor law enforcement agencies." Alcantar v. Hobart Serv., Case No. 11-cv-

27 1600, 2013 WL 146323, at *1 (C.D. Cal. Jan. 14, 2013) (citing Arias, 46 Cal. 4th at 986); see also

28 Sakkab v. Luxottica Retail North America, Inc., 803 F.3d 425, 436 (9th Cir. 2015) ("Because a

PAGA action is a statutory action for penalties brought as a proxy for the state, rather than a procedure for resolving the claims of other employees, there is no need to protect absent employees' due process rights in PAGA arbitrations.")  Other differences between PAGA actions and class actions recognized by the California Supreme Court are that "PAGA does not make other potentially aggrieved employees parties or clients of plaintiff's counsel, does not impose on a plaintiff or counsel any express fiduciary obligations, and does not subject a plaintiff or counsel to scrutiny with respect to the ability to represent a large class." Williams v. Superior Court, 3 Cal. 5th 531, 546-47 (2017).  The Ninth Circuit has also noted the differences between PAGA actions and class actions, concluding that the two "are more dissimilar than alike." Baumann v. Chase Inv. Servs. Corp., 747 F.3d 1117, 1124 (9th Cir. 2014) ("A PAGA action is at heart a civil enforcement action filed on behalf of and for the benefit of the state, not a claim for class relief.").

"[T]he majority of federal courts have determined that class certification under Rule 23 is not required to maintain a cause of action under PAGA. They assert that because PAGA is a law-enforcement mechanism, and not an action designed to confer a private benefit on behalf of the plaintiff and any represented employees, the Rule 23 requirements do not apply." Alcantar, 2013 WL 146323, at *3 (citing cases); see also Canela v. Costco Wholesale Corp., Case No. 13-cv-3598, 2018 WL 2331877, at *10 (N.D. Cal. May 23, 2018); Varsam v. Lab. Corp. of Am., 120 F. Supp. 3d 1173, 1180-82 (S.D. Cal. 2015).  However, even courts that have concluded that PAGA actions are not subject to Rule 23's requirements have held that if the plaintiff wants to maintain the PAGA action as a class action — i.e., "litigated as a class action with the protections provided by Rule 23" — then the PAGA action must satisfy Rule 23's requirements.  See, e.g., Canela, 2018 WL 2331877, at *9 ("So long as the Rule 23 requirements are satisfied, the matter may be litigated as a class action with the protections provided by Rule 23."); Thomas v. Aetna Health of California, Inc., Case No. 10-cv-1906, 2011 WL 2173715, at *13 (E.D. Cal. June 2, 2011) ("Rule 23 certification is not necessary to the extent PAGA actions are brought in a non-class representative capacity"), report and recommendation adopted sub nom. Thomas v. Aetna, Inc., Case No. 10-cv-1906, 2011 WL 13240291 (E.D. Cal. Aug. 31, 2011) (Ishii, J.).

Here Plaintiffs' certification motion does not request class certification of the PAGA action, see Doc. No. 108-1, and Plaintiffs' complaint expressly states that the PAGA action "need not comply with Class Action Certification." Doc. No. 95 at ¶ 116. Therefore, because class certification is not being sought for the PAGA action, the Court need not consider whether the PAGA action satisfies Rule 23's requirements, and the PAGA action will not be certified.

**B.    Superiority**

The superiority requirement of Rule 23(b)(3) asks whether class aggregation is superior to other available procedural alternatives, such as individual actions, coordinated individual actions, test or model cases, and consolidated individual actions. See Advisory Committee Note to 1966 Amendments, 39 F.R.D. 69, 103 (1966) (discussing alternative procedures). Rule 23(b)(3) lists four illustrative, non-exhaustive factors to help guide courts in determining whether the advantages of class aggregation are present: (1) the class members' interests in individually controlling their own litigation; (2) the extent and nature of any already-pending litigation concerning the controversy; (3) the desirability of concentrating claims in one judicial forum; and (4) potential problems that could arise in managing the case as a class suit. Fed. R. Civ. P. 23(b)(3).

Based on these factors, the Court concludes that class aggregation is superior for the wage statement claim identified supra. And were it not for the commonality and predominance problems discussed supra, the Court would similarly conclude that class aggregation is superior for Plaintiffs' other claims.

