# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARISOL GOMEZ and IGNACIO OSORIO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>J JACOBO FARM LABOR CONTRACTOR, INC.; and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. 1:15-cv-01489 JLT-BAM<br><br>ORDER DENYING DEFENDANT'S MOTION TO DECERTIFY CLASS (Doc. 168)<br><br>ORDER DENYING DEFENDANT'S MOTION IN LIMINE TO EXCLUDE PLAINTIFFS' EXPERT WITNESS (Doc. 167) |

This class action lawsuit involves an employment dispute with J. Jacobo Farm Labor Contractor, Inc.  The Court certified Plaintiff's claim that Defendant failed to issue proper itemized wage statements to its employees in violation of California law.[1]  (Doc. 114.)  The Court then modified its original certification order by also certifying Plaintiff's claim that Defendant failed to pay its employees for rest breaks in violation of California law.[2]  (Doc. 126.)  The Court further modified its order by setting the class period end date for the certified rest break class to

---

[1] The class is defined as follows: "All individuals who were employed as a nonexempt field worker or agricultural worker from September 30, 2012, to November 5, 2019, by J. Jacobo Farm Labor Contractor, Inc."

[2] The Court also certified Plaintiff's derivative claims—namely, Plaintiff's Migrant and Seasonal Agricultural Workers Protection Act of 1983 ("MAWPA") claim, accurate itemized wage statement claim, wages upon termination/resignation claim, and unfair business practices claim—because liability for these claims hinges on whether Defendant violated California's rest break laws.  (Doc. 126.)

November 5, 2019.³ (Doc. 138.)

Before the Court is Defendant's Motion to Decertify and Motion in Limine to Exclude Plaintiff's Expert Witness. (Doc. 167; Doc. 168.) Defendant's Motion to Decertify seeks decertification of Plaintiff's rest break pay claim but not the wage statement claim. Plaintiff filed Opposition briefs, (Doc. 171; Doc. 172.), and Defendant filed Reply briefs. (Doc. 173; Doc. 174.) The Court found the matters suitable for decision without oral arguments, and the hearing on same was vacated. (Doc. 175.) For the reasons below, the Court **DENIES** Defendant's Motion in Limine and **DENIES** Defendant's Motion to Decertify the class.

## FACTUAL BACKGROUND

The original certification order includes a detailed recitation of facts relevant to the certified classes. (Doc. 114 at 1-9.) The facts in the original certification order control and remain unchanged. For purposes of this order, the Court will summarize additional facts relevant to Defendant's Motion to Decertify and Motion in Limine.

Defendant is a farm labor contractor. It employed at least 3,267 employees between December 20, 2011, and January 6, 2018. Some of the employees worked as field workers. For the most part, Defendant allowed the employees to decide when to take breaks and the length of the breaks. A significant contingent of the class elected to forego their rest breaks by working through the provided rest breaks.

Of Defendant's 3,267 employees, 2,868 employees (or 87.8%) were paid on a piece-rate basis at some point during their employment. Of those 2,868 piece-rate employees, 2,320 employees (or 80.1%) were paid with checks that did not include any payment for rest breaks. Some but not all employees were paid retroactively by Defendant by check for unpaid break and non-productive time. Defendant appears to have payment records identifying the employees who were given retroactive "safe harbor" payments and minimum wage true ups. Defendant also provided its employees with wage statements, some of which failed to include information about

---

³ The rest break claim and derivative claims class is defined as follows: "All individuals who have been employed, or are currently employed, by Defendant as a non-exempt "field worker" or agricultural worker, who worked on a piece rate basis at any time from September 30, 2011, to November 5, 2019, and were not separately compensated for rest periods during their piece rate shifts."

2

rest breaks and rest payments. Defendant universally applied the same system and practices for wage statements to all employees.

Defendant used a software called Datatech to process and maintain payroll records. Plaintiffs designated Aaron Woolfson as an expert witness in this action to "provide structure to, and analyze time keeping and payroll data" produced from Defendant's Datatech records. (Doc. 168-1 at 8-9.) In his expert report, Woolfson states that the Datatech records "indicate that 100% of checks dated before 2/27/2016 which involved piece-work [or approximately 2,275 checks] did not have any payment for rest periods." (*Id.* at 11, 15.) Woolfson's report further states he "created the damage formulas and assumptions that will transform all of Defendants data into damages which [he] will present at trial." (*Id.* at 13.) Defendant designated Joseph Krock as a rebuttal expert to provide comment regarding "claims made by Mr. Woolfson" and "his qualifications as an expert witness in matters similar to this." (Doc. 168-1 at 237.)

