1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| MARISOL GOMEZ, individually and on behalf of all others similarly situated, | ) ) | Case No.: 1:15-cv-1489 JLT BAM |
| Plaintiff, | ) ) ) | ORDER GRANTING PLAINTIFF'S MOTION FOR FINAL APPROVAL OF THE CLASS SETTLEMENT AND APPROVING THE |
| v. | ) ) ) | REQUESTS FOR ATTORNEYS' FEES, SETTLEMENT ADMINSITRATION COSTS, AND LITIGATION EXPENSES |
| J. JACOBO FARM LABOR CONTRACTOR, INC., | ) ) ) | ORDER GRANTING IN PART PLAINTIFF'S REQUEST FOR CLASS REPRESENTATIVE |
| Defendant. | ) ) | SERVICE PAYMENT |
| | ) ) | (Doc. 211) |

Marisol Gomez seeks to hold J. Jacobo Farm Labor Contractor, Inc., liable for violations of California wage and hour laws and the federal Agricultural Workers Protection Act. (*See generally* Docs. 1, 95.) Gomez now seeks final approval of a class settlement reached in this action. In addition, Gomez seeks attorneys' fees and costs from the settlement fund, costs for settlement administration, and a service payment for the class representative. (Doc. 211.) Defendant does not oppose the requests, and no class member submitted objections to the settlement terms. The Court found the matters suitable for decision without oral arguments pursuant to Local Rule 230(g) and vacated the final approval and fairness hearing.

Because Gomez carries the burden to demonstrate certification of the Settlement Class is appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are

fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**. The request for attorney fees is granted in the amount of **$25,000.00**; litigation expenses are awarded in the amount of **$32,800.00**; settlement administration costs are granted in the amount of **$25,000.00**; and Gomez's service payment as the class representative is granted in the modified amount of **$500.00**.

## BACKGROUND

Marisol Gomez asserts she is a former employee of J. Jacobo Farm Labor Contractor, for whom she performed "agricultural work." (Doc. 95 at 4, ¶ 13.) Gomez reports she worked "at agreed-upon piece rates that varied over her period of employment," which ended in 2015. (*Id.*)

Gomez contends that with the piece-rate policy, she was not compensated "for all hours worked" within the meaning of California Wage Orders. (*Id.* at 7, ¶ 25 [quotation marks omitted].) She asserts Defendant also failed "to pay overtime premium wages for work performed in the fields." (*Id.*) Gomez alleges Defendant failed to provide proper meal and rest breaks and had a "policy … to not pay the premium wages owed to workers for missed and untimely" meal and rest breaks. (*Id.* at 7-8, ¶¶ 26-27.) In addition, she contends that "Defendant[] had a policy of discouraging and preventing employees from taking rest breaks." (*Id.* at 8, ¶ 27.) Further, she alleges Defendant failed "to maintain accurate time-keeping records" and "willfully provide[d] inaccurate itemized wage statements that [did] not reflect all 'hours worked,' wages earned and applicable pay rates." (*Id.*, ¶ 28.)

On September 30, 2015, Gomez initiated this action by filing a complaint on behalf of herself and a class including all individuals who are, or have been, employed in California by J. Jacobo Farm Labor Contractor "within four (4) years of the filing of the Initial Complaint in this action." (Doc. 1 at 9, ¶ 35.) She sought to hold the defendants—at that time, J. Jacobo Farm Labor Contractor and Bedrosian Farms LLC—liable for violations of the Migrant and Seasonal Agricultural Worker Protection Act, the California Labor Code, and California Business and Professions Code § 17200 *et seq.*, and penalties under California's Private Attorney General Act.[1] (*Id.* at 6, ¶ 21; *see also id.* at 1.)

---

[1] The parties later stipulated to dismiss the claims under PAGA, indicating the claims of the state of California were dismissed without prejudice and the claims of the named plaintiffs were dismissed with prejudice. (Docs. 159.) The Court construed the stipulation "as a joint request to amend the First Amended Complaint under Fed. R. Civ. P. Rule 15, to delete the PAGA claims and all references to it." (Doc. 188 at 3.) Accordingly, the Court granted the stipulation and deemed the FAC "to be amended to delete the PAGA claim set forth in the Ninth Claim for Relief and to delete all references to PAGA made throughout the complaint." (*Id.*)

2

After the Court granted Gomez leave to amend, Ignacio Osorio-Cruz was added as a named plaintiff on August 28, 2018.  (Docs. 93, 95.)

Bedrosian Farms moved for summary judgment on the claims raised against the company, after which Plaintiffs stipulated to dismiss the claims against Bedrosian Farms.  (Docs. 91, 97.)  Based upon the stipulation of the parties, the Court dismissed the claims against Bedrosian Farms with prejudice on September 6, 2018.  (Doc. 98.)  Thus, J. Jacobo Farm Labor Contractor is now the only defendant.

Gomez and Osorio-Cruz moved for class certification, requesting certification of a class including "all individuals who have been employed or are currently employed, by Defendant[] J. Jacobo Farm Labor Contractor Inc. as a non-exempt 'field worker' or agricultural worker who worked at any time from September 30, 2011 up to the present."  (Doc. 108 at 2.)  Plaintiffs proposed several subclasses based upon the claims raised, including rest breaks for those who worked on a piece rate basis, meal breaks, inaccurate/incomplete wage statements, MAWPA, and claims under Labor Code Section 17200.  (*Id.* at 2-4.)  The Court granted the motion in part, certifying the "Wage Statement" subclass of "[a]ll individuals who were employed as a non-exempt field worker or agricultural worker from September 30, 2012, to November 5, 2019, by J. Jacobo Farm Labor Contractor, Inc."  (Doc. 114 at 56.)  The Court appointed Osorio-Cruz as the sole class representative; and appointed Stan Mallison, Hector Martinez, Mario Martinez, and Edgar Aguilasocho as Class Counsel.  (*Id.*)

Plaintiffs moved for reconsideration regarding claims that were not certified, and the Court granted the motion.  (Docs. 117, 126.)  The Court determined that "Plaintiffs' rest break claim, wages upon termination claim, accurate itemized wage statement claim[], MAWPA claim, and unfair business practices claim warrant class certification under Rule 23(b)(3)."  (Doc. 126 at 12-13 [footnote omitted].)  Therefore, the Court certified an additional "Piece Rate Rest Period" class to address these claims.  (*Id.* at 13.)  Defendant also filed a motion for reconsideration (Doc. 129), which resulted in modification of the class definition for the "Piece Rate Rest Period" class to include: "individuals who have been employed, or are currently employed, by Defendant as a non-exempt 'field worker' or agricultural worker, who worked on a piece rate basis at any time from September 30, 2011, to November 5, 2019, and were not separately compensated for rest periods during their piece rate shifts."  (Doc. 138 at 13.)

After the parties filed their proposed class notice, the Court determined further modifications of the class definitions were necessary to clarify the certified claims for the putative class members. (*See* Doc. 151.) Ultimately, the Court determined the class notice should contain the following definitions for the putative class:

> **Inaccurate/Incomplete Wage Statement Subclass:**
> All individuals who were employed by J. Jacobo Farm Labor Contractor Inc. as a non-exempt field worker or agricultural worker at any time from September 30, 2012, to November 5, 2019.
>
> The Inaccurate/Incomplete Wage Statement Subclass applies to the certified claim for Defendant's alleged violation of the California Labor Code for failure to provide accurate wage statements.
>
> **Piece Rate Rest Period Subclass:**
> All individuals who were employed by J. Jacobo Farm Labor Contractor Inc. as a non-exempt field worker or agricultural worker at any time from September 30, 2011, to November 5, 2019, and who worked on a piece rate basis and were not separately compensated for rest periods during their piece rate shifts.
>
> The Piece Rate Rest Period Subclass applies to the certified claim for Defendant's alleged violation of California Labor Code and Industrial Wage Order provisions regarding employee rest periods. The subclass also applies to the following certified claims that are derivative of the rest period claim: alleged violations of the federal Agricultural Workers Protection Act, California's unfair competition law under California Business and Professions Code, and California Labor Code and Industrial Wage Order provisions regarding wage statements and separation wages.

(Doc. 151 at 6; *see also id.* at 7.) The Court approved the class notice and ordered service upon the class members on April 8, 2021. (Doc. 155 at 4.)

In late 2022, the parties engaged in limited expert witness discovery. (*See* Doc. 161 at 2-3.) Plaintiffs designated an expert witness, Aaron Woolfson, and produced his report to Defendant on October 28, 2022. (*Id.* at 2, ¶ 3.) Defendant disclosed a rebuttal expert and produced his report on November 8, 2022. (*Id.*, ¶ 4.) Defendant moved to exclude testimony from Mr. Woolfson and moved to decertify the class. (Docs. 167, 168.) Defendant argued that Plaintiffs could not establish commonality, or that "questions of law or fact common to class members predominate over any questions affecting only individual members or that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." (Doc. 168 at 5.) The Court denied Defendant's motions to exclude the expert testimony and to decertify the classes on May 23, 2023. (Doc. 178.)

4

Following the denial of the motion to decertify the classes, the parties participated in a private mediation with Judge Donald Black. (Doc. 190-2 at 9.) Stan Mallison reports that J. Jacobo Farm Labor Contractor ceased doing business and financial documents showed "about $100,000 in total assets." (Doc. 202-2 at 10, Mallison Decl. ¶ 17.) Based upon this information, the parties "accepted [the] mediator's proposal to resolve the Lawsuit" for a gross settlement fund of $100,000. (*Id.*, ¶¶ 17-18.) According to Mr. Mallison, "the primary impetus of the proposed settlement agreement [was] Defendant's limited financial resources." (*Id.*, ¶ 17.)

The parties entered into the "Settlement Agreement and Release," which Plaintiff Marisol Gomez executed on November 16, 2023; and Javier Jacobo executed on behalf of Defendant J. Jacobo Farm Labor Contractor on November 9, 2023. (Doc. 190-3 at 22; Doc. 202-3 at 22.) Gomez filed a motion for preliminary approval of the agreement on January 10, 2024. (Doc. 190.)

In the motion for preliminary approval, Gomez reported she is "the only Plaintiff and Class Representative, due to the passing of Ignacio Osorio." (Doc. 191-1 at 6, n.6; *see also* Doc. 190-2 at 8, Mallison Decl. ¶ 8.) Thereafter, counsel filed a "Notice of Suggestion of Death upon the Record"— reporting that Mr. Osorio-Cruz passed away on July 26, 2022—and served the Notice upon the adult son of Mr. Osorio-Cruz as the successor-in-interest. (Docs. 193, 197.) The Court dismissed the claims of Mr. Osorio-Cruz pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure on August 14, 2024. (Doc. 198.)

The Court ordered supplemental briefing on terms in the settlement, including the release for claims under the Fair Labor Standards Act and a provision setting minimum payments for class members. (Docs. 192, 199.) Further, the Court directed Gomez to "address whether the settlement is fair, reasonable, and adequate under current federal law," because the initial motion evaluated the terms under state law. (Doc. 199 at 3 [internal quotation marks, citation omitted].) Gomez filed the supplemental brief on September 6, 2024, and a notice of errata on September 9, 2024. (Docs. 200, 202.) Gomez also filed supplemental declaratory evidence to address the qualifications and experience of the proposed class counsel. (Doc. 205.) The parties also filed stipulations regarding the FLSA release and minimum payment provisions, indicating the terms of the agreement may be modified. (Docs. 195, 203.)

5

On September 26, 2024, the Court granted preliminary approval of the Settlement, as modified by the parties' stipulations. (Doc. 206 at 35-36; *see also id.* at 11-35.) The Court appointed Marisol Gomez as Class Representative and authorized her request for an incentive payment up to $5,000 "subject to a petition and review." (*Id.* at 36.) In addition, the Court appointed the firms of Mallison & Martinez and Martinez Aguilasocho Law as Class Counsel. (*Id.*) The Court preliminarily granted "Class Counsel's request for fees not to exceed 1/3 of the gross settlement amount and identified costs," noting these requests were also subject to review at the final approval stage. (*Id.*) Finally, the Court appointed Phoenix Settlement Administration as the Settlement Administrator and authorized expenses up to $25,000 for the administration. (*Id.*; *see also* 32.)

The Court approved the Class Notice Packet that conveyed this information for class members on September 30, 2024. (Doc. 208; *see also* Doc. 211-15 at 2-4.) The Class Notice Packet informed the class members of the nature of the action, the Settlement Class preliminarily certified by the Court, claims to and issues to be resolved, representation by counsel, how a class member could request exclusion or make objections, deadlines for any requests for exclusion and objections, and the binding effect of a class judgment. (*See* Doc. 211-15 at 2-4.) Upon the request of the parties, the Court extended deadlines related to providing notice to the class, which were incorporated into the Class Notice Packet. (Doc. 210; Doc. 211-15.)

Taylor Mitzner, a case manager at Phoenix Settlement Administration, reports the company mailed the Class Notice to 4,088 Class Members via the U.S. Postal Service on November 12, 2024. (Doc. 211-14 at 2-3, Mitzner Decl. ¶¶ 1, 7.) She reports that if the Postal Service returned a Class Member's Notice Packet as undeliverable without a forwarding address, "Phoenix attempted to locate a current mailing address using TransUnion TLOxp, one of the most comprehensive address databases available for skip tracing." (*Id.* at 3, ¶ 8.) According to Ms. Mitzner, Phoenix performed skip tracing for 326 individuals and successfully found updated addresses to re-mail the packets to 123 Class Members. (*Id.*) Ms. Mitzner reports that 203 Notice Packets "remain undeliverable since an updated address could not be obtained via skip trace." (*Id.*, ¶ 9.) The Settlement Administrator reports that six individuals submitted timely "Elections Not to Participate." (*Id.*, ¶ 10.) No Class Members disputed the number of work weeks identified in their Notice Packets for the purposes of calculating their

settlement shares.  (*Id.* at 4, ¶ 12.)  Further, neither the Settlement Administrator nor the Court received any objections to the agreement terms.  (*See id.*, ¶ 11; Doc. 212.)