First, the class members do not have a strong interest in individually controlling their own litigation, and this is because the individual members' potential recovery appears to be small when compared to the expense and burden of litigation. See Beattie v. CenturyTel, Inc., 511 F.3d 554, 567 (6th Cir. 2007) ("Such a small possible recovery would not encourage individuals to bring suit, thereby making a class action a superior mechanism for adjudicating this dispute."); Smilow v. Southwestern Bell Mobile Systems, Inc., 323 F.3d 32, 41 (1st Cir. 2003) ("The core purpose of Rule 23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual claims would be too small to warrant litigation."); Kempen v. Matheson Tri-Gas, Inc., Case No.

15-cv-660, 2016 WL 4073336, at *7 (N.D. Cal. Aug. 1, 2016) (finding estimated recovery of $50 for one class and $500 for the other class "suggest that the incentive to litigate any individual claim is low and that class treatment is superior").

Second, there does not appear to be any other already-pending litigation concerning the controversy.  See Gregory v. Finova Capital Corp., 442 F.3d 188, 191 (4th Cir. 2006); Wolph v. Acer America Corp., 272 F.R.D. 477, 489 (N.D. Cal. 2011) ("There is no other pending litigation that relates to the issues raised herein.  Thus, the first two factors weigh in favor of certification.").

Third, judicial economy would be served by concentrating the many class members' claims into one forum and one case, as opposed to multiple forums and dozens or hundreds of individualized cases.  Additionally, this forum appears to be relatively centralized for the parties and most witnesses.  See Breeden v. Benchmark Lending Group, Inc., 229 F.R.D. 623, 631 (N.D. Cal. 2005) (finding superiority requirement satisfied where "the parties, evidence, and witnesses are all likely to be located relatively close to this particular forum").

Fourth, aside from the predominance problems discussed supra — which in turn will create relatively more manageability problems than other procedural alternatives, Williams v. Mohawk Industries, Inc., 568 F.3d 1350, 1358 (11th Cir. 2009) (stating that the manageability inquiry focuses not on "whether this class action will create significant management problems, but instead [on] whether it will create relatively more management problems than any of the alternatives"); Romero v. Philip Morris Inc., 109 P.3d 768, 781 (N.M. Ct. App. 2005) ("Predominance and superiority are often peas in the same pod when management of a class action is at issue."); Newberg on Class Actions § 4:72 (5th ed.) ("[T]he manageability concern often simply echoes the predominance analysis.") — Defendant has not identified any potential manageability problems that are unique to this lawsuit.

**5.**     **Standing**

Defendant argues that class certification is inappropriate because neither Marisol Gomez nor Ignacio Osorio have standing.  The premise of Defendant's standing argument is that Defendant did not violate the Labor Code's requirements for meal breaks and rest breaks, at least with respect to Gomez and Osorio.

48

"[S]tanding is the threshold issue in any suit.  If the individual plaintiff lacks standing, the court need never reach the class action issue." Lierboe v. State Farm Mut. Auto. Ins. Co., 350 F.3d 1018, 1022 (9th Cir. 2003) (citing Newberg on Class Actions § 3:19 (4th ed.)).  "In a class action, standing is satisfied if at least one named plaintiff meets the requirements." Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007).  "As we know from the oft-repeated passages in Lujan, standing requires that (1) the plaintiff suffered an injury in fact, i.e., one that is sufficiently 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical,' (2) the injury is 'fairly traceable' to the challenged conduct, and (3) the injury is 'likely' to be 'redressed by a favorable decision.'" Bates v. United Parcel Serv., Inc., 511 F.3d 974, 985 (9th Cir. 2007) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  "In class actions, the named representatives must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." Pence v. Andrus, 586 F.2d 733, 736–37 (9th Cir. 1978). Further, "[s]tanding must be shown with respect to each form of relief sought, whether it be injunctive relief, damages or civil penalties." Bates, 511 F.3d at 985.

The elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." Sali v. Corona Reg'l Med. Ctr., 909 F.3d 996, 1006 (9th Cir. 2018) (citations omitted).  Consequently, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.  Hence, the proof required to establish standing varies at the complaint, summary judgment and trial phases." Id. (emphasis in original) (citations omitted).  Thus, at the summary judgment phase, "plaintiffs must set forth by affidavit or other evidence 'specific facts' to survive a motion for summary judgment." Seals v. McBee, 898 F.3d 587, 591 (5th Cir. 2018), as revised (Aug. 9, 2018) (citing Bennett v. Spear, 520 U.S. 154, 167-68 (1997)).  By contrast, when "ruling on a motion to dismiss for lack of standing, the well-pleaded allegations of the complaint must be accepted as true." Perry v. Vill. of Arlington Heights, 186 F.3d 826, 829 (7th Cir. 1999) (citations omitted).