## LEGAL STANDARD

### 1. Decertification

District courts retain the "flexibility to address problems with a certified class as they arise, including the ability to decertify." *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 809 (9th Cir. 2010). "Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *Id.* (citing *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *see also Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) ("A district court may decertify a class at any time."). In resolving a motion for class decertification, the court may rely on "previous substantive rulings in the context of the history of the case," "subsequent developments in the litigation," and "the nature and range of proof necessary to establish the class-wide allegations." *Munoz v. Phh Mortg. Corp.*, 478 F. Supp. 3d 945, 985 (E.D. Cal. 2020) (citing *Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 502 (E.D. Cal. 2014)). The standard is the same for class decertification as it is with class certification: a district court must be satisfied that the requirements of Rules 23(a) and (b) are met to allow plaintiffs to maintain the action on a representative basis. *Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 947 (9th Cir. 2011).

## 2. **Rule 23**[4]

Under Rule 23(b)(3), a plaintiff must demonstrate "that the questions of law or fact common to class members predominate over any questions affecting only individual members." *Castillo v. Bank of Am., NA*, 980 F.3d 723, 730 (9th Cir. 2020) (citing *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 596 (9th Cir. 2012)). Rule 23(b)(3)'s "predominance" requirement inquires into whether the class members' interests are "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. v. Windsor*, 521 U.S. 591, 623 (1997). The inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (citing *Amchem Prods.*, 521 U.S. at 623). "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

## **DISCUSSION**

*Defendant's Arguments*

Defendant argues that the class should be decertified because common questions regarding Plaintiff's rest break pay claim do not predominate over individualized inquiries. Specifically, Defendant asserts that for Plaintiff to establish his rest break pay claim, he must identify the total number of shifts class members worked each day, and then prove per day that Defendant failed to pay its employees for rest breaks. Defendant contends that Plaintiff cannot prove this because Plaintiff's proffered evidence—specifically, Woolfson's expert report—is unreliable for several reasons. First, Woolfson's report relies on incomplete records and weekly payroll data that cannot be used to ascertain how many work shifts—and corresponding rest break violations—occurred each day. Second, Woolfson's report does not provide a calculation of damages using the Datatech data it relies on. Finally, Woolfson's report does not include any supplemental analysis

---

[4] Defendant's Motion to Decertify challenges only the commonality-predominance element of Rule 23(b)(3). (Doc. 160 at 17.) Therefore, the Court will limit its review of Defendants' Motion to this component of Rule 23.

4

1 using extrinsic non-Datatech data, such as data drawn from surveys or studies of the class that
2 Woolfson conducted independently.

   *Plaintiff's Arguments*

   Plaintiff argues that Defendant's Motion to Decertify should be denied because Woolfson's expert report demonstrates that common questions regarding rest break violations still predominate over individual inquiries. According to Plaintiff, Woolfson's reliance on weekly payroll data does not make his report unreliable because his findings can still be used to prove that class members worked shifts with mandatory rest breaks and that Defendant failed to pay its employees for those rest breaks. For example, Plaintiff notes that if a weekly payroll record shows that an employee worked 14 hours over a four-day stretch, then basic principles of logic and math demonstrate that the employee worked at least one 3.5-hour shift on a given day and, therefore, was entitled to a rest break and corresponding rest break pay. Although Woolfson's report does not indicate the exact number of shifts and violations that occurred each day, Plaintiff argues that this issue ultimately goes to damages, which is no bar to class certification. Furthermore, Plaintiff argues that Woolfson's inability to show when shift-level violations occurred is a result of Defendant's own timekeeping practices. Specifically, Woolfson's report could not rely on daily payroll data drawn from Defendant's system because Defendant did not track daily time records in the first instance.