Gomez now seeks final approval of the settlement, attorneys' fees and costs, a service award for Gomez as the Class Representative, and costs of settlement administration.  (Doc. 211.)  Defendant did not oppose the motion or requested payments.

## SETTLEMENT TERMS

Pursuant to the proposed "Settlement Agreement and Release" ("the Settlement"), the parties agreed to a gross settlement amount of $100,000.00 for the class defined as follows:

> All individuals who have been employed or are currently employed by Defendant J. Jacobo Farm Labor Contractor Inc. as a non-exempt "field worker" or agricultural laborer who worked at any time from September 30, 2011 to November 5, 2019.

(Doc. 211-3 at 2-4, Settlement §§ I.A, I.Q.)  Defendant also agreed "to pay its share of any payroll taxes in addition to the Gross Settlement amount."  (*Id.* at 4, § I.Q.)  Defendant agreed to pay $50,000 to the appointed Settlement Administrator within 15 days of an order granting preliminary approval, and the remaining $50,000 within 15 days of an order granting final approval.  (*Id.* at 7, § III.B.)  Late payments by Defendant "will incur interest at the statutory rate for a judgment for wages under California Labor law."  (*Id.*, § III.A.3.)

## I.     Payment Terms

The settlement fund will cover payments to class members with additional compensation to the Gomez as the Class Representative.  (Doc. 211-3 at 6-7, Settlement § III.A.)  The Settlement also provides for payments to Class Counsel and the Settlement Administrator.  (*Id.*)  Specifically, the Settlement provides for the following payments from the gross settlement amount:

- The Class Representative will receive an incentive award up to $5,000;

- Class counsel will receive up 1/3 of the gross settlement amount for fees, and costs in an amount to be determined by the Court[2];

- The Settlement Administrator will receive up to $25,000 for fees and expenses.

---

[2] Class Counsel assert, "Considering the modest recovery for Class Members, Class Counsel will take a reduced Class Counsel fee of 25% of the Gross Settlement Amount."  (Doc. 211-1 at 10, citation omitted.)  In addition, Class Counsel now report their litigation costs total $32,880.  (*Id.*, citations omitted.)

7

(*Id.* at 9-11, Settlement § III.C; Doc. 211-1 at 10.)  After these payments, the remaining money ("Net Settlement Amount") will be distributed as settlement shares to class members.  (*Id.* at 5, Settlement § I.T.)  Gomez reports that if the Court approves the requested payments—including 25% attorney fees and the maximum class representative enhancement award—the anticipated Net Settlement Amount for distribution to the class members is $12,120.00.  (Doc. 211-1 at 10.)  If the Court approves less than the amount requested for attorney's fees and costs, "the remainder will be retained in the Net Settlement Amount for distribution to Participating Class Members."  (Doc. 211-3 at 8, Settlement § III.C.2.)  No funds from the gross settlement fund shall revert to Defendant, and "Participating Class Members are entitled to 100% of the Net Settlement Amount."  (*Id.* at 11, § III.E.7.)

Class members are not required to submit a claim to receive a share from the Net Settlement Amount.  (*See* Doc. 211-3 at 9-10, Settlement § III.E; *see also* Doc. 202-1 at 5.)  Class members' shares will be distributed on a *pro rata* basis, with shares "calculated by dividing the Net Settlement Amount by the total number of pay periods worked by each Class Member from September 30, 2011 to November 5, 2019."  (Doc. 202-1 at 10, citing Settlement § III.E.1.)  Thus, the exact amount settlement class members receive depends upon how long they worked for Defendant.  However, with an estimated 4,082 class members, the average payment is approximately $2.97.  (Doc. 211-1 at 10.)

## II.    Releases

The Settlement provides that Gomez and class members, other than those who elect not to participate in the Settlement, shall release Defendant from claims arising in the class period.  (Doc. 211-3 at 17-18.)  Specifically, the release for class members provides:

> Plaintiff and every member of the Settlement Class (except those who opt out, as described herein) will fully release and discharge Defendant, its past, current, and future officers (including Javier Jacobo), directors, shareholders, employees, agents, principals, heirs, representatives, and its respective successors, predecessors in interest, parents subsidiaries, affiliates, and attorneys (collectively the "Released Parties") from all claims, debts, liabilities, demands, obligations, penalties, guarantees, costs, expenses, damages, attorney's fees and costs, based on the certified claims during the Class Period, which are plead in the FAC or which could have been plead on the factual allegations in the FAC, including alleged violations of California Labor Code sections 201, 202, 203, 204, 205.5, 206, 210, 214, 216, 218, 218.5, 218.6, 221, 225.5, 226, 226.2, 226.3, 226.6, 226.7, 256, 510, 512, 558, 558.1, 1174, 1174.5, 1185, 1194, 1194.2, 1197, 1197.1, 1199, the applicable wage order, or under the Migrant and Seasonal Agricultural Worker Protections Act (29 U.S.C. § 1801, et seq.) (collectively, the "Released Claims"). Released claims also

includes a) claims that could have been brought under the Fair Labor Standards Act or similar federal or state governmental agencies regulating wage and hour or labor and employment laws. For members of the Settlement Class who do not validly opt out, the release period shall run from September 30, 2011, through November 5, 2019 ("Class Period").The release applies regardless of whether the Class Member deposits his/her settlement check.

(Doc. 211-3 at 17, Settlement § IV.A.)

The release for Gomez encompasses more claims than those identified for Settlement Class Members, because she agreed to release any claims that could have arisen during the course of his employment with Defendant, not just those claims constrained to the facts alleged in this lawsuit. Specifically, the release for Gomez provides:

In consideration of their Settlement Shares, and the other terms and conditions of the Settlement, Plaintiff hereby fully and finally releases Jacobo and Released Parties from any and all claims, rights, demands, liabilities, obligations, penalties, costs, expenses, attorneys' fees, rights, damages, suits, indemnities, actions and causes of action of every nature and description whatsoever in law, equity or otherwise, or any other monetary or non-monetary relief, that any of them had, now have, or may have in the future, including any arising in any way from Plaintiff's employment with Jacobo or the cessation thereof, whether such claims are known or unknown, suspected or unsuspected, arising on or before the date on which Plaintiff sign this Agreement (except for any claims that cannot be released by law).

Plaintiff further expressly waives any rights against Jacobo and Javier Jacobo and the Released Parties conferred upon them by California Civil Code Section 1542, and expressly consents that this Agreement shall be given full force and effect according to all of its terms, including those terms relating to unknown and unsuspected claims, if any.

(Doc. 211-3 at 18, Settlement § IV.3[3], emphasis omitted.)  Thus, claims released by Gomez—but not the Settlement Class—include any claims arising under the Americans with Disabilities Act, Title VII of the Civil Rights Act, and the Employee Retirement Income Security Act.  (*See id.*)

## III.    Service of the Class Notice Packets and Responses Received

The "Notice of Class Action Settlement and Your Rights" (the "Notice") explained to class members they "need not take any action" to receive a settlement share.  (Doc. 211-4 at 3.)  However, any class member who wishes may file objections or elect not to participate in the Settlement.  (Doc.

---

[3] The sections in this portion of the Settlement are misnumbered.  (*See* Doc. 211-3 at 18-19.)  For the sake of clarity, the Court retains the section numbers identified in the Settlement.

9

211-3 at 13-14, Settlement § III.F.2.c-d.)

Individuals who wished to be excluded from the Settlement Class were required to submit a completed "Election Not to Participate in Settlement" form to the Settlement Administrator within 45 days of the mailing of the Notice Packet.  (Doc. 202-3 at 13, Settlement § III.F.2.c.)  The form included the statement: "I have received notice of the proposed Settlement in the Lawsuit and wish to be excluded from the Class and not to participate in the proposed Settlement. I understand this means that I will not be bound by the Settlement and also will not share in the class action Settlement proceeds (if eligible)."  (Doc. 202-4 at 7, emphasis omitted.)  Individuals who wanted to be excluded were required to sign and date the form, and provide identifying information including their address, telephone number, and "employee identification number or last for digits of Social Security number."  (*Id.*)

Class members could also object to the settlement terms by mailing a written statement to the Settlement Administrator within 45 days of the mailing of the Notice Packet.  (Doc. 203-2 at 14, Settlement § III.F.2.d.)  Any objection was required to include:

> (i) the objecting person's full name, address, and telephone number; (ii) the words "Notice of Objection" or "Formal Objection"; (iii), in clear and concise terms, the legal and factual arguments supporting the objection; (iv) list identifying witness(es) the objector may call to testify at the Final Approval hearing; and (v) provide true and correct copies of any exhibit(s) the objector intends to offer at the Final Approval hearing.

(*Id.*)  The proposed Notice explained these requirements.  (Doc. 202-4 at 5.)  Further, class members were informed that they cannot both ask to be excluded *and* object to the Settlement terms.  (*Id.*)

Taylor Mitzner reports the Settlement Administrator mailed the Notice Packet—in English and Spanish—to 4,088 Class Members on November 12, 2024.  (Doc. 211-14 at 2-3, Mitzner Decl. ¶¶ 1, 7.)  The Settlement Administrator received six valid elections to not participate in the Settlement from Angelica Levya, Sofia Rafael-Pascual, Bladimir Quiroz-Talavera, Jesus Saldana, Erik Leon, and Shirley L. Paul.  (Doc. 214 at 2; Doc. 211-14 at 3, ¶ 10.)  These individuals are excluded from the Settlement Class will not receive payments from the settlement fund.  (Doc. 211-3 at 13, Settlement § Settlement § III.F.2.c.)  One individual also filed an untimely request for exclusion, which was not deemed valid pursuant to the terms of the agreement and instruction of the parties.  (Doc. 211-14 at 3, ¶ 10; *see also* Doc. 214 at 2 [reporting "there was no mutual consent of the Parties to treat the untimely

request as valid"].)  Finally, neither the Settlement Administrator nor the Court received any

objections to the Settlement.  (*See* Doc. 211-14  at 4, ¶ 11; Doc. 212.)

### APPROVAL OF A CLASS SETTLEMENT

Proposed class action settlements require approval, even where the Court previously certified a

class.  Fed. R. Civ. P. 23(e).  The Court has an obligation to "peruse the proposed compromise to ratify

both the propriety of the certification and the fairness of the settlement."  *Staton v. Boeing Co.*, 327

F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is generally a two-step process.  First,

the Court must assess whether the proposed class exists.  *Id.* (citing *Amchem Prods., Inc. v. Windsor*,

521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the proposed settlement is

fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

1026 (9th Cir. 1998)).  The decision to approve or reject a settlement is within the Court's discretion.

*Hanlon*, 150 F.3d at 1026.

### I.    Certification of a Settlement Class[4]

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

of all."  Fed. R. Civ. P. 23(a).  The proposed Settlement Class includes:

> All individuals who have been employed or are currently employed by
> Defendant J. Jacobo Farm Labor Contractor Inc. as a non-exempt "field
> worker" or agricultural laborer who worked at any time from September 30,
> 2011 to November 5, 2019.

(Doc. 211-3 at 2, Settlement § I.A.)  This Settlement Class appears to encompass both the "Wage

Statement" and "Piece Rate Rest Break" classes previously certified.  (*See* Docs. 114, 126, 138, and

151.)  However, Osorio-Cruz, the only appointed class representative for the two classes, is now

deceased.  Due to this change in circumstances, the Court could not simply affirm its prior orders.

Gomez and the Settlement Class must satisfy the requirements of Rule 23.

### A.    Rule 23(a) Requirements

The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

---

[4] Because the Court only conditionally certified the class upon preliminary approval of the Settlement, final
certification of the Settlement Class is required.

1   by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

2   155-56 (1982).  Certification of a class is proper if:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class; (3) the claims
> or defenses of the representative parties are typical of the claims or
> defenses of the class; and (4) the representative parties will fairly and
> adequately protect the interests of the class.

6   Fed. R. Civ. P. 23(a).  These prerequisites are generally referred to as numerosity, commonality,

7   typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

8          1.     Numerosity

9       This prerequisite requires the Court to consider "specific facts of each case and imposes no

10  absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980).  Although there is

11  not a specific threshold, joining more than one hundred plaintiffs is impracticable.  *See Immigrant*

12  *Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002)

13  (finding the numerosity requirement … "satisfied solely on the basis of the number of ascertained

14  class members").  The Settlement Administrator reports there are 4,082 Class Members.[5]  (Doc. 211-1

15  at 14; *see also* Doc. 202-6 at 3.)  Therefore, joinder of all identified class members as plaintiffs is

16  impracticable, and the numerosity requirement is satisfied.