Here Defendant's standing argument will not preclude class certification of the wage statement claim. Defendant has not demonstrated that it provided Osorio with compliant wage statements, whereas Osorio declared that he did not receive compliant wage statements. See Doc. No. 108-6. Thus, at this phase of the litigation, Osorio has sufficiently demonstrated that he has standing to bring and maintain his wage statement claim. See Cal. Lab. Code § 226(e)(2) (defining "injury" for purposes of a wage statement claim).

Second, with respect to the other claims brought by Gomez and Osorio — claims that will not be certified — Defendant has failed to sufficiently raise and support its standing argument, so at this time the Court will not make a ruling on the issue. For one, Defendant has not formally moved the Court for a ruling on Gomez's and Osorio's standing. Instead, Defendant merely flags the standing issue in its opposition brief to the certification motion, and Defendant obviously did this in an attempt to defeat class certification. If Defendant truly wants the Court to rule on Gomez's and Osorio's standing as to the non-certified claims, then Defendant should move the Court for that ruling. For another, Defendant's standing argument is premised, in part, on the assertion that Gomez and Osorio received "safe harbor" payments from Defendant pursuant to Labor Code § 226.2, which, if true, would possibly act as an affirmative defense to some of the Labor Code claims. But Defendant failed to sufficiently demonstrate that Gomez and Osorio received safe harbor payments. For example, in its attempt to prove that Osorio received safe harbor payments, Defendant merely cites to a large batch of (presumably payroll) documents that lack foundation and raise more questions than answers.[11] The Court will not do Defendant's work (or, more specifically, Defendant's counsel's work) for it: the Court will not mine through numerous pages of documents, nearly all of which make little sense to the Court absent some foundation, in an attempt to find some evidence of the alleged safe harbor payments.

---

[11] The documents at issue appear to be payroll documents from Defendant, but this is only the Court's presumption because Defendant failed to lay an adequate foundation for the documents. Defendant attempted to lay some foundation for the documents through a declaration from Defendant's counsel's paralegal, Patricia Morrison. See Doc. No. 109-2 at ¶ 7. But there is no evidence before the Court indicating that Morrison is qualified to lay the foundation for the documents.

**6.** **Exhaustion of administrative remedies**

Defendant argues that Gomez and Osorio did not exhaust their administrative remedies with respect to the PAGA claim and, for that reason, the Court should not certify the PAGA claim. The doctrine of administrative exhaustion requires litigants to first exhaust their available administrative remedies before bringing their claims to court.  See, e.g., Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51 (1938).  For California claims, "the purposes of the exhaustion doctrine are to bolster administrative autonomy, permit the agency to resolve factual issues and apply its expertise, to mitigate damages, and to promote judicial economy."  Gallup v. Superior Court, 235 Cal. App. 4th 682 (2015) (citing Jonathan Neil & Associates, Inc. v. Jones, 33 Cal. 4th 917, 930-931 (2004)).  PAGA provides for administrative remedies.  Specifically, PAGA requires the aggrieved employee to first provide notice of the employment violations to the employer and the Labor and Workforce Development Agency ("LWDA") before commencing a civil suit. California Labor Code § 2699.3 states,

> The aggrieved employee or representative shall give written notice by online filing with the Labor and Workforce Development Agency and by certified mail to the employer of the specific provisions of this code alleged to have been violated, including the facts and theories to support the alleged violation.

Cal. Lab. Code § 2699.3(a)(1)(A).  Letters of notice provided to the LWDA must contain "facts and theories specific to the plaintiff's principal claims; merely listing the statutes allegedly violated or reciting the statutory requirements is insufficient."  Amey v. Cinemark USA Inc., Case No. 13-cv-5669, 2015 WL 2251504, at *13 (N.D. Cal. May 13, 2015) (citations omitted); see also Archila v. KFC U.S. Properties, Inc., 420 Fed. Appx. 667 (9th Cir.2011) (stating that to exhaust administrative remedies under PAGA, notice to the LWDA must contain "facts and theories" which support a plaintiff's allegations); Varsam v. Lab. Corp. of Am., 120 F. Supp. 3d 1173, 1182 (S.D. Cal. 2015) (dismissing a PAGA claim due to the plaintiff's failure to recite the "facts and theories" of her PAGA claim).  The written notice must be accompanied by a filing fee of seventy-five dollars, subject to certain exceptions.  Cal. Lab. Code § 2699.3(a)(1)(B).  The aggrieved employee must then wait until either the LWDA tells the employee that the agency will not

1  investigate the grievance or sixty-five calendar days,[12] whichever is shorter, before commencing a

2  civil action.  Cal. Lab. Code § 2699.3(a)(2)(A).