   *Discussion*

   In certifying Plaintiff's rest break pay claim in its original order, the Court observed that Section 226.7 of the California Labor Code requires employers to provide rest breaks consistent with the applicable wage order. (Doc. 126 at 9.) Wage Order No. 14 requires employers of agricultural workers to provide rest breaks and count authorized rest breaks "as hours worked for which there shall be no deduction from wages." 8 Cal. Code Regs. tit. 8, § 11140(12). "The wage order's requirement not to deduct wages for rest periods presumes the [employees] are paid for their rest periods." *Bluford v. Safeway Inc.*, 216 Cal. App. 4th 864, 871 (2013) (interpreting similar language in Wage Order Nos. 7 and 9, Cal. Code Regs. tit. 8, §§ 11070(12); 11090(12)). This means that in a piece-rate system, authorized rest breaks "must be separately compensated"

5

and "are considered hours worked." *Bluford*, 216 Cal. App. 4th at 872. Considering this authority, the Court concluded that "an employer is liable for violating California's rest break laws if the employer provides a piece-rate employee with a mandated rest break but fails to pay the employee for the rest break—regardless of whether the employee voluntarily works through the provided rest break." (Doc. 126 at 9.)

The Court thereafter certified Plaintiff's rest break pay claim because a common question existed as to "whether Defendant had a universal practice of not paying the rest period subclass for mandated rest breaks." (*Id.* at 11.) This question was "susceptible to generalized, class-wide proof" because Defendant's payroll practices were the same for all members of the rest period subclass. (*Id.*) The Court further found that this common question predominated over individualized inquiries because it can be answered by simply looking to Defendant's universal payroll practices, which can be objectively and quickly verified through Defendant's payroll records, among other methods. (*Id.*) After the Court certified Plaintiff's rest break pay claim class, Plaintiffs designated Woolfson as an expert witness to analyze Defendant's payroll records. Woolfson completed his report on Defendant's payroll records on October 28, 2022. (Doc. 168-1 at 16.)

After reviewing Woolfson's report, Defendant argues that Plaintiff's rest break pay claim should be decertified because Woolfson does not reliably show how Defendant's payroll data can be used to establish Defendant's liability to the class. (Doc. 167; Doc. 168.) Considering Defendant's arguments, the issue now before the Court is whether Plaintiff's expert report is sufficiently reliable under *Daubert*, and if not, whether the class should be decertified on commonality-predominance grounds. The Court will address each issue below in turn.

A. Plaintiff's Expert Report

As an initial matter, the Court notes that "[i]nadmissibility alone is not a proper basis to reject evidence submitted in support of class certification." *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1006 (9th Cir. 2018). However, the Court recognizes that "in evaluating challenged expert testimony in support of class certification, a district court should evaluate admissibility under the standard set forth in *Daubert*." *Id.* Because Defendant filed a Motion in Limine to

exclude Plaintiffs' expert (Doc. 167), the Court will review the admissibility of the expert's testimony under the *Daubert* standard in addition to the arguments set forth in Defendants' Motion to Decertify (Doc. 168).

Under *Daubert*, the Court has a duty to act as a "gatekeeper" for expert testimony by assessing its admissibility. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 145, 147 (1999). This inquiry is governed in part by Fed. R. Evid. 702 which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

To determine the reliability of expert testimony, the Supreme Court has identified four factors that a trial court may consider: "(1) whether the 'scientific knowledge . . . can be (and has been) tested'; (2) whether 'the theory or technique has been subjected to peer review and publication'; (3) 'the known or potential rate of error'; and (4) 'general acceptance.'" *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005) (quoting *Daubert*, 509 U.S. at 593-94). These factors, however, are not exclusive. *See Kumho Tire*, 526 U.S. at 150 ("Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test." (emphasis in the original) (citation and internal quotation marks omitted)). Rather, the trial court enjoys "broad latitude" in deciding how to determine the reliability of proposed expert testimony. *Id.* at 141-42. "[T]he test under Daubert is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).