17         2.     Commonality

18      Rule 23(a) requires "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).

19  To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and

20  law.  *See Wal-Mart Stores*, 564 U.S. at 350.  Thus, "commonality requires that the class members'

21  claims depend upon a common contention such that determination of its truth or falsity will resolve an

22  issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the

23  capacity of classwide proceedings to generate common answers to common questions of law or fact

24  that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581,

---

[5] Initially, Gomez estimated there were approximately 3,627 class members.  (Doc. 190-1 at 4.)  Seeking final approval, Gomez now reports "there are 4,088 Participating Class Members." (Doc. 211-1 at 14.)  However, the Settlement Administrator reported the class list included 4,088 individuals, of which submitted valid requests for exclusion from the settlement.  Thus, Ms. Mitzner reports the total of Settlement Class Members is 4,082. (Doc. 211-14, ¶ 13.)

588 (9th Cir. 2012) (internal quotation marks, citations omitted); *see also Parsons v. Ryan*, 754 F.3d 657, 684 (9th Cir. 2014) (finding commonality satisfied where "[t]he factual and legal questions that [plaintiffs] present can be answered 'yes' or 'no' in one stroke as to the entire class, dissimilarities among class members do not impede the generation of common answers to those questions, and the capacity of classwide proceedings to drive the resolution of this litigation cannot be doubted").

Previously, Gomez asserted the commonality requirement is satisfied because "common questions of both law and fact which exist regarding Defendants' alleged failure to provide properly paid rest breaks and itemized wage statements." (Doc. 202-1 at 22.) Although this conclusory statement offered little assistance in evaluating whether the commonality requirement is satisfied, the Court examined commonality when certifying the Inaccurate/Incomplete Wage Statement Class and Piece Rate Rest Period Class. (*See* Doc. 114 at 37-40; Doc. 138 at 11-12.) Addressing the alleged violations related to the wage statements, the Court observed that the claim was premised, in part, on the theory that wage statements did not include:

> (1) the address information of Defendant, (2) the address information of the grower / farm that secured the services of the employer, and (3)(a) the total hours of compensable rest, recovery, and nonproductive periods, (b) the rate of compensation, and (c) the gross wages paid for those periods during the pay period.

(Doc. 114 at 39; *see also* Doc. 108-1 at 7-8.) The Court found common questions exist related to the wage statements because "Defendant's practices for creating wage statements were uniformly applied to all class members." (*Id.*) Similarly, the Court found the commonality requirement was satisfied by the "Piece Rate Rest Break" class because "the issue of whether Defendant paid for mandated rest breaks is 'susceptible to generalized, class-wide proof' … which is indicative of a common question under Rule 23(a)(2)." (Doc. 126 at 11.) The derivative claims—for wages due, violation of the Agricultural Workers Protection Act, and unfair business practices—were also subject to the "common and predominating question of whether Defendant paid … mandated rest breaks" with the piece rate policy in place. (*Id.* at 12.) Because it appears resolution of issues—such as whether Defendant's payroll and wage policies violated California wage and hour laws— apply to the claims of each of the class members, the Court finds the commonality requirement is satisfied.

///

13

### 3.    Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality ensures "the interest[s] of the named representative align[] with the interests of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1141 (9th Cir. 2016) (citation omitted). A claim or defense is not required to be identical, but rather "reasonably coextensive" with those of the absent class members. *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Torres*, 835 F.3d at 1020 (identifying the same as "[m]easures of typicality").

Gomez asserts that her claims "are essentially identical to all other non-exempt farm laborers employed by Defendants." (Doc. 211-1 at 15, citing Gomez Decl. ¶¶ 2-7 [Doc. 211-11 at 2-3], Mallison Decl. ¶ 52 [Doc. 211-2 at 19].) Gomez alleged that she was paid on a piece rate basis while working for Defendant. (Doc. 1 at 4, ¶ 13; *see also* Doc. 211-11 at 2, ¶ 4.) In addition, Gomez reports she was not paid "all the wages [she] was owed upon [her] separation from employment with Defendant." (Doc. 211-11 at 2, ¶ 6.) Further, Gomez asserts Defendant failed to provide her with "accurate and itemized wage statements." (*Id.*) Thus, it appears Gomez reports similar injuries as those of class members for the "Inaccurate/Incomplete Wage Statement" and "Piece Rate Rest Period" classes now incorporated into the Settlement Class. Because Gomez was subjected to the same company policies and payment procedures as Settlement Class Members—and there are no unique defenses identified by either party at this time— the Court finds the typicality requirement is satisfied for purposes of settlement.[6] *See Hanon*, 976 F.2d at 508.

---

[6] The Court is somewhat concerned there is a unique defense that may be applied to Gomez, because she filed an amended complaint that added a new named plaintiff shortly before seeking class certification, and Gomez did not seek appointment as the class representative when the prior classes were certified. (*See* Docs. 83, 95, 108.) In addition, in the Joint Pretrial Statement, Defendant indicated that a disputed fact included "[w]hether Plaintiff Marisol Gomez released her individual claims pursuant to a settlement and release." (Doc. 182 at 6.) Nevertheless, there is no information concerning the release that Gomez may have signed, and Defendant agreed it would not "object to [Gomez's] appointment as class representative for purposes of settlement." (Doc.

4.     <u>Fair and Adequate Representation</u>

Absentee class members must be adequately represented for judgment to be binding upon them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940). This prerequisite is satisfied if the representative party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Supreme Court explained, "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. Resolution of the adequacy issue requires the Court to address two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Kim v. Allison*, 87 F.4th 994, 1000 (9th Cir. 2023) (quoting *Hanlon*, 150 F.3d at 1020).

a.     *Proposed class representative*

Mr. Mallison reports that "[p]rior to commencing this action," counsel interviewed Gomez "in detail regarding her working conditions and Defendants' wage payment practices." (Doc. 211-2 at 12, Mallison Decl. ¶ 22.) According to Mr. Mallison, Gomez "carried out all required tasks in this case to help [counsel] pursue this action, providing … information, documents, insights, opinions, and necessary decisions to make this case successful." (*Id.* at 19, ¶ 50.) For example, Mr. Mallison reports that Gomez assist[ed] in responding to over 50 discovery requests and [was] deposed on March 26, 2018 by Defendant." (*Id.*, ¶ 51.) Mr. Mallison also asserts that Gomez "actively participated in … the negotiations leading to the settlement of this matter." (*Id.*, ¶ 52.) Finally, the interests of the named plaintiff are aligned with those of the class members: to maximize their recovery. Thus, for settlement purposes only, the Court also finds Gomez is an adequate class representative.

b.     *Proposed class counsel*

Mr. Mallison and Mr. Martinez report their law firm, Mallison & Martinez, has extensive experience litigating wage and hour class actions and serving as class counsel. (Doc. 211-2 at 2-7, Mallison Decl. ¶¶ 3-8; Doc. 211-8 at 2-8, Martinez Decl. ¶¶ 3-12.) Mr. Mallison and Mr. Martinez

---

211-3 at 3, Settlement § I.I.) Accordingly, the Court finds the issue of a prior release does not thwart her appointment as a class representative for the Settlement Class.

each assert: "Neither I, nor any member of the firm, have any personal affiliation or family relationship with the Plaintiff and Class Representative Marisol Gomez.  The only relationship with Plaintiff in this current litigation is the attorney-client relationship."  (Doc. 211-8 at 8, ¶ 13; Doc. 211-2 at 11, ¶ 20.)  Similarly, Edgar Aguilasocho from Martinez Aguilasocho Law, Inc. (formerly Martinez Aguilasocho & Lynch), describes significant experience with "the representation of low-income farmworkers and low-income wage earners in complex class actions in state and federal courts in California."  (Doc. 211-9 at 2, Aguilasocho Decl. ¶ 3; *see also id.* at 4-7, ¶ 9.)  Mario Martinez also reported, "Neither I nor any attorney at Martinez Aguilasocho Law, Inc. have any conflicts of interest with the class members in this case.  Our only relationship with the class representatives and class members is the attorney-client relationship."  (Doc. 205 at 8, Martinez Decl. ¶ 10.)

Defendant did not oppose appointment of Class Counsel, or assert the attorneys were inadequate to represent the interest of the class.  After reviewing the qualifications and experience of the firms of Mallison & Martinez and Martinez Aguilasocho Law, Inc., the Court finds counsel satisfy the adequacy requirements for purposes of the pending settlement.[7]

## B.    Certification of a Class under Rule 23(b)(3)

Once the requirements of Rule 23(a) are satisfied, the Court must consider whether the class is maintainable under one or more of the three alternatives set forth in Rule 23(b).  *Amchem Prods.*, 521 U.S. at 61; *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).  Gomez asserts the Settlement Class is maintainable under Rule 23(b)(3).  (Doc. 211-1 at 16.)  Certification under Rule 23(b)(3) requires a finding that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other

---

[7] The Court previously expressed serious concerns regarding the quality of the work product by Class Counsel in this action.  (Doc. 114 at 53; *see also id.* at 53-56.)  The Court noted that "the quality of the filings and briefing bear on the adequacy of class counsel, which is a required consideration under Rule 23(a)."  (*Id.* at 53.)  The Court observed that "the deficiencies with the briefing surrounding the certification motion significantly increased the burden on the Court."  (*Id.*)  Since then, counsel neglected to notify the Court of the death of Mr. Osorio Cruz—the only appointed class representative for the certified classes— until seeking preliminary approval of the settlement and did not comply with the requirements of Rule 25 of the Federal Rules of Civil Procedure until ordered to do so.  (*See* Docs. 192, 194.)  Also, deficiencies in briefing continued with the pending request for preliminary approval.  The memorandum in support of the motion addressed the terms of the settlement under *state* law, despite that the matter is in *federal* court.  (*See* Doc. 190-1 at 15.)  Furthermore, counsel did not provide any evidence concerning the qualifications of Mario Martinez and Edgar Aguilasocho until ordered by the Court to support their request for appointment as counsel.

16

1   available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

2   These two requirements are generally called the "predominance" and "superiority" requirements.  *See*

3   *Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to

4   make findings about predominance and superiority before allowing the class")

5             1.      Predominance

6             The predominance inquiry focuses on "the relationship between the common and individual

7   issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

8   representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central

9   concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help

10  achieve judicial economy.'"  *Vinole v. Countrywide Home Loans,* 571 F.3d 935, 944 (9th Cir. 2009)

11  (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

12            As discussed above, and in the Court's prior orders related to certification, it appears the class

13  claims are subject to proof by common evidence related to the alleged unlawful wage and payroll

14  policies and practices.  Consequently, the Court finds adjudication of the claims via a class action

15  promotes judicial economy, and the predominance factor is satisfied.

16            2.      Superiority

17            The superiority inquiry requires a determination of "whether objectives of the particular class

18  action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).

19  This tests whether "class litigation of common issues will reduce litigation costs and promote greater

20  efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule

21  23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior

22  method of adjudication, including (1) interests of class members, (2) other pending litigation, (3) the

23  desirability of concentrating claims in one forum, and (4) difficulties with the management of the class

24  action.  *Id.; see also James v. Uber Techs. Inc.*, 338 F.R.D. 123, 143 (C.D. Cal. 2021) (indicating the

25  factors identified in Rule 23(b)(3) address the "superiority" analysis).

26            *a.      Class members' interest in individual litigation*

27            The Court is directed to consider "the class members' interests in individually controlling the

28  prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  This factor is most relevant

when class members "suffered sizeable damages or [have] an emotional stake in the litigation." *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011). The Ninth Circuit explained that "[w]here damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190.

The Settlement Administrator reports that no objections were made to the settlement and there only 7 requests for exclusion from the 4,088 individuals who received the Notice Packet. (Doc. 211-14 at 3-4, Mitzner Decl. ¶¶ 10-11.) There is very little indication Class Members desire to control this action or proceed with individual litigation, as over 99.5% of the individuals who received the Notice Packet are now Participating Class Members. Indeed, "[t]he absence of a single objection to the Proposed Settlement provides further support for final approval of the Proposed Settlement." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529 (citations omitted); *see also Barcia v. Contain-A-Way, Inc.*, 2009 WL 587844 at *4 (S.D. Cal. Mar. 6, 2009).

In addition, the anticipated payments to Class Members are not large. With over 4,000 participating class members sharing the estimated Net Settlement Amount, Ms. Mitzner reports the average payment is $2.97. (Doc. 211-14 at 4, ¶ 15.) It is unlikely that individuals would pursue such small claims. *See Zinser*, 253 F.3d at 1190. As this Court previously observed, "When the individual claims of class members are small, the class action facilitates the spreading of the litigation costs among the numerous injured parties." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, (E.D. Cal. 2013) (internal quotation marks, citation omitted). Thus, the factor weighs significantly in favor of certification for the Settlement Class.

### b.    Other litigation

Next, the Court considers "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B). The parties did not identify any other litigation related to the claims addressed raised by Gomez or encompassed in this Settlement. Therefore, this factor weighs in favor of class certification.

### c.    Concentration in one forum

Third, the Court must consider "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). There is no suggestion the Eastern

District is an undesirable forum for the matter, which raises wage and hour claims on behalf of individuals who worked within this District. *See U.S. ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. 2018). Moreover, when "parties … agreed on a proposed Settlement Agreement, the desirability of concentrating the litigation in one forum is obvious." *Wright v. Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009) (internal quotation marks, citation omitted). Therefore, this factor weighs in favor of certification.

### d.    Management of the action

Finally, the Court must consider "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D). The Supreme Court explained that, in general, "manageability … encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974). Because the parties entered into an agreement that encompasses the claims of two certified classes, it does not appear there are any problems with managing the action. *See Espinosa v. Ahearn*, 926 F.3d 539, 556-57 (9th Cir. 2019) ("manageability is not a concern in certifying a settlement class where, by definition, there will be no trial"); *Spann v. J.C. Penney Corp.*, 214 F.R.D. 312, 318 (C.D. Cal. 2016) ("settlement obviates the need for a manageable trial"). Further, the Court need not speculate as to manageability of the classes if the case were to proceed to trial. *See Amchem Prods.*, 521 U.S. at 620 ("("with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems"). Thus, this factor weighs in favor of certification.