3      In California, exhaustion of administrative remedies is a procedural prerequisite, meaning

4  the failure to exhaust administrative remedies does not deprive the court of subject matter

5  jurisdiction.  Mokler v. Cty. of Orange, 157 Cal. App. 4th 121, 135 (2007); Wallis v. Farmers

6  Grp., Inc., 220 Cal. App. 3d 718, 735 (1990).  Federal district courts in California have held that

7  failure to exhaust administrative remedies under PAGA justifies dismissing PAGA claims.  See

8  Sinohui v. CEC Entm't, Inc., Case No. 14-cv-2516, 2016 WL 3406383, at *4 (C.D. Cal. June 14,

9  2016); Gonzalez v. OfficeMax N. Am., Inc., Case No. 07-cv-452, 2014 WL 12701077, at *5 (C.D.

10 Cal. Jan. 6, 2014); Silva v. U.S. Bancorp, Case No. 10-cv-1854, 2011 WL 7096576, at *3 (C.D.

11 Cal. Oct. 6, 2011).  Federal district courts in California have also held that failure to exhaust

12 administrative remedies under PAGA is an affirmative defense subject to waiver.  Alcantar v.

13 Hobart Serv., Case No. 11-cv-1600, 2013 WL 228501, at *4 (C.D. Cal. Jan. 22, 2013); Batson v.

14 United Parcel Serv., Inc., Case No. 12-cv-839, 2012 WL 4482782, at *2 (S.D. Cal. Sept. 27,

15 2012); see also Healy Tibbits Const. Co. v. Ins. Co. of N. Am., 679 F.2d 803, 804 (9th Cir.1982)

16 ("While state law defines the nature of the defenses, the Federal Rules of Civil Procedure provide

17 the manner and time in which defenses are raised and when waiver occurs.").

18     Based on the information before it, the Court has doubts that Plaintiffs complied with

19 PAGA's administrative requirements.  In Defendant's opposition brief to Plaintiffs' certification

20 motion, Defendant's counsel's paralegal, Patricia Morrison, declared that she searched online for

21 information concerning Plaintiffs' notice sent to the LWDA but could find no information

22 suggesting that such a notice was sent by Plaintiffs.  Then in Plaintiffs' reply brief, Plaintiffs

23 avoided addressing the issue.  Presumably if Plaintiffs had sent a written notice to the LWDA and

24 Defendant, then there exists some record of that notice in Plaintiffs' possession.  Yet Plaintiffs did

25 not provide the Court with evidence of such a notice.  Further, in Plaintiffs' first amended

26 complaint, which was filed on August 28, 2018 — nearly three years after the original complaint

27
28
_____

[12]  The earlier version of Cal. Lab. Code § 2699.3(a)(2)(A) contained a thirty-three day deadline, not a sixty-five day deadline.  See Stats. 2016, c. 31 (S.B.836), § 190, eff. June 27, 2016) (changing deadline from thirty-three days to sixty-five days).

was filed — Plaintiffs indicate that the PAGA administrative requirements are tasks that are pending completion.  See Doc. No. 95 at ¶ 6 ("The pre-lawsuit notice requirements set forth in Labor Code § 2699.3 will be satisfied by written notice by certified mail to all Defendants and to the Labor and Workforce Development Agency, detailing the Labor Code and IWC Wage Order violations averred herein.  The waiting time period will have elapsed prior to service of this complaint.") (emphasis added); id. at ¶ 2 ("All PAGA administrative requirements will have been met for this purpose prior to service of this complaint.") (emphasis added).