Woolfson states he was retained in this matter "to provide structure to, and analyze time keeping and payroll data produced by [Defendant]." (Doc. 168-1 at 8-9.) He was tasked primarily

with determining how many of Defendant's paychecks contained piece-work shifts with shift lengths sufficient to necessitate separate rest pay. (Doc. 171-1 at 2.) In reaching his conclusions, Woolfson states he relied on his knowledge, Defendant's Datatech payroll data, the opinions of Defendant's expert Joseph Krock, the pleadings in this case, written orders from similarly situated cases, and documents identifying immunity payments under Cal. Labor Code 226.2(b). (Doc. 168-1 at 11-12.) Woolfson specifically incorporated the Datatech data into a set of database tables in a server called Pinpoint that illustrate the workday activities of employees and the resulting payroll outputs. (*Id.* at 12.) According to Woolfson, the database "can be used to answer nearly any question that may be contemplated by the trier of fact," including questions concerning "the number of employees who experienced one or more shifts equal-to-or-greater than 3½ hours where no separate rest-break-payment appears to have been paid, and the number of checks that shifts occurred on." (*Id.*) Woolfson purports to use two methods to determine how many paychecks contained piece-work shifts with shift lengths sufficient to necessitate separate rest pay: (1) the mathematical necessity method which sets a minimum number of violations for a pay period, and (2) the averaging method which assumes, barring any other data, the average length of a shift in a work week. (Doc. 171-1 at 2; Doc. 172 at 10.)

Based on his review of the Datatech data, Woolfson concludes that "no payment was made for rest periods on piece-rate shifts before 2/27/2016." (Doc. 168-1 at 12.) Woolfson further concludes that although the Datatech data does not contain daily time records to determine the exact length of each shift per day, the shift lengths may still be determined by "averaging the number of pay period hours over the number of days worked." (Doc. 171-1 at 4.) If the average is equal to or greater than 3.5 hours, then at least one shift during that period must have been at least 3.5 hours and, consequently, was required to have rest break pay. (*Id.*) Woolfson performed this method of analysis on approximately 12,398 paychecks indicating piece rate pay. (*Id.* at 7.) He determined there were at least 3,870 shifts that lasted 3.5 hours or more and that did not include rest break pay. (*Id.* at 7-9.) Woolfson further states this number is likely much higher when shifts

1 lasting more than 6 hours are considered.[5] (*Id.* at 9.) Based on Defendant's Datatech data, Woolfson constructed a database that allows him to present the breadth and scope of damages at trial.[6] (*Id.* at 15; Doc. 168-1 at 13.)

As an initial matter, the Court notes that Defendant's timekeeping and payroll system did not keep track of daily time records during the class period. Defendant concedes this point and does not attempt to rebut Plaintiff's contention that Defendant's failure to maintain daily time records violated California law. (Doc. 173 at 14; Doc. 167 at 18.) In fact, Defendant repeatedly refers to its own time keeping records as "incomplete" and "faulty." (Doc. 173 at 14; Doc. 167 at 18.) Notwithstanding its inadequate time keeping system, Defendant asserts that Plaintiff failed to satisfy his burden to prove his rest break pay claim because Woolfson failed to "supplement[] his understanding of [Defendant's] data through extrinsic methodology," such as by conducting a separate survey or sampling. (Doc. 167 at 17-18.)

The Court disagrees with Defendant's contention that Woolfson was required to perform such extrinsic analysis in this case. "In wage and hour claims, courts recognize that where the employer has a statutory obligation to maintain wage records and those records are inadequate, employees should not be penalized in litigation." *Rodriguez v. Taco Bell Corp.*, 2014 U.S. Dist. LEXIS 150702, at *9 (E.D. Cal. Oct. 23, 2014) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-88 (1946), and *Hernandez v. Mendoza*, 199 Cal. App. 3d 721, 727 (1988)). The Court is reluctant to penalize Plaintiff for not recreating time records that Defendant should have had in the first instance. At any rate, the issue before the Court is not whether Woolfson was required to perform supplemental analysis using extrinsic data, but whether Woolfson's proffered

---

[5] Woolfson also concludes that the number shifts that lasted 3.5 hours or more and that did not include rest break pay is likely higher when the paychecks that indicate "zero (0) days" worked or an unavailable date are considered. (Doc. 171-1 at 9-10.) While it is not clear why some paychecks for piece rate work indicate zero days worked or an unavailable date, Woolfson asserts that "[o]bviously [these] employees worked at least one shift and a reasonable approach [is to] assume that there was at least one shift during this pay period." (*Id.*) Woolfson further asserts that the number of days worked may be determined by dividing the total number of piece-work items listed in each of these paychecks by 500.52, which is the average number of piece-work items performed per day, according to the paychecks where piece-work hours, units, pay, and number of days worked are indicated. (*Id.* at 10-11.) Thus, for example, if a paycheck indicating zero days worked shows that 1,000 piece-work items were performed, then the number of days worked would be 1.99 days. The number of hours worked indicated on the paycheck can then be divided by 1.99 to determine whether a shift of at least 3.5 hours was present, according to Woolfson's approach.