### C.    Conclusion and Certification

The Court finds Gomez carries the burden to show the prerequisites of Rule 23(a) are satisfied, and the class is maintainable under Rule 23(b)(3). Accordingly, the request to certify the Settlement Class defined above is **GRANTED**.

## II.    Evaluation of the Settlement Terms

Settlement of a class action requires approval of the Court, which may be granted "only after a hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the class. *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).

The Ninth Circuit identified several factors for the Court to evaluate whether a settlement agreement meets these standards, including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely
> duration of further litigation; the risk of maintaining class action status
> throughout the trial; the amount offered in settlement; the extent of
> discovery completed, and the stage of the proceedings; the experience
> and views of counsel; the presence of a governmental participant; and the
> reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).

The Federal Rules now also identify "specific factors to consider in determining whether a settlement is 'fair, reasonable, and adequate.'" *Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021). In relevant part, Rule 23(e) directs the Court to consider whether:

> (A) the class representatives and class counsel have adequately
> represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
> (i) the costs, risks, and delay of trial and appeal;
> (ii) the effectiveness of any proposed method of distributing relief to
> the class, including the method of processing class-member claims;
> (iii) the terms of any proposed award of attorney's fees, including
> timing of payment; and
> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24. "The goal of amended Rule 23(e) is to focus the district court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Aquino v. 99 Cents Only Stores LLC*, 2023 WL 8696362, at *6 (C.D. Cal. July 11, 2023) (quoting Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes) (modifications adopted). The Ninth Circuit determined the revision to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026. Nevertheless, the Ninth Circuit also instructs courts to examine its prior factors "comprehensively." *Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021).

## A. Extent of Discovery Completed and Stage of the Proceedings

Gomez asserts the parties "conducted significant amounts of written discovery, and Defendants produced documents, including payroll and timekeeping records for Class Members during the Class Period." (Doc. 190-1 at 6-7; *see also* Doc. 211-2, Mallison Decl. ¶¶ 24-25.) Mr. Mallison reports that

Class Counsel reviewed the produced data and "engaged their expert to perform a review and analysis of these records and assembled a damages model…." (Doc. 211-2 at 12, Mallison Decl. ¶¶ 24-25.) He also reports that Class Counsel interviewed class members to investigate the class claims. (Doc. 205 at 8, Martinez Decl. ¶¶ 9-10.) Mr. Mallison believes "the investigation and discovery conducted … was thorough and elaborate." (Doc. 211-2 at 12, Mallison Decl. ¶ 24.)

Given the discovery completed related to class issues and the extensive litigation of the certified issues—including motions to reconsider and decertify the classes—these factors support final approval. *See Low v. Trump Univ., LLC*, 246 F. Supp. 3d 1295, 1302 (S.D. Cal. Mar. 31, 2017) (explaining these factors favor settlement when "the parties have conducted extensive discovery and thoroughly litigated the issues").

### B. Strength of the Case

When evaluating the strength of a case, the Court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc*., 913 F. Supp. 2d 964, 975 (E.D. Cal. 2012) (quoting *In re Wash. Pub. Power Supply Sys. Sec. Litig*., 720 F. Supp. 1379, 1388 (D. Az. 1989)).

The Court previously certified two classes, and the fact-finder would be required to evaluate these claims on the merits. Gomez reports, "Review of timekeeping and payroll documents by Plaintiff's expert allowed the Parties to assess the strengths and weaknesses of the case in preparation for mediation." (Doc. 211-1 at 22, citing Mallison Decl. ¶ 24 [Doc. 211-2 at 12].) The parties were able to estimate the value of the case, while acknowledging the "financial constraints of Defendant." (*Id.*) Gomez notes that "continued litigation risks the prospect of no recovery at all." (*Id.*) Towards this end, it appears the parties made informed decisions, which lead to resolution of the matter. This factor weighs in favor of final approval of the Settlement.

### C. Representation of the Class

To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether the interests of the named plaintiff are "aligned with the interests of the Class Members." *See Cottle v. Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021). In addition, a finding that "Class Counsel are experienced and competent" supports a conclusion that the class is adequately represented. *Id.; see*

1  *also In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent

2  counsel are better positioned than courts to produce a settlement that fairly reflects each party's

3  expected outcome in litigation."). Thus, the adequacy analysis under Rule 23(e)(2) is "redundant of

4  the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Mandalevy v. Bofi Holding, Inc.,*

5  2022 WL 1556160, at *6 (S.D. Cal. May 17, 2022) (quoting 4 William B. Rubenstein, Newberg on

6  Class Actions § 13:48 (5th ed. 2020)).

7      Gomez's interests appear aligned with those of Class Members, as they share a common

8  interest in challenging the alleged wrongful payment and payroll policies. In addition, Class Counsel

9  are clearly experienced in class action litigation. (*See* Doc. 211-2 at 2-7, Mallison Decl. ¶¶ 3-8; Doc.

10  211-8 at 2-8, Martinez Decl. ¶¶ 3-12; Doc. 211-9 at 2, Aguilasocho Decl. ¶ 3.) Because Gomez

11  carried the burden to show the adequacy prerequisite was satisfied under Rule 23(a), the Court finds

12  the requirement under Rule 23(e)(2) is also satisfied. *See Flores v. Dart Container Corp.*, 2021 WL

13  1985440, at *5 (E.D. Cal. May 17, 2021) ("Because the Court has found that the proposed class

14  satisfies Rule 23(a)(4) for purposes of class certification, the adequacy factor under Rule 23(e)(2)(A)

15  is also met").

16      **D.    Negotiation of the Settlement**

17      Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length."

18  Fed. R. Civ. P. 23(e)(2)(B). The Ninth Circuit also "put[s] a good deal of stock in the product of an

19  arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement.

20  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009). The inquiry of collusion addresses

21  the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators"

22  or improper incentives of class members at the expense of others. *Staton*, 327 F.3d at 960. The Ninth

23  Circuit observed that "settlement class actions present unique due process concerns for absent class

24  members" because the "inherent risk is that class counsel may collude with the defendants, tacitly

25  reducing the overall settlement in return for a higher attorney's fee." *See In re Bluetooth Headset*

26  *Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted).

27  Thus, the Court must consider whether the process by which the parties arrived at their settlement is

28  truly the product of arm's length bargaining—as Gomez asserts (Doc. 211-1 at 19)— or the product of

collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

District courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 94; *see also Briseño*, 998 F.3d at 1023.  These "more subtle signs" include: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.* (internal quotations, citations omitted).

### 1.     Whether there is a disproportionate distribution to counsel

The Settlement provides that Class Counsel may request attorneys' fees up to 1/3 of the settlement fund.  (Doc. 211-3 at 8, Settlement § III.C.2.)  However, Class Counsel now seek "a reduced … fee of 25%" given the limited funds available for settlement.  (Doc. 211-1 at 10, n. 5.)  The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Because the requested fees requested are equal to the Ninth Circuit's benchmark, the Settlement Agreement does not provide a disproportionate distribution to Class Counsel.  *See Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 946, 984  (E.D. Cal. 2012) (finding "[c]lass counseling is not receiving a disproportionate distribution of the settlement, whether in percentage terms or in absolute terms," where counsel requested fees within the range identified by the Ninth Circuit.

### 2.     Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947.  However, the Ninth Circuit recognized also a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

Defendant agreed that "Jacobo will not oppose Class Counsel's application to the Court for an award of 1/3 of the Gross Settlement Amount as their Class Counsel Fees Payment, plus an additional amount for reasonable costs." (Doc. 211-3 at 8, Settlement § III.C.2.) However, the parties also agreed "[t]he ultimate amount of any award for Class Counsel Fees Payment and Class Counsel Litigation Expenses Payment is to be determined by the Court." (*Id.*) Thus, the Settlement includes a version of a "clear sailing agreement." Nevertheless, the existence of a clear sailing provision is not necessarily fatal to approval. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 948; *see also In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling"). Rather, "when confronted with a clear sailing provision, the district court has a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Id.* (citing *Staton*, 327 F.3d at 954).

As discussed below, the Court finds an award from the common fund is appropriate, and the modified award is reasonable in light of the time expended and results obtained. This factor does not mandate a finding of collusion and the factor does not weigh against final approval of the settlement. *See Swain v. Anders Group, LLC*, 2023 WL 2976368, at *10 (E.D. Cal. Apr. 17, 2023) (finding a clear sailing provision did not weigh against final approval where the fees were "reasonable based on evidence submitted by class counsel"); *see also Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan 24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the Cour analyzed the fee request and found it was reasonable).

### 3.    Whether there is a reversion to Defendant

Finally, the parties did not arrange for any unawarded fees to revert to Defendant. Instead, the parties acknowledge in the Settlement Agreement that the Court may approve less than the requested amount of fees, in which case "the remainder will be retained in the Net Settlement Amount for distribution to Participating Class Members." (Doc. 211-3 at 8, Settlement § III.C.2.) Because there is no reversion to Defendant, this factor supports the conclusion that there is no collusion between the parties. *See, e.g., Wise v. Salon*, 2020 WL 1492672 (E.D. Cal. Mar. 26, 2020) (where there was no

reversionary cause, the court was "satisfied that the settlement is not the product of collusion").

### 4.    Findings on collusion

Based upon the factors set forth by the Ninth Circuit, the Court finds the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations." *See Rodriguez v. Danell Custom Harvesting, LLC*, 327 F.R.D 375, 383 (E.D. Cal. 2018) (citation omitted).  Thus, this factor under Rule 23 supports final approval of the class settlement.

### E.    Amount Offered and Relief Provided to the Class

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should examine "the complete package taken as a whole," and the proposed settlement is "not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625, 628.

The proposed gross settlement amount is $100,000.00.  (Doc. 211-3 at 4, Settlement § I.Q.) After the anticipated deductions from the gross settlement, Gomez estimates that $12,120.00 will be dispersed to Participating Class Members.  (Doc. 211-1 at 10.)  Although this is significantly low with an estimated class of 4,402, the gross settlement amount is based upon the remaining assets of Defendant.  (*See* Doc. 211-2 at 13, Mallison Decl. ¶ 27.)  Analyzing the factors identified in Rule 23 and by the Ninth Circuit, as discussed below, the Court finds the amount offered and relief provided support final approval of the Settlement.

### 1.    Costs, risks, and delays

"A central concern when evaluating a proposed class action settlement relates to the cost and risk involved in pursuing a litigated outcome." *Feltzs v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9 (C.D. Cal. Mar. 2, 2022) (quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modifications adopted].)  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the settlement were to be rejected, the parties would have to engage in further litigation, which could potentially "waste the remaining assets of Defendant[]," and leave nothing for the class to

recover.  (*See* Doc. 211-2 at 13, Mallison Decl. ¶ 27; *see also* Doc. 211-1 at 20.)

The parties agree the claims are "highly disputed."  (Doc. 211-3 at 6, Settlement § II.H.)
Defendant indicates it considered "the uncertainty and risks inherent in any litigation and … concluded
that further defense of the Lawsuit would be protracted and expensive."  (*Id.*)  Similarly, Gomez
reported that counsel "carefully considered the risks of trial and other normal perils of litigation,
including the merits of the affirmative defenses asserted by Defendant, the difficulties of complex
litigation, the lengthy process of establishing specific damages, …and other various possible risks and
delays."  (Doc. 202-1 at 6, citing Mallison Decl. ¶¶ 19, 29-30 [Doc. 202-2 at 10, 13-14].)  Further,
Gomez asserted the Settlement "provides a certainty of recovery," while "further litigation or trial of
the matter would substantially delay any compensation to Class Members and/or potentially imperil the
financial stability of Defendant[], and the[] ability to provide any remedies in this action."  (*Id.* at 7.)

Notably, employment law class actions are, by their nature, time-consuming and expensive to
litigate.  *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959 at *6 (C.D. Cal. Aug. 4, 2015).
If the Settlement is rejected, the parties would have to engage in further litigation, including seeking
class certification and discovery on the issue of damages.  The time and expense of continued litigation
could outweigh any additional recovery.  Indeed, as discussed above, Defendant ceased operations and
has only approximately $100,000 in remaining assets, and the costs of additional litigation may further
diminish this amount.  On the other hand, the proposed settlement provides for immediate recovery on
claims presented by Gomez on behalf of the class, even when limited.  Due to the acknowledged risk of
the claims of Class Members, costs of future litigation that may reduce—or even preclude— any
recovery to class members, and delay in payments if the settlement is not approved, this factor weighs
in favor of preliminary approval of the Settlement.  *See Rodriguez*, 563 F.3d at 966 (finding that the
risk, expense, complexity and duration of litigation supports settlement).

### 2.    Method distribution

"[T]he goal of any distribution method is to get as much of the available damages remedy to
class members as possible and in as simple and expedient a manner as possible."  *Hilsley v. Ocean
Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval
criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th

ed.)). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes. "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id*.