Despite the Court's doubts as to Plaintiffs' compliance with PAGA's administrative requirements, the Court will not rule on the issue at this time.  This is because Defendant has not properly raised the issue with the Court.  First, it appears that Defendant has not pleaded an affirmative defense for Plaintiffs' failure to exhaust administrative remedies.  See generally Doc. No. 48 (Defendant's answer).  Second, Defendant has not raised the exhaustion argument through a motion, such as a motion for summary judgment.  See Magana v. Com. of the N. Mariana Islands, 107 F.3d 1436, 1446 (9th Cir. 1997) ("We have liberalized the requirement that defendants must raise affirmative defenses in their initial pleadings.  However, defendants may raise an affirmative defense for the first time in a motion for summary judgment only if the delay does not prejudice the plaintiff.") (emphasis added); Szucs v. L & D Scaffolding, Inc., 78 F.3d 594 (9th Cir. 1996) ("While a defendant should generally plead affirmative defenses in his or her answer, absent a showing of prejudice to the plaintiff, an affirmative defense may be raised by motion before the trial court.") (emphasis added) (citations omitted).

**7.     Quality of counsel's filings and briefing**

The Court generally does not go out of its way to comment on the quality of counsel's filings and briefing.  However, here the Court will do so for the following reasons.  First, the deficiencies with the briefing surrounding the certification motion significantly increased the burden on the Court.  Second, the quality of the filings and briefing bear on the adequacy of class counsel, which is a required consideration under Rule 23(a).  Third, the quality of the filings and briefing may bear on any future award of attorney's fees.  Fourth, problems with certain filings

could endanger the parties' and nonparties' privacy, security, and financial interests.  In no particular order, the following problems are obvious to the Court.

First, as noted <u>supra</u>, Plaintiffs' certification motion advances case law that has been prominently rejected by the Supreme Court.

Second, as noted <u>supra</u>, Plaintiffs' certification motion includes an erroneous beginning date for the proposed piece-rate subclass, and the Court suspects that this error was the careless result of copying-and-pasting from a prior certification motion filed by Plaintiffs' counsel in another lawsuit.

Third, Plaintiffs' certification motion repeatedly asserts that class certification is warranted in light of Defendant's company-wide policies.  But despite the heavy reliance on these alleged company-wide policies, Plaintiffs never provided the Court with any deposition testimony or specific interrogatory answers from someone qualified to speak about Defendant's company-wide policies, such as a Rule 30(b)(6) witness or the president of the company.[13]  Presumably Javier Jacobo could have filled that role.

Fourth, despite its excessive length at fifty-four pages, Defendant's opposition brief to the certification motion struggled to concisely identify and incisively analyze the relevant legal and factual issues.  Instead, the opposition brief dedicated the first twenty-six pages to simply parroting the allegations, assertions, and declarations made in Plaintiffs' complaint, Plaintiffs' certification motion, and the witness declarations attached to the certification motion.  Beginning not until the twenty-seventh page of the brief, Defendant's opposition brief ventures into the actual legal analysis.  But the analysis is almost entirely comprised of discrete and disjointed statements of law — too many of which come from non-controlling jurisdictions — that are poorly, if at all, synthesized and applied towards the key facts in this case.

Fifth, as noted <u>supra</u>, Defendant's opposition briefing broadly cites to batches of evidentiary documents without providing helpful pin-cites or appropriate foundation.  <u>See, e.g.</u>, Doc. No. 109 (Defendant's opposition brief citing to "Exhibit B" through "Exhibit M" without

---

[13]  It appears that Plaintiffs' database expert, Aaron Woolfson, was similarly not provided with "company-wide policy" testimony from a representative of Defendant.

providing any pin-cites or foundation despite the exhibits comprising approximately seventy pages of presumably payroll records that do not speak for themselves).

Sixth, multiple filings contain sensitive personal information about parties and nonparties. See, e.g., Doc. Nos. 109-1, 109-2 (revealing dozens, if not hundreds, of individuals' names, addresses, and Social Security numbers); c.f., Fed. R. Civ. P. 5.2. All or most of the sensitive personal information in these filings serves no beneficial purpose, leading the Court to suspect that such filings were carelessly made without responsible review and redaction. As for the filings that contain sensitive information that the Court is currently aware of (i.e., Doc. Nos. 109-1, 109-2), the Court will seal those filings pursuant to Rule 5.2 and order Defendant's counsel to refile those filings with appropriate redactions within three days of this order.[14] The Court will also order counsel for all parties to, within three days of this order, review the entire docket, identify any additional filings that warrant sealing and redaction pursuant to Rule 5.2, and file with the Court either a list of the additional filings that warrant sealing and redaction or a declaration stating that no additional filings reveal sensitive information under the purview of Rule 5.2.