[6] Woolfson testified that he shared his constructed database with Defendant. (Doc. 171-1 at 15.)

9

testimony is sufficiently reliable under *Daubert*. Upon review, the Court finds that Woolfson's methodology is sufficiently reliable in this case. *Daubert*, 43 F.3d at 1318.

Woolfson based his testimony on the Datatech data produced by Defendant. Although Defendant did not track daily time records of its employees, the Datatech data indicates the total number of hours and days worked on a weekly basis. As discussed above, Woolfson used a "mathematical necessity" method and an "averaging" method to determine that there were at least 3,870 shifts that lasted 3.5 hours or more and that did not include rest break pay. (Doc. 171-1 at 7-9.) These records and the examples discussed above indicate that Woolfson's mathematical methods can be tested and are based on fundamental principles of math. *Obrey*, 400 F.3d at 696 (quoting *Daubert*, 509 U.S. at 593-94). Defendant's rebuttal expert Joseph Krock also acknowledged that if the average number of hours worked during a workday, based upon the calculation of total hours worked divided by workdays in a week, is greater than three and a half hours and no rest break pay was provided, then mathematically there must be at least one violation for failure to provide rest break pay. (Doc. 172-2 at 2.) Because Woolfson determined there were at least 3,870 shifts that lasted at least 3.5 hours without rest break pay using the methodology described above, it follows that Krock would agree that there were at least 3,870 violations for failure to provide rest break pay. (Doc. 171-1 at 7-9; Doc. 172-2 at 2.) Defendant also has not submitted any evidence in its briefing showing that these 3,870 shifts were less than 3.5 hours in length, or that it provided rest break pay for these shifts or any other shift "before 2/27/2016." (Doc. 168-1 at 12.)

Defendant's argument that Woolfson's report is unreliable on the ground that it fails to identify shift-level violations is unavailing. Defendant has not cited any authority indicating that a plaintiff can only establish a rest break pay claim by providing daily records showing shift-level violations. The Court will decline to impose such a requirement in this case considering Defendant's inadequate records and Woolfson's findings based on Defendant's weekly payroll data that Defendant regularly did not pay rest period subclass members for mandated rest breaks. Additionally, Defendant has not proffered its own interpretation of the weekly payroll data to show that no shifts of at least 3.5 hours in length were worked during those weeks. To the extent

10

Defendant is arguing that a different conclusion should have been reached from Woolfson's methodology, this argument is inapposite because "the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert*, 43 F.3d at 1318. Accordingly, given Defendant's inadequate time records and Woolfson's mathematical methods and findings, the Court finds that Woolfson's testimony is sufficiently reliable under *Daubert* in this case. Therefore, Defendant's Motion in Limine (Doc. 167.) will be **DENIED**.

### B. Commonality and Predominance

Defendant argues that commonality and predominance are lacking for Plaintiff's rest break pay claim under Rule 23 because "the only way Plaintiffs plan to prove class-wide proof of piece rate rest break violations is through the testimony of Woolfson," which "must be excluded." (Doc. 160 at 20.) Because the Court will not exclude Woolfson's testimony as discussed above, Defendant's stated ground for decertifying Plaintiff's rest break pay claim is ineffective. Therefore, Defendant's Motion to Decertify (Doc. 168.) will be **DENIED**.

## ORDER

Accordingly, the Court **ORDERS**:

1. Defendants' Motion in Limine to Exclude Plaintiffs' Expert Witness (Doc. 167) is **DENIED**; and
2. Defendants' Motion to Decertify Class (Doc. 168) is **DENIED**.

IT IS SO ORDERED.

Dated:   **May 22, 2023**

UNITED STATES DISTRICT JUDGE