### a.    Distribution to class members

Gomez asserts that "[t]he proposed method of distribution is effective." (Doc. 211-1 at 21, emphasis omitted.) Settlement Class members are not required to "take any action," such as submitting a claim form, to receive their shares. (*See* Doc. 211-4 at 4.) Rather, individuals only needed to take action if they wished to opt-out of the settlement, object to any of the terms of the settlement, or dispute the amount of their individual settlement share. (Doc. 211-1 at 21.) Because the class members are not required to submit a claim form, the proposed method of distribution facilitates payment for legitimate claims without being "unduly demanding" upon the Settlement Class. Thus, this factor weighs in favor of final approval of the settlement. *See Jackson v. Fastenal Co.*, 2021 WL 5755583 at *11 (E.D. Cal. Dec. 3, 2021) (finding "the proposed method of distributing relief is effective, and weighs in favor of a finding that the settlement agreement is fair, reasonable and adequate" where the class members did not have to file a claim).

### b.    Distribution to a cy pres beneficiary

Since many class action settlements result in unclaimed funds, parties should have a plan for distributing unclaimed funds. *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990). The options for such distribution include cy pres distribution, escheat to the government, and reversion to the defendants. *Id.*, 904 F.2d at 1307. Here, the parties agree that a cy pres beneficiary will receive uncashed or returned funds under the Settlement. (Doc. 211-3 at 17, Settlement § III.F.4.) Gomez proposes the organization "Legal Aid at Work" be appointed as the cy pres beneficiary. (Doc. 202-1 at 13.)

The Ninth Circuit determined a cy pres recipient should be "tethered to the nature of the lawsuit and the interest of the silent class members." *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039 (9th Cir. 2011). In other words, the Ninth Circuit "require[s] that there be a driving nexus between the plaintiff class and the cy pres beneficiaries." *Dennis v. Kellogg Co*., 697 F.3d 858, 865 (9th Cir. 2012) (citing

*Nachshin*, 663 F.3d at 1038).  The Court explained that without such tethering, the distribution of funds "may create the appearance of impropriety" by catering "to the whims and self interests of the parties, their counsel, or the court." *Nachshin*, 663 F.3d at 1038.  Thus, a cy pres award should not benefit a group that is "too remote from the plaintiff class." *Six Mexican Workers*, 904 F.2d at 1308.

In identifying a cy pres beneficiary, the Ninth Circuit directs courts to consider whether awards to the beneficiary "(1) address the objectives of the underlying statutes, (2) target the plaintiff class, or (3) provide reasonable certainty that any member will be benefitted." *Nachshin*, 663 F.3d at 1040. Further, the Court must consider whether the cy pres distribution is appropriate given the "size and geographic diversity" of the class members. *Id.* at 1040-41 (citing, e.g., *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 683 (8th Cir. 2002); *Houck on Behalf of U.S. v. Folding Carton Admin. Comm.*, 881 F.2d 494, 502 (7th Cir. 1989)).

At the preliminary approval stage, the Court observed that Gomez did not provide "any analysis" of the factors identified by the Ninth Circuit "to assist the Court in evaluating whether Legal Aid at Work is an appropriate cy pres beneficiary." (Doc. 206 at 10.)  The Court observed:

> [T]he Court is aware of many other cases in which Mr. Mallison and Mr. Martinez were counsel of record and recommended the cy pres beneficiary be a pro bono law firm.  *See, e.g.*, *Rosales v. El Rancho Farms*, 2015 WL 4460635, at *9 (E.D. Cal. July 21, 2015), *report and recommendation adopted*, 2015 WL 13659310 (E.D. Cal. Oct. 2, 2015); *Ontiveros v. Zamora*, 2014 WL 3057506, at *1 (E.D. Cal. July 7, 2014); *Ortega v. Aho Enterprises, Inc.*, 2021 WL 5584761, at *13 (N.D. Cal. Nov. 30, 2021); *Sandoval v. M1 Auto Collisions Centers*, 2017 WL 11679905, at *5 (N.D. Cal. Mar. 20, 2017).  This suggests that pro bono law firms represent the interests of counsel, rather than the class.  Indeed, Class Counsel previously worked for the CRLA, which was the recipient of the cy pres funds in many of the cases cited here.

(*Id.*, n. 4.)  Accordingly, the Court preliminarily found that "**the anticipated cy pres beneficiary is not appropriate**." (*Id.*, emphasis in original.)  The Court ordered: "Plaintiff **SHALL** clearly address the factors identified by the Ninth Circuit in *Nachshin* in seeking final approval of the Settlement." (*Id.*.)

In response to the Court's order, Gomez provided additional information from Hector Martinez, Class Counsel.  (Doc. 211-8 at 8-10.)  Joan Graff, President of Legal Aid at Work (LAAW), also provided a declaration in support of the cy pres beneficiary request.  (Doc. 211-12.)

///

i.      *Whether there is any conflict by the appointment*

As an initial matter, Gomez asserts that LAAW "does not represent the interests of Class Counsel but rather benefits the demographic of clients that Class Counsel frequently represents." (Doc. 211-1 at 31.) Class Counsel report they have not worked for LLAW, and "[t]here is no appearance of impropriety here." (*Id.*, internal quotation marks omitted.)

Ms. Graff also provides information regarding the professional relationship, reporting that Martinez Aguilasocho Law never designated LAAW as a cy pres beneficiary in their cases, while Mallison & Martinez had LAAW designated as the cy pres beneficiary in four prior cases: *Olvera v. PHI* (December 2019), *Ayala v. Cold Storage Manufacturing* (October 2021) *Ramirez v. Damn Fine Pizza, LLC* (November 2023) and *Cristomo et al v. 15 Main LLC* (July 2024). (Doc. 211-12 at 12, Graff Decl. ¶¶ 31, 34.) Ms. Graff reports that "LAAW has no financial relationship with Mallison & Martinez and has never provided any consideration to the firm in exchange for being named a recipient of cy pres funds." (*Id.*, ¶ 32.) She also asserts that LAAW "never referred any cases or potential clients" to either Mallison & Martinez or the firm of Martinez Aguilasocho Law. (*Id,*, ¶¶ 33, 36.)

Based upon the information provided by Class Counsel and Ms. Graff, it does not appear there are is any conflict—or an appearance of impropriety— with the appointment of LAAW as the cy pres beneficiary in this action.

ii.      *Objectives of underlying statutes*

Gomez filed this action to obtain relief under the Agricultural Workers Protection Act and state law related to violations of wage-and-hour laws. (*See generally* Doc. 1; Doc. 95.) Gomez asserts that appointment of LAAW meets the objectives of the underlying statutes in issue. (Doc. 211-1 at 30.) She reports that LAAW "is a non-profit organization providing civil legal services to the indigent communities." (*Id.*, citing Graff Decl. ¶¶ 4-9 [Doc. 211-12 at 2-3].) According to Ms. Graff, "[t]he core of LAAW's work is providing free legal services to low-wage workers with employment law claims," including: "(a) violations of wage-and-hour laws; (b) workplace retaliation; (c) discrimination on account of race, national origin, disability, sex, gender identity, sexual orientation, immigration status and language proficiency; (d) harassment; and (e) failure to comply with equal pay laws and family medical leave laws." (*Id.* at 2-3, ¶ 7.) She reports that LAAW also created the "Central Valley

Workers Rights Project," which is focused on employment rights for workers in the Central Valley. (*Id.* at 9-10, ¶¶ 24-26.)

### iii.    Whether the Settlement Class is targeted and will benefit

Gomez contends LAAW "targes the Plaintiff and the Class," and the "the interests of the class are met" by the appointment. (Doc. 211-1 at 30, emphasis omitted.) Specifically, Ms. Graff asserts, "LAAW is … one of the few legal services organizations in California that has a wage/hour litigation program and has no restrictions on helping undocumented workers, including those who are farmworkers or who hold related jobs in the agriculture industry." (Doc. 211-12 at 9, Graff Decl. ¶ 23.) She notes that LAAW has litigated several employment matters on behalf of low income workers and day laborers, including one "on behalf of 16 farmworkers who were not paid for all of the strawberry boxes that they harvested during the 2022 season." (*Id.* at 4, ¶ 12.) Further, the LAAW puts on "Workers' Rights Clinics" that "help[] low-wage workers assess their claims for unpaid wages, calculate the amount of unpaid wages, and prepare the forms necessary to initiate wage claims before the Labor Commissioner." (*Id.*, ¶ 13.)

According to Ms. Graff, the Central Valley Project serves the following counties: Butte, Colusa, Fresno, Glenn, Kern, Kings, Madera, Merced, Placer, Sacramento, San Joaquin, Shasta, Stanislaus, Sutter, Tehama, Tulare, Yolo, and Yuba. (Doc. 211-12 at 9, ¶ 25.) She reports the Workers' Rights Clinic operates in partnership with Central California Legal Services, with offices in Fresno, Visalia, and Merced. (*Id.* at 10, ¶ 27.) According to Ms. Graff, between the clinics and services offered, "LAAW helped 1,992 workers who either lived or worked in the Eastern District of California," including 85 agricultural workers, between 2020 and 2024. (*Id.*, ¶ 16.) Thus, it is clear that LAAW offers assistance to those who reside in Fresno County—where Defendant operated—and the low income workers in the area, including farmworkers, benefit from their services. It is likely that Settlement Class Members can benefit from the work performed by LAAW, whether through litigation, the Central Valley Project, or the Workers' Rights Clinics provided in Fresno County.

### iv.    Conclusion

Based upon the information provided regarding the work performed by LAAW, including the litigation of wage-and-hour claims on behalf of plaintiffs similar to those in the matter now pending, it

appears the work of LAAW is appropriately tethered to the interests of the Settlement Class. Consequently, the Court finds LAAW is an appropriate cy pres beneficiary for any uncashed funds in this action.

### 3.    Attorneys' fees

Under Rule 23, "courts must scrutinize 'the terms of any proposed award of attorney's fees.'" *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021) (citation omitted).  The Ninth Circuit explained, "the new Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members."  *Id.*, quoting *Briseño*, 998 F.3d at 1024.

As discussed above, Class Counsel may request fees in the amount of one third of the gross settlement fund, although they now seek a lower amount.  (Doc. 211-3 at 8, Settlement § III.C.2; Doc. 211-1 at 25-28.)  The Court-approved payment to Class Counsel shall be made by the Settlement Administrator "out of the Gross Settlement Amount promptly upon receipt."  (*Id.*)  The Settlement also provides that all payments from the fund are "subject to timing as directed by counsel for the Parties and/or the Court."  (*Id.* at 7, § III.C.)  Because a specific timeframe for class payments was not identified in the Settlement, the Court now orders that the Settlement Administrator shall distribute payments from the Net Settlement Amount—including those Class Counsel and the Settlement Class—within 15 days of receipt final installment of the settlement funds.[8]  Consequently, Class Counsel will receive their payments in the same period of time as Class Members.  The amount of fees and the timing of the payments do not weigh against final approval of the Settlement.

### 4.    Agreement required to be identified

The Court must consider any agreement that is required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  Gomez reports there were two agreements made in connection with the proposed settlement: (1) a stipulation related to the FLSA release dated May 9, 2024; and (2) a stipulation related to the minimum payment

---

[8] At the preliminary approval stage, the Court ordered Class Counsel to address this proposed timeline.  Class Counsel responded that the "timeline is reasonable" and they have no objections.  (Doc. 211-1 at 21, n.12.)

provision dated September 13, 2024. (Doc. 211-1 at 21; *see also* Docs. 195, 203.)  As discussed below, the identified stipulations respond to issues the Court identified and respond to orders for supplemental briefing.  In addition, the stipulations do not involve material modifications of the Settlement.  (*See* Doc. 211-1 at 21.)  Accordingly, the Court finds this factor does not weigh against final approval.

### F.    Treatment of Class Members

Rule 23 requires the Court to consider whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit."  *Hilsley*, 2020 WL 520616, at *7 (citation omitted).

The parties agreed that class members who do not timely request exclusion from the Settlement will receive a *pro rata* share of the Net Settlement Amount, "calculated by dividing the Net Settlement Amount by the total number of pay periods worked by each class member during the Class Period." (Doc. 211-3 at 9-10, Settlement § III.E.2.)  However, the Settlement also provides:

> No payments shall be made to Participating Class Members who receive a payment in the amount of $5.00 or less to conserve resources and promote efficiency of distribution. Notwithstanding this provision, all Participating Class Members will still be deemed to have released claims against Released Parties specified herein, regardless of whether they receive payment under this Agreement. To the extent Participating Class Members do not receive their settlement share because payment is not equal to or more than $5.00, their settlement share will be re-distributed pro rata to Participating Class Members who are due to all remaining Participating Class Members.

(*Id.* at 10, § III.E.3.)  With the minimum payment provision, Gomez  anticipated that approximately 2,000 members of the class would receive settlement shares.  (Doc. 190-1 at 13, n.4.)

Previously, the Court expressed concern over this minimum payment provision, noting that based upon the initial estimate of 3,267 class members, nearly 40% of the anticipated class would not receive a settlement share.  (Doc. 199 at 3.)  Gomez was ordered to address "whether the settlement is fair and adequate for these class members … who will not receive even a nominal settlement share under the proposed terms."  (*Id.*)  The parties met and conferred regarding the provision, and "agreed

1  to remove Section III.E.3 of the Settlement Agreement." (Doc. 203 at 2.) The parties also agreed that

2  removal of this provision is "not a material modification of the terms," such that it would render the

3  agreement null and void. (*Id.*) Accordingly, the Court ordered Section III.E.3 stricken from the

4  Settlement. (Doc. 206 at 35-36.)

5         With the above modification, shares will be distributed on a *pro rata* basis to the entirety of the

6  Settlement Class, and the agreement treats the class members equitably. This distribution, based upon

7  the number of pay periods worked by class members, supports final approval. *See Cooks v. TNG GP*,

8  2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021) (observing that the calculation of payments to class

9  members "on a pro-rata basis based on the number of compensable workweeks each member worked

10  … is fair and treats class members equitably"); *see also Morgan v. Rohr*, 2025 WL 1285830 at *14

11  (S.D. Cal. May 1, 2025) (finding a *pro rata* distribution plan had "little to no risk of unequal treatment"

12  and weighed in favor of approving the settlement terms); *Gomez-Gasca v. Future AG Mgmt. Inc.*, 2020

13  WL 6149688 at *4 (N.D. Cal. Oct. 20, 2020) (noting that in the preliminary approval stage, "the Court

14  approved the proposed plan pro rata allocation based on the number of workweeks the class member

15  performed work during the Class Period").