Seventh, despite the fact that the amended complaint was filed nearly three years after the original complaint, the amended complaint states — just like the original complaint states — that the service of the complaint and the fulfilment of the applicable PAGA administrative remedies are events pending completion. Cf. Doc. No. 95 at ¶¶ 2, 6 (first amended complaint filed on Aug. 28, 2018) ("All PAGA administrative requirements will have been met for this purpose prior to service of this complaint. . . . The pre-lawsuit notice requirements set forth in Labor Code § 2699.3 will be satisfied by written notice by certified mail to all Defendants and to the Labor and Workforce Development Agency, detailing the Labor Code and IWC Wage Order violations averred herein. The waiting time period will have elapsed prior to service of this complaint."); Doc. No. 1 at ¶¶ 2, 6 (original complaint filed on Sept. 30, 2015) (same). In other words, the amended complaint failed to amend obvious factual developments that (presumably) occurred since the filing of the original complaint, such as the completed service of process.

---

[14] The redactions must comply with Rule 5.2.

Eighth, in paragraph 13 of the original complaint, Plaintiffs' counsel incorrectly and inexplicably referred to their client, Marisol Gomez, as "Mora." Doc. No. 1 at ¶ 13. Then, despite filing the amended complaint nearly three years after the original complaint, Plaintiffs' counsel again referred to their client as "Mora," indicating that counsel failed to catch and correct this obvious error. See Doc. No. 95 at ¶ 13.[15]

# **ORDER**

Accordingly, IT IS HEREBY ORDERED as follows:

1. Plaintiffs' certification motion (Doc. No. 108) is GRANTED, IN PART, and DENIED, IN PART, as follows:

   a. Plaintiffs' wage statement claim, as identified supra, is CERTIFIED for class aggregation under Rule 23(b)(3). The class is defined as follows:

   > All individuals who were employed as a non-exempt field worker or agricultural worker from September 30, 2012, to November 5, 2019, by J. Jacobo Farm Labor Contractor, Inc.

   b. Plaintiffs' other claims are NOT CERTIFIED for class aggregation under Rule 23.

   c. Ignacio Osorio is APPOINTED as the class representative.

   d. Stan Mallison, Hector Martinez, Mario Martinez, and Edgar Aguilasocho are APPOINTED as the class counsel.

2. The parties must promptly MEET AND CONFER about the submission of a joint stipulated class notice and distribution plan. Within twenty-one days of this order, the parties must FILE either a stipulated class notice and distribution plan or a notice that no stipulation can be agreed to. If the parties cannot agree to a class notice or distribution plan, then Plaintiffs must FILE a proposed class notice and distribution plan within thirty-five days of this order, and Defendant shall have fourteen days following Plaintiffs' filing to file any objections, and Plaintiffs shall have seven days

---

[15] Plaintiffs' counsel also incorrectly referred to their client, Plaintiff Ignacio Osorio, as "Ignacio Osorio Cisneros-Morales." Plaintiffs' counsel states that this error was due to "an administrative error." Doc. No. 111-1 at ¶ 6.

1    following Defendant's filing to FILE a reply.

2    3.  Pursuant to Rule 5.2 of the Federal Rules of Civil Procedure and for the reasons

3        discussed supra, the Clerk of Court shall SEAL the following filings on the docket:

4        Doc. No. 109-1 and Doc. No. 109-2.

5    4.  Within three days of this order, Defendant shall REFILE the documents previously

6        filed as Doc. No. 109-1 and Doc. No. 109-2, and the refiled documents must contain

7        redactions that are consistent with Rule 5.2.

8    5.  Within three days of this order, the parties must REVIEW the entire docket, identify

9        any additional filings that warrant sealing and redaction pursuant to Rule 5.2, and

10       JOINTLY FILE either a list of the additional filings that warrant sealing and redaction

11       or a declaration stating that no additional filings reveal sensitive information within the

12       scope of Rule 5.2.

13   6.  This case is REFERRED BACK to the assigned magistrate judge for further

14       scheduling and other proceedings consistent with this order.

IT IS SO ORDERED.

Dated:   November 5, 2019   _____

                                    SENIOR  DISTRICT  JUDGE