16         **G.    Views of Counsel**

17         As addressed above, Class Counsel are experienced in class action litigation. Mr. Mallison

18  reports that "the Settlement is reasonable, fair, and adequate, as it provides compensation to class

19  members in proportion to the relative value of their claims." (Doc. 211-2 at 13, ¶ 30.) Similarly, Mr.

20  Martinez opined "the proposed settlement in this case is fair, reasonable, and in the best interest of the

21  class, particularly given Defendants' financial constraints." (Doc. 205 at 8, ¶ 11.) Finally, the

22  Settlement provides: "The Parties and their respective counsel believe and warrant that this Settlement

23  reflects a fair, reasonable, and adequate settlement of the Lawsuit…." (Doc. 211-3 at 20, § IV.I.8.)

24  These opinions of counsel are entitled to significant weight and support approval of the Settlement.

25  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 (indicating "great weight" is given to the opinions of

26  counsel because they "are most closely acquainted with the facts of the underlying litigation");

27  *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("the trial court is

28  entitled to, and should, rely upon the judgment of experienced counsel for the parties").

### H.    Reaction of Class Members to the Proposed Settlement

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle*, 340 F.R.D. at 376 (observing the court may assess the reaction of class members by considering "how many class members submitted … objections" at the final approval stage).

Gomez agreed to the terms of Settlement Agreement.  (*See* Doc. 211-3 at 22.)  After receiving the Court-approved Notice, Class Members reacted favorably to the proposed settlement terms, because there were no objections and only 7 of more than 4,000 individuals requested exclusion.  As Gomez observes, this resulted in a 99.85% participation rate from those who received the Notice Packet.  (Doc. 211-1 at 25.)  This "absence of a negative reaction[] strongly supports settlement." *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010); *see also Taylor v. Populous Group, LLC*, 2023 WL 139724, at *3 (S.D. Cal. Jan 9, 2023) (the class members' reaction—after notice of the settlement terms and "an opportunity to express their reactions"—supported final approval where no objections to the Settlement were filed); *Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *8 (E.D. Cal. Sept. 29, 2022) ("[t]he lack of any objection weighs in favor of final approval of the settlement").  Accordingly, this factor weighs in favor of final approval.

### III.    Conclusion

The factors identified under Rule 23 and by the Ninth Circuit weigh in favor of final approval of the Settlement, and the terms of the Settlement are fair, reasonable, and adequate.  Therefore, the request for final approval of the Settlement Agreement is **GRANTED**.

### THE FLSA RELEASE

The Settlement originally indicated that "Released Claims" include "claims that could have been brought under the Fair Labor Standards Act or similar federal or state governmental agencies regulating wage and hour or labor and employment laws."  (Doc. 202-3 at 17-18, Settlement § IV.A.)  Previously, the Court noted that Gomez did not raise a claim under the Fair Labor Standards Act, and she did not address the propriety of such a release in her initial brief supporting preliminary approval.  (*See* Doc. 190-1.)  The Court observed:

> [T]he purposes of the FLSA may be frustrated where a plaintiff seeks to release a claim not previously raised in the complaint. *See Gonzalez v. Corecivic of Tenn., LLC*, 2018 WL 4388425, at *4-6 (E.D. Cal. Sept. 12, 2018). In *Gonzalez*, the Court observed at a hearing on the plaintiff's motion for preliminary approval that the proposed settlement included a release of FLSA claims, though no such claim was alleged in the initial complaint. *Id.* at *4. In response, the plaintiff requested leave "to amend the complaint to add an FLSA claim for the purpose of settling it." *Id.* The Court observed that amending a complaint under such circumstances "raises red flags in large part because it appears plaintiff agreed to settle the FLSA claim before he ever considered litigating it." *Id.* In addition, the "atypical circumstances create a potentially indelible stain for the settlement agreement as drafted, because they point toward collusion between the parties." *Id.* Similarly, here, there was no FLSA claim raised in the complaint, and it appears the specific mention of the claim in the release thwarts the purposes of the FLSA. Under such circumstances, the Court is unable to find the release is proper.

(Doc. 192 at 2-3.)  Accordingly, the Court ordered Class Counsel to file supplemental briefing regarding claims arising under the FLSA.  (*Id.* at 3.)  In the alternative, the Court indicated "the parties may file a stipulation to amend the settlement…." (*Id.*)

On May 9, 2024, the parties filed a "Stipulation to Amend the Settlement Agreement to Remove the Sole Mention of FLSA."  (Doc. 195.)  Specifically, the parties stipulated "to remove the sole mention of the FLSA from the proposed Settlement and further stipulate[d] that the removal of the reference to the FLSA does not amount to a material modification of the Settlement."  (*Id.*)  Because the stipulation cures the issue related to the FLSA release, the Court approved the stipulation and struck the provision.  (Doc. 206 at 35.)

## REQUEST FOR ATTORNEYS' FEES

Pursuant to the Settlement, Class Counsel may request fees in the amount of 1/3 of the settlement fund.  (Doc. 211-3 at 8, Settlement § III.C.2.)  Class Counsel now request an award of 25% of the common fund, asserting it "is appropriate under the circumstances."  (Doc. 211-1 at 26, emphasis omitted.)  Defendant agreed to not oppose this fee request.  (Doc. 211-3 at 8, Settlement § III.C.2.)

## I.    Legal Standards

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  Thus, a court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case.  *Common Cause v. Jones*, 235 F.

Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (a court may not adopt representations regarding the reasonableness of time expended without independent review); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request when "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

The Court has discretion to use either a lodestar or percentage of the common fund calculation to evaluate a fee request. *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022). The Ninth Circuit observed that "either method may… have its place in determining what would be reasonable compensation." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). Whether the Court applies the lodestar or percentage method, the fees awarded must comply with Rule 23 and be "fundamentally fair, adequate, and reasonable." *Staton*, 327 F.3d at 963 (quoting Fed. R. Civ. P. 23(e)).

## A.    Lodestar method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433). The product of this computation, the "lodestar" amount, yields a "presumptively reasonable" fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Edmo v. Corizon, Inc.*, 97 F.4th 1165, 1168 (9th Cir. 2024). Next, the Court may adjust the lodestar upward or downward using a "multiplier" considering factors adopted by the Ninth Circuit:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.[9]

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *see also Quesada v. Thomason*, 850

---

[9] The Ninth Circuit has since determined the "desirability" of a case is no longer a relevant factor. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

1    F.2d 537, 539 (9th Cir. 1988) (indicating the Court should "consider[] some or all twelve relevant

2    criteria set forth in *Kerr*" to determine whether to deviate from the lodestar).

### B.    Percentage from the common fund

4          As the name suggests, under this method, "the court makes a fee award on the basis of some

5    percentage of the common fund." *Florida*, 915 F.2d at 545 n. 3. "The typical range of acceptable

6    attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25%

7    considered the benchmark." *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491 (E.D. Cal. 2010);

8    *see also In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (noting the

9    Ninth Circuit established "[t]he benchmark percentage is 25%" of the common fund).

10         To evaluate whether the requested percentage is reasonable, courts may consider a number of

11   factors, including: (1) the results obtained for the class; (2) the risks undertaken by class counsel,

12   including the complexity of the issues; (3) the length of the professional relationship between class

13   counsel and the plaintiffs; and (5) the market rate, with a lodestar cross-check. *Vizcaino v. Microsoft*

14   *Corp.*, 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *Six Mexican Workers v. Ariz. Citrus Growers*, 904

15   F.2d 1301, 1311 (9th Cir. 1990). The percentage awarded as fees may be adjusted below or above the

16   benchmark, but the Court's reasons for adjustment must be clear. *Graulty*, 886 F.2d at 272; *see also In*

17   *re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("courts typically calculate

18   25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the

19   record of any 'special circumstances' justifying a departure").

### C.    Fee applicants' burden

21         Notably, the Court must consider similar factors under both the lodestar method and awarding a

22   percentage of the common fund. *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050. With

23   either method, the fee applicant bears the burden of establishing that the fees and costs were reasonably

24   necessary to achieve the results obtained. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th

25   2000). Therefore, a fee applicant must provide records documenting the tasks completed and the

26   amount of time spent. *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins.*

27   *Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007). "Where the documentation of hours in inadequate, the

28   district court may reduce hours accordingly." *Hensley*, 461 U.S. at 433.

## II.    Evaluation of the Fees Requested

Class Counsel request application of the percentage of common fund doctrine.  (*See* Doc. 211-1 at 25-28.)  Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded fees from that fund.  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf."  *Boeing Co.*, 444 U.S. at 478.  Because the Settlement applies a *pro rata* distribution formula to determine the amount paid to each Class Member, the Court agrees application of the common fund doctrine is appropriate.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and counsel "turns adversarial."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class.  It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted).  As a result, the district court must assume a fiduciary role for the class members in evaluating the reasonableness of a request for fees from the common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

### A.    Time and labor required

Class Counsel report they worked over 800 hours on this case, through the preparation of the motion for final approval.  (Doc. 211-1 at 27, citing Mallison Decl. ¶ 62 [Doc. 211-2 at 21], Aguilasocho Decl. ¶ 15 [Doc. 211-9 at 15.)  The total 814.8 hours worked includes 520.2 hours from

the firm of Mallison & Martinez and 294.6 hours from Martinez Aguilasocho Law.[10]  (*Id.*; *see also* Doc. 211-5 [billing records from Mallison & Martinez]; Doc. 211-10 [billing records from Martinez Aguilasocho Law].)  There is no showing that Class Counsel were precluded from other work during the course of this litigation. Nevertheless, Class Counsel performed an extensive amount of work on this action.  The Court finds this factor supports the requested fee award.

### B.     Results obtained for the Class

The result achieved for the class is a major factor to be considered in making a fee award. *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994).  Although the financial recovery in this action is limited because Defendant ceased operations, Class Counsel were able to obtain Defendant's total remaining assets for the Settlement Class.  Given the financial constraints faced by the parties, the Court finds this factor supports the fee request.

### C.     Risks undertaken by counsel

The risk undertaken is an important factor in determining the fee award.  *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual merits of the claim, and (2) the difficulty of establishing those merits." *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992).

Class Counsel argue the fee request is justified, in part, because "there were significant risks in pursuing this case." (Doc. 211-1 at 26.)  Class Counsel do not identify specific legal or factual risks, or address the difficulty of establishing the merits.  (*See id.*)  It appears the risks related to the legal merits were typical of those faced in wage and hour class action, including the prior requests to certify and decertify the classes.  These risks support the requested percentage of the common fund.  *See Vizcaino*, 290 F.3d at 1048; *see also Sebastian v. Sprint/United Mgmt. Co.*, 2019 WL 13037010, at *7 (C.D. Cal. Dec. 5, 2019) (risks that are common to "wage-and-hour-class actions … counsel[] in favor of approving the fee award at the benchmark").

///

---

[10] The declaration from Mr. Aguilasocho erroneously indicated that his firm expended 295.6 hours on this action. (Doc. 211-9 at 8-9, ¶ 15.)  Rather, adding the hours identified in the declaration for each of the identified lawyer and professional staff yields a total of 294.6 hours.  This total is confirmed by the firm's billing records. (Doc. 211-10 at 17.)

### D.    Financial risk related to contingent fee

Class Counsel contend "the contingent nature of the fee and the financial burden" support the requested fee award.  (Doc. 211-1 at 27, emphasis omitted.)  Mr. Mallison asserts prosecuting this case on a contingency basis "was extremely risky."  (Doc. 211-2 at 21, ¶ 62.)  He contends that "Class Counsel risked never collecting at all in this case and expended a total of over [800] hours."  (*Id.*)  Despite the fact that Class Counsel worked on a contingency basis, there is no evidence that Class Counsel faced atypical risks when taking on this action.  Although Mr. Mallison asserts his firm "would not have agreed to represent Plaintiffs in this case on a contingency fee basis if we were not confident that we would be awarded a contingency fee approximately one-third of the potential recovery," he acknowledges that "[o]ne hundred percent of Mallison & Martinez's legal practice involves legal work that is on a contingency fee basis."  (Doc. 211-11 at 20, ¶¶ 57.)

The identified risk associated with the contingency fee supports the requested award at the benchmark.  *See Clayton v. Knight Transp.*, 2013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013) (awarding a fee at the benchmark because a contingency fee risk is common wage and hour class actions); *Fan v. Delta Air Lines*, 2020 WL 5044614, at *4 C.D. Cal. May 20, 2020 (finding a fee award of 25% of the settlement fund was appropriate where class counsel proceeded on a continency basis because "nearly all wage and hour class action litigation is conducted [in this manner]").

### E.    Complexity of issues and skill required

Courts recognize that "the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award." *Ross v. Bar None Enters.*, 2015 WL 1046117, at *9 (E.D. Cal. Mar. 10, 2015) (citation omitted).  Class Counsel contend "this case required exceptional skill in obtaining the relevant pay and time records, performing an expert analysis thereon, certifying two classes, and negotiation for the maximum recover for the Class allowable by Defendant's financial assets."  (Doc. 211-1 at 26-27.)  Class Counsel assert their "skills in developing an extensive damage analysis to negotiate with at mediation underpinned the success of the mediation in obtaining recovery for the Class."  (*Id.* at 27.)

Notably, Class Counsel do not identify any complex issues faced in this matter.  On the other hand, the overall experience of Class Counsel undoubtedly benefited Plaintiff and Class Members.  As

noted, Class Counsel retained an expert for data analysis and calculated damages in advance of mediation.  (*See* Doc. 211-2 at 12, Mallison Decl. ¶ 24.)  The skill and experience of Class Counsel with wage and hour litigation very likely assisted the parties in evaluating the strengths and weaknesses of the action.  Accordingly, the Court finds this factor supports an award equal to the benchmark.  *See Monterrubio*, 291 F.R.D. at 458 (declining to depart from the benchmark based upon the "skill and quality of the work in [the] particular case," though also acknowledging class counsel were "skilled litigators in the wage and hour context").

### F.    Length of the professional relationship

Class Counsel filed the initial complaint in this action in September 2015.  (Doc. 1.)  Thus, the professional relationship has lasted approximately 10 years.  (*See also* Doc. 211-10.)  The duration of this professional relationship supports the requested award of 25% of the settlement fund.  *See Six Mexican Workers v*, 904 F.2d at 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

### G.    Awards in other cases

Class Counsel assert that "California wage and hour class action cases are typically litigated in state court, which reflect fee awards in wage and hour cases of 25-40%."  (Doc. 211-1 at 27, citing *Walgreens Overtime Cases*, JCCP No. 4387; *Collins v. Aaron Bros*., LASC No. BC 208856; *Gallegos v. Office Depot, Santa Clara Sup. Ct.*, Case No. CV 797847; *Chalmers v. Electronics Boutique*, LASC Case No. BC306571.  Class Counsel observe that in each of these cases, the courts awarded 31-33 1/3% of the common fund as attorneys' fees.  (*Id.*)  However, Class Counsel do not provide *any* analysis as to how these cases were similar to the matter now pending.  The Court declines to manufacture arguments on behalf of Class Counsel.

Moreover, it is well-established that that for litigation in the federal court—where Gomez plainly elected to file this matter, invoking not just state claims but also the federal Migrant and Seasonal Agricultural Worker Protection Act —25% of a common fund is the "benchmark award for attorney fees."  *Hanlon*, 150 F.3d at 1029; *see also Vizcaino*, 290 F.3d at 1047.  To this end, Class Counsel's reference to the range of awards in *state court* is misplaced.  However, the amount requested by Class Counsel is equal to the benchmark established by the *federal* courts in this Circuit.

**H.     Lodestar cross-check and market rate**

As noted above, the Court may perform a lodestar cross-check to assist in the determination of whether the fees sought from a common fund are reasonable.  *See Indirect Purchaser Class v. Erwin (In re Optical Disk Drive Prods. Antitrust Litig.)*, 959 F.3d 922, 933 (9th Cir. 2020) ("we have encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable"); *see also In re Apple Device Performance Litig.*, 50 F.4th 769, 786 (9th Cir. 2022) (also encouraging a lodestar cross-check "when utilizing the percentage-of-recovery method").  Here, Class Counsel report a total of 814.8 hours worked on this action, for a total lodestar of $367,356.00.  (Doc. 211-1 at 28; *see also* Doc. 211-5 at 2; Doc. 211-9 at 9, ¶ 15.)

In general, the first step in determining the lodestar is to determine whether the number of hours expended was reasonable.  *Fischer*, 214 F.3d at 1119.  When the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours."  *See Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431, 451 (E.D. Cal. 2013) (citation omitted).  Class Counsel report a total of 814.8 hours worked on this action, including 520.2 hours by the firm of Mallison & Martinez and 294.6 hours by the firm of Martinez Aguilasocho Law.  The Court reviewed the billing records from Class Counsel and finds the time expended on the litigation—which involved challenges to the pleadings, class certification, a motion for decertification, and extensive discovery—was reasonable.[11]

Next, the Court must determine whether the hourly rates are reasonable to calculate the lodestar.  *See Florida*, 915 F.2d at 545 n.3.  The Supreme Court explained attorney fees are to be calculated with "the prevailing market rates in the relevant community."  *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).  For purposes of calculating the lodestar, the law firm of Mallison & Martinez reduced their hourly rates conform with those typically awarded by this Court, which resulted in a total of $188,991.00.  (*See* Doc. 211-1 at 28; *see also* Doc. 211-5 at 2.)  Martinez

---

[11] Class Counsel erroneously included some clerical tasks in the billing records, such as mailing, filing, and calendaring deadlines.  (*See* Docs. 211-5, 211-10.)  Because the reported lodestar exceeds the fees requested by more than $340,000.00, the Court declines to recalculate the lodestar to deduct the minimal clerical entries.

Aguilasocho Law reports a lodestar of $178,685.00. (Doc. 211-1 at 9, ¶ 15.) Although it appears the hourly rates applied by Martinez Aguilasocho Law exceed those typically awarded in this community, the Court declines to recalculate the lodestar for purposes of this cross-check. It is indisputable that the lodestar in this matter vastly exceeds the fees requested by counsel, and the cross-check supports approving the percentage requested from the common fund.

### III.    Amount of Fees to be Awarded

The factors set forth above weigh in favor of granting the fees requested, totaling one quarter of the gross settlement fund. Moreover, the lodestar—which is a presumptively reasonable amount—undoubtedly supports granting the fees requested by Class Counsel, who agreed to receive only a fraction of the fees incurred in this action.[12] The fees requested are fair, adequate, and reasonable as required under Rule 23. Therefore, the request for fees is **GRANTED** in the amount of **$25,000**.

**REQUESTS FOR COSTS**

### I.    Litigation Costs

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (citation omitted). Generally, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54. Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters. *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994). In addition, costs may be awarded under California law to an employee who prevails on a PAGA claim. *See* Cal. Lab. Code § 2699(g).

The Settlement provides that Class Counsel may seek an award of litigation expenses in amount "to be determined by the Court." (Doc. 211-3 at 8, Settlement § III.C.2.) Pursuant to this provision, Class Counsel now request $32,800.00 in costs. (Doc. 211-1 at 28.) The advanced costs identified by Class Counsel total $28,422.14 from the firm of Mallison & Martinez (Doc. 211-6 at 1-2) and $3,457.74 from Martinez Aguilasocho Law (Doc. 211-10 at 13-17), for a total of $32,879.88. The advanced costs includes fees for filing; mediation; legal research; travel for depositions, client

---

[12] Specifically, Class Counsel agreed the firm of Mallison & Martinez shall be awarded $15,000.00 and Martinez Aguilasocho Law shall receive $10,000.00. (*See* Doc. 211-17 at 3.)

meetings, and mediation; and the expert fees.  (Doc. 211-6 at 1-2; Doc. 211-10 at 13-17) Previously, this Court observed that costs "including filing fees, mediator fees, ground transportation, copy charges, computer research, and database expert fees … are routinely reimbursed" in class action cases. *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011); *see also Ontiveros*, 303 F.R.D. at 375 (finding costs including mediation, mileage, court fees, research, and expert fees were "reasonable litigation fees" and approving class counsel's request for costs).  Because the costs requested are reasonable and the type routinely approved in wage-and-hour class action settlements, the request for litigation expenses is **GRANTED** in the amount of **$32,800.00**.

## II.    Costs of Settlement Administration

The parties agreed the Settlement Administrator was responsible for "printing, distributing, and tracking forms for this Settlement, calculating estimated amounts per Class Member, tax reporting, distributing all payments from the Gross Settlement Amount (including conducting skip trace address searches, as necessary), and providing necessary reports and declarations…."  (Doc. 211-3 at 8-9, Settlement § III.C.3.)  Phoenix now expects its administration costs to be $26,800.06, but indicated the company will accept $25,000 for the administration.  (Doc. 202-5 at 2; Doc. 202-1 at 13.)  Gomez now seeks approval of the payment of $25,000 for the Settlement Administrator from the gross settlement fund.  (Doc. 211-1 at 29.)

Based upon the information provided regarding the tasks performed by the Settlement Administrator— and the continuing responsibilities with the calculation of the settlement shares, issuance and mailing of those settlement payments, and any necessary tax reporting on such payments—the Court finds the requested Settlement Administration costs are reasonable.  *See Ramirez v. Merrill Gardens LLC*, 2024 WL 3011142, at *31 (E.D. Cal. June 10, 2024) (approving $30,000 in administration costs for a class of nearly 4,700 individuals at the final approval stage).  Therefore, the requested payment of $**25,000.00** for the Settlement Administrator is **GRANTED**.

## CLASS REPRESENTATIVE PAYMENT

A class representative may "receive a share of class recovery above and beyond her individual claim" with a service payment, also known as an "incentive payment."  *China Agritech, Inc. v. Resh*, 584 U.S. 732, 747 n.7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for

reasonable incentive payments"). However, additional payments for class representatives are *not* to be given routinely. The Ninth Circuit observed: "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Staton*, 327 F.3d at 975 (citations omitted). Further, "'excessive payments to named class members can be an indication that the agreement was reached through fraud or collusion.'" *Id.* (citation omitted).

## I.     **Awarding a Service Payment**

The Ninth Circuit emphasized that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013). In evaluating a request for a service payment, the Court must consider: "'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any financial or reputational risks the plaintiff faced." *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC,* 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton*, 327 F.3d at 977.

Pursuant to the agreement of the parties, Gomez may seek a "Class Representative Payment of up to $5,000" from the gross settlement fund. (Doc. 211-3 at 7, Settlement § III.C.1.) The Settlement explains the enhancement is to be given to Gomez "to compensate her for initiating the Lawsuit, performing work in support of the Lawsuit and undertaking the risk of liability for attorneys' fees and expenses in the event she was unsuccessful in the prosecution of the Lawsuit as well as the risk of retaliation from future employers." (*Id.* at 3, § I.I.) The Court granted preliminary approval of the request "given the flexibility for an award *up to* $5,000," but found the amount "appears excessive in this action." (Doc. 206 at 30, n.9.) Therefore, the Court ordered that "**Plaintiff must provide evidence supporting the requested enhancement**." (*Id.* at 30, emphasis in original.) Gomez now requests a service payment in the amount of $5,000 and provided a declaration in support of the request. (Doc. 211-1 at 30, n.14; *see also* Doc. 211-11.)

### A.     **Time expended**

Gomez reports that she "expended considerable time and effort" on this action, including before

she became a class representative.  (Doc. 211-11 at 3, ¶ 9.)  Gomez did not provide any estimate regarding the total time she spent on this action.  (*See generally* Doc. 211-11.)  The Court declines to speculate as to the total time expended by Gomez on the matter, particularly given the failure to provide such evidence despite the Court's prior order.  Nevertheless, the Court reviewed the billing records of Class Counsel, which include entries for several communications with Gomez concerning discovery, preparing for a deposition, and the deposition itself.[13]  (*See generally* Doc. 211-5 [records from Mallison & Martinez]; Doc. 211-10 [records from Martinez Aguilasocho Law].)  The Court finds this factor supports issuing a service payment.

## B.    Actions taken to benefit the class

Mr. Mallison reports that Gomez "actively participated in the investigation of the issues in this case and the negotiations leading to the settlement of this matter."  (Doc. 211-2 at 19, Mallison Decl. ¶ 50.)  Specifically, Gomez reports that she: (1) spoke with counsel prior to filing the case to discuss her claims; (2) assisted with responding to discovery requests in 2016 and 2018, "which required [her] to review, approve, and verify written responses to over 50 document requests"; (3) "had to search for and gather documents in response to the dozens of categories requested by J. Jacobo"; (4) was deposed; (5) "reviewed the agreement in detail with [the] attorneys" after the settlement terms were presented in writing.  (Doc. 211-11 at 3-4, Gomez Decl. ¶¶ 9-12.)  Notably, Gomez likely would have taken many of these actions even if proceeding only with her individual claims.  On the other hand, by assisting with discovery and reviewing documents, her actions undoubtedly benefitted Class Members.  Therefore, the identified actions support a service payment for Gomez.

## C.    Workplace retaliation

The Court may consider whether the class representative has "reasonable fears of workplace retaliation" in evaluating a request for a service payment.  *Staton*, 327 F.3d at 977.  However, this Court observed that when a class representative was a former employee—as is the case now here—

---

[13] The Court is unable to ascertain the specific amount of time expended on these actions because several billing entries refer to the "client" and it is unclear whether the records refer to Gomez or Orsorio.  However, the Court notes that while Gomez asserts her "actual deposition took an entire day," the billing records from Martinez Aguilasocho Law indicate the deposition took 4.3 hours on March 26, 2018.  (*Compare* Doc. 211-11 at 3, ¶ 11 *with* Doc. 211-10 at 6.)

1    retaliation by the defendant was not possible.  *See Torcia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280

2    (E.D. Cal. 2014).  Indeed, Defendant ceased operations.  (Doc. 211-2 at 13, ¶ 27.)  Because Gomez

3    cannot suffer workplace retaliation from Defendant, this factor does not support a service payment.

4              **D.      Reputational risk**

5              Gomez asserts that she "was concerned about future employers learning of [her] involvement

6    and … [she] risked being branded as a troublemaker."  (Doc. 211-11 at 4, Gomez Decl. ¶ 14.)  Notably,

7    if Gomez elected file her *individual* claims rather than a class action, her name also would have been on

8    the complaint as the plaintiff.  Regardless, any difficulty for Gomez obtaining future employment due

9    to her status as a named plaintiff lacks evidentiary support and is speculative.  The Ninth Circuit

10   observed: "the trial court is not bound to, and should not, accept conclusory statements about 'potential

11   stigma' and 'potential risk,' in the absence of supporting evidence."  *See Wilson v. Telsa, Inc.*, 833 Fed.

12   App'x 59, 62 (9th Cir. 2020) (quoting *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 805

13   (2009)).  Thus, the Ninth Circuit determined a court did not abuse its discretion in reducing a requested

14   class representative payment based on the speculative "risk of reputational injury."  *Id.*  This factor

15   does not support the requested service payment for Gomez.

16             **E.      Financial risk**

17             Gomez observes that she "bore all the risk of being held liable for Defendant's costs in the

18   event of an adverse judgment."  (Doc. 211-1 at 4, Gomez Decl. ¶ 16.)  Courts in the Ninth Circuit have

19   repeatedly acknowledged such a financial risk supports an incentive payment to a class representative.

20   *See, e.g., Vasquez,* 266 F.R.D. at 491 ("Class Representatives undertook the financial risk that, in the

21   event of a judgment in favor of Defendant in this action, they could have been personally responsible

22   for any costs awarded in favor of Defendant"); *Wilson v. Metals USA, Inc.*, 2021 WL 516585, at *9

23   (E.D. Cal. Feb. 11, 2021) (noting the plaintiffs asserted that "by initiating this case, they assumed the

24   risk of a judgment against them and personal liability for an award of costs to defendant in the event of

25   an adverse outcome, and finding the identified financial risk "weighs in favor of granting an incentive

26   award"); *Herrera v. Wells Fargo Bank, N.A.,* 2021 WL 9374975, at *14 (C.D. Cal. Nov. 16, 2021)

27   (evaluating a service payment request and noting the class representatives "faced financial risks should

28   [the defendant] seek to recover the cost of the defense"); *Pierce v. Rosetta Stone, Ltd.*, 2013 WL

5402120, at *7 (N.D. Cal. Sept. 26, 2013) (considering that the class representatives "may have been personally responsible for any costs awarded in favor of Defendant"). Therefore, this factor supports a service payment for Plaintiff.

**II.      Reasonableness of Plaintiff's request**

To determine the amount to be awarded, the Court may consider several factors, such as the time and actions undertaken by the class representative, the fairness of the hourly rate, and how large the incentive payment is compared to the average award class members expect to receive. *See, e.g., In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015); *Ontiveros v. Zamora,* 303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received"); *Smith v. Am. Greetings Corp*., 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) ("courts consider the proportionality between the incentive payment and the range of class members' settlement awards").

Gomez acknowledges the Court preliminarily found the requested payment appears excessive, but "requests the Court reconsider." (Doc. 211-1 at 29, n.14.) Gomez "contends that an enhancement fee up to $5,000.00 enhancement … for her hard work in prosecuting this case is reasonable." (*Id.*, citing *Van Vranken v. Atl. Richfield Co*., 901 F. Supp. 294, 300 (N.D. Cal. 1995); *Glass v. UBS Fin. Servs., Inc.*, 2007 WL 221862 (N.D. Cal. January 26, 2007).) Gomez observes that in *Van Vraken*, the court found an "incentive award of $50,000 to [the] named plaintiff was fair and reasonable," while in *Glass*, the court approved "incentive award[s] of $25,000 for each of the four plaintiffs." (*Id.*) However, Gomez does not provide any argument as to how *Van Vraken* and *Glass* are similar to the matter before the Court. (*See id.*)

The settlement in *Van Vraken*, following a jury trial and an appeal, totaled $76,723,213.26. *Van Vranken*, 901 F. Supp. at 296. The plaintiffs filed the complaint in *Van Vraken* in 1979, and it went to trial in 1992. *Id.* at 295-96. The parties reached the settlement while an appeal was pending in 1994. *Id.* The Court noted that while Van Vraken did not estimate how many hours he spent on the litigation over the course of the 15 years, he "participated in 49 telephone conferences and five meetings with

48

Class Counsel, attended three pre-trial hearings, had his deposition taken twice, and testified at trial." *Id.*, 901 F. Supp. at 300. The court also observed that Van Vraken reported he had "out-of-pocket expenditures for gas, occasional meals, and wear and tear on his car during his travels from Fresno to San Francisco, San Jose, and Los Angeles." *Id.* Based upon these factors, the court found an incentive award to *Van Vraken* in the amount of $50,000 was "just and reasonable under the circumstances." *Id.*

In *Glass*, the parties agreed to a gross settlement fund of $45,000,000. *Glass*, 2007 WL 221862 at *1. The plaintiffs requested "a $25,000 enhancement to each of the four class representatives." *Id.* at *16. The court observed that the appointed class counsel attested each plaintiff "provided a great deal of informal discovery… and a great deal of insight into the policies and practices of UBS, [] and provided additional relevant detail at the final fairness hearing." *Id.* at *17 (citation omitted). The court also noted that the named plaintiffs were "still currently employed in the securities industry, [and were] at risk by putting their names on a complaint against one of the largest brokerage houses in America." *Id.* Therefore, the court granted the request service payments to the named plaintiffs. *Id.*

This matter must be distinguished from both *Van Vraken* and *Glass*, in which settlement funds were exponentially larger than the $100,000 fund in this action. The total of $100,000 in service payments in *Glass* amounted to 0.2% of the settlement fund, and the service payment of $50,000 in *Van Vraken* was 0.06% of the settlement fund. In contrast, Gomez now seeks 5% of the settlement fund. In addition, Van Kraken identified a specific number of conferences and meetings with class counsel over the course of 15 years while the case was pending, was deposed twice, testified at trial, and was required to travel for the litigation. On the other hand, Gomez did not provide any information regarding the number of meetings with counsel, does not assert that she was required to travel extensively, did not testify at trial, and did not identify any out-of-pocket expenses. Consequently, Gomez fails to show her actions were comparable to those of the named plaintiffs in *Van Vraken* and *Glass*, and Gomez misplaced her reliance upon these two cases to support the requested award. As discussed below, the Court finds the requested award is not fair and reasonable in this action.

### A.    Time expended, and actions taken

Plaintiff assisted with discovery in this action, had an unidentified number of conversations with counsel, and sat for a deposition that took 4.3 hours. However, Gomez failed to identify the total time

spent on these actions, or provide even an estimate.  Consequently, the Court is unable to find the time expended and actions taken support the amount requested.  *See, e.g., Tellez v. Ulta Salon, Cosmetics & Fragrance, Inc.,* 2020 WL 619588 *8 (S.D. Cal. Feb. 10, 2020) (declining to award incentive payments in the requested amount of $5,000 to representatives who did not provide an estimate of the time expended on the action).

**B.    Hourly rate of compensation**

Courts have considered the hourly rate of compensation for a class representative.  *See, e.g., Ontiveros*, 303 F.R.D. at 366; *Moss v. USF Reddaway*, 2018 WL 5099291, at *11 (C.D. Cal. Feb. 15, 2018); *Pappas v. Naked Juice Co of Glendora, Inc.*, 2014 WL 12382279, at *14-15 (C.D. Cal. Jan. 2, 2014).  In doing so, the courts declined to issue service awards where the hourly rate for the tasks completed in the action was excessive or unreasonable.  *See, Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15.

Gomez reports that when employed by Defendant, she worked on a piece-rate basis and "routinely worked more than 8 hours per day."  (Doc. 211-11 at 2, ¶ 4.)  She estimated that she "made between $80.00 and $100.00 per day."  (*Id.*)  Based upon this estimate, assuming that Gomez worked an 8-hour day to maximize the hourly rate, she received between $10-12.50 per hour.  At this rate, the requested service payment of $5,000 would compensate Gomez for between 400-500 hours of work.  However, there is no evidence that Gomez expended such a significant amount of time on this litigation.  Consequently, this factor does not support the requested service payment.

**C.    Comparison of the award to those of the Class Members**

The Ninth Circuit indicated the Court may consider the "proportion of the [representative] payment[s] relative to the settlement amount, and the size of each payment."  *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d at 947; *see also Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016).  For example, in *Rankin*, the Court approved a service award of $5,000, where the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day mediation."  *Id.*, 2011 WL 13239039, at *2.  The Court found the amount reasonable, observing it was "reasonably close to the average per class member amount to be received."  *Id.*

The requested reward for Gomez is approximately 1,683.5 times the anticipated average award

of $2.97 for the Class Members.  In addition, the requested service payment is 5.0% of the gross

settlement fund.  These amounts demonstrate the requested payment is unreasonable.  *Compare with In*

*re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015) (awarding $5,000 as a service

payment, which was 0.17% of the gross settlement fund); *Spann,* 211 F. Supp. 3d at 1265 (awarding a

class representative payment of $10,000, which was less than 0.25 percent of the gross settlement).

Given the extreme disparity between the average award and Gomez's requested service payment—as

well as the high percentage of the settlement fund— this factor favors a reduction to the service award.

**III.    Amount Awarded**

Considering the factors set forth above—including the actions taken by Gomez on behalf of the

class, the time expended, benefit received, and financial risk—a service payment is appropriate.

However, the amount requested is excessive, particularly in comparison to the average payment to

Class Members and the amount of the gross settlement fund.  A reduced service payment to Gomez is

appropriate given the lack of evidence regarding the time expended, but in acknowledgement for the

tasks undertaken, including sitting for a deposition and assisting counsel in discovery.

Notably, courts have determined that service payments of $500 for class representatives are

appropriate upon consideration of the tasks undertaken by the named plaintiffs.  *See, e.g., Cipolla v.*

*Team Enters., LLC*, 2024 WL 4591483, at *6 (N.D. Cal. Oct. 28, 2024) (approving service payments of

$500 for three named plaintiff who each "sat for deposition, cooperated in responses to multiple sets of

written discovery, and … [spent] at least 25 hours prosecuting [the] matter"); *see also Taylor v. West*

*Marine Products, Inc.*, 2014 WL 7388780, at *3 (N.D. Cal. Dec. 29, 2014) (indicating upon

preliminary approval that a requested service payment of $5,000 for a named plaintiff who reported that

she "expended time conferring with class counsel, submitted to deposition[], attended the Court's

summary judgment hearing, and attended the settlement conference" would be denied, and "an

incentive payment of $500 … is the most that would be approved"); *Taylor v. West Marine Products,*

*Inc.*, 2015 WL 2452902, at *2 (N.D. Cal. May 21, 2015) (approving the modified payment of $500

upon final approval of the settlement as "reasonable in light of the services rendered").  Similar to the

plaintiffs in *Cipolla* and *Taylor*, Gomez sat for deposition, conferred with counsel, and assisted with

discovery.  Thus, the Court finds that a reduced service payment of $500.00 for Gomez is fair,

reasonable, and adequate as required under Rule 23. Therefore, Gomez's request for a service payment as a class representative is **GRANTED** in the modified amount of **$500.00**.

## **CONCLUSION AND ORDER**

Based upon the foregoing, the Court finds the proposed class settlement is fair, adequate, and reasonable. The factors set forth under Rule 23 and Ninth Circuit precedent weigh in favor of final approval of the settlement agreement. Accordingly, the Court **ORDERS**:

1.  Plaintiff's motion for final approval of the Settlement (Doc. 211) is **GRANTED**

2.  Certification of the Settlement Class is **GRANTED**, and the class is defined as follows:

    > All individuals who have been employed or are currently employed by Defendant J. Jacobo Farm Labor Contractor Inc. as a non-exempt "field worker" or agricultural laborer who worked at any time from September 30, 2011 to November 5, 2019.

3.  Pursuant to their timely and valid "Elections Not to Participate in Settlement," Angelica Levya, Sofia Rafael-Pascual, Bladimir Quiroz-Talavera, Jesus Saldana, Erik Leon, and Shirley L. Paul are **EXCLUDED** from the Settlement Class.

4.  The parties' "Stipulation to Remove Minimum Payment Language from Settlement Agreement" dated September 13, 2024 (Doc. 203) is **APPROVED**, and Section III.E.3 is **STRICKEN** from the Settlement Agreement.

5.  Legal Aid at Work is **APPOINTED** as the cy pres beneficiary.

6.  The request for a class representative service payment for Gomez is **GRANTED** in the modified amount of $**500.00**.

7.  Class Counsel's motion for attorneys' fees is **GRANTED** in the amount of 25 percent of the gross settlement, which totals **$25,000.00** including:

    a.  Payment to the firm of Mallison & Martinez in the amount of $15,000.00; and

    b.  Payment to Martinez Aguilasocho Law, Inc. in the amount of $10,000.00.

8.  Class Counsel's request for litigation costs and expenses is **GRANTED** in the amount of **$32,800.00**.

9.  Payment to the Settlement Administrator in the amount of $25,000 for settlement administration costs is **APPROVED**.

10.    The Settlement Administrator **SHALL** distribute all approved payments, including to Class Members and Class Counsel, within 15 days of receipt of the final installment of the settlement funds.

11.    The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court.

12.    The Clerk of Court is **DIRECTED** to close this action.

13.    The Court retains jurisdiction to consider any further applications arising out of or in connection with the Settlement.

IT IS SO ORDERED.

Dated:   **September 8, 2025**

UNITED STATES DISTRICT JUDGE